**OFFICE OF THE CITY ATTORNEY**
Peter S. Holmes, WSBA # 15787
Laura B. Wishik, WSBA #16682
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti *(pending Pro Hac Vice)*
(CA Bar No. 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez *(pending Pro Hac Vice)*
(CA Bar No. 171485)
John P. Fiske *(pending Pro Hac Vice)*
(CA Bar No. 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 237-3490

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, a municipal corporation located in the County of King, State of Washington, <br><br>                Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100, <br><br>                Defendants. | CASE NO. _____ <br><br> **PLAINTIFF'S ORIGINAL COMPLAINT** |

*///*

*///*

PLAINTIFF'S ORIGINAL COMPLAINT - 1

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

I.      **INTRODUCTION**

1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.      The extent of environmental PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.      PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events.

5.      As a result, PCBs contaminate City streets, the City's drainage systems, stormwater, and water bodies within the City of Seattle.

6.      The Duwamish River runs through the heart of the City of Seattle.  At the mouth of the Duwamish is Harbor Island, bounded on one side by the East Waterway and on the other side by the West Waterway.  Beginning at the upstream end of Harbor Island and continuing for about six miles upstream is a section known as the Lower Duwamish.

7.      PCBs were detected in seventy-five percent of more than 1,000 samples collected from catch basins and drainage lines in the Lower Duwamish drainage area.   In the East Waterway

1  drainage areas, PCBs were detected in eighty-two percent of samples collected with "in-line grabs" of
2  sediment in drainage pipes and PCBs were detected in seventy-three percent of samples collected
3  from catch basins in street right-of-ways.

4       8.       The City has incurred costs to identify and reduce sources of PCBs entering its
5  stormwater and wastewater systems. The Washington Department of Ecology is requiring the City to
6  increase its efforts to reduce PCBs entering its drainage systems.  The City will continue to incur costs
7  to do so.

8       9.       Under a Consent Decree jointly issued by EPA and the Washington Department of
9  Ecology, the City will be constructing a stormwater treatment plant adjacent to the Lower Duwamish
10  River.  The plant is designed to remove PCBs from stormwater.  The cost for the plant is currently
11  estimated to be nearly $27 Million.  The plant will treat stormwater from 1.25 percent of the 20,000
12  acres that drain to the Lower Duwamish.

13       10.       The Lower Duwamish is listed on the National Priorities List as a Superfund Site.  The
14  City is subject to an administrative order issued jointly by the United States Environmental Protection
15  Agency and the Washington Department of Ecology that required extensive investigation of
16  contamination in the Lower Duwamish and preparation of a Feasibility Study identifying remedial
17  options.  The City is continuing to incur costs to implement the order and will incur costs to implement
18  the remedy selected by EPA.

19       11.       In November 2014, EPA issued its Record of Decision for the Lower Duwamish.  EPA
20  selected a remedy that EPA estimates will cost $342 million.

21       12.       The City also incurred millions of dollars investigating and remediating four specific
22  areas, called Early Action Areas, within the Lower Duwamish Site that were contaminated with PCBs,
23  including property that the City owns in Slip 4 and City streets adjacent to Terminal 117.

24       13.       The other two Early Action Areas were adjacent to outfalls where discharges from the
25  City's drainage system were contaminated with PCBs through no fault of the City.

26       14.       The East Waterway also is listed on the National Priorities List as a Superfund Site.
27  PCBs are a primary contaminant of concern.  Some of the PCB contamination got into sediments in
28  the East Waterway through stormwater and combined sewer overflows.

GOMEZ TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

15.     The City is paying a substantial portion of the costs to investigate contamination in the East Waterway and identify remedial options.  The current draft of the Feasibility Study identifies remedial options that range in cost from $267 million to $443 million.  The City will continue incurring costs to complete the Feasibility Study and to implement the remedy that EPA selects.

Plaintiff CITY OF SEATTLE hereby alleges, upon information and belief, as follows:

**II.    PARTIES**

16.     The CITY OF SEATTLE ("Seattle," "City," or "Plaintiff") is a municipal corporation, duly organized and existing by virtue of the laws of the State of Washington.

17.     The City brings this suit pursuant to RCW 7.48.010, et al. and any other applicable codes or forms of relief available for monetary damages and removal of the public nuisance caused by Monsanto's PCBs.

18.     Seattle has three types of drainage systems:  a municipal separated stormwater system (MS4), a partially separated system, and a combined sewer system that collects stormwater and sewage.  The City's combined system is connected to trunk lines operated by King County that go to wastewater treatment plants.  Heavy rains cause the combined system to overflow through Combined Sewer Outfalls ("CSOs").

19.     In order to discharge stormwater from the MS4, Seattle is subject to a Phase I Municipal Stormwater Permit issued by the State of Washington, Department of Ecology, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

20.     Seattle's other systems are subject to the National Pollutant Discharge Elimination System (NPDES) Waste Discharge Permit (WDR) WA0031682.

21.     The City currently has one CSO outfall in the Lower Duwamish. The City's MS4 system discharges stormwater into the Lower Duwamish through 17 outfalls that the City owns and 12 outfalls owned by others.  The City also has CSO and stormwater outfalls in the East Waterway.

22.     The City of Seattle has spent and will continue to spend significant money to reduce PCBs in its discharges.  Under a Consent Decree regarding the City's combined sewer overflows (CSOs), the U.S. Environmental Protection Agency ("EPA") has approved the City's plan to build a

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

1   stormwater treatment plant adjacent to the Lower Duwamish.  The plant will treat stormwater for

2   PCBs.  The cost for treating stormwater from this one drainage basin is currently estimated to be

3   $26,899,672.  This drainage basin contains just 1.25 percent of the twenty thousand acres that drain to

4   the Lower Duwamish.

5           23.     In November 2014, EPA issued its Record of Decision selecting a remedy for the

6   Lower Duwamish.  EPA identified PCBs in the Lower Duwamish as a significant threat to human

7   health and the environment.

8           24.     Fish and shellfish that reside in the Lower Duwamish are contaminated with PCBs at

9   levels that make them unfit for human consumption.  Despite warnings, people continue to eat them.

10  Many residents of the City of Seattle, particularly people who are recent immigrants or low income,

11  depend on fish and shellfish from the Lower Duwamish as a significant food source.

12          25.     Puget Sound is a Category 5 "impaired" water body for PCBs through at least one

13  medium: wildlife tissue. PCBs are found in the tissue of harbor seal pups in South Central Puget

14  Sound.

15          26.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its

16  principal place of business in St. Louis, Missouri.

17          27.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and

18  principal place of business in St. Louis, Missouri.

19          28.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

20  to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack,

21  New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.  The City is not asserting

22  claims against Pharmacia for costs of investigating and remediating contamination in the Lower

23  Duwamish.  In all other respects the City's claims apply to Pharmacia.

24          29.     The original Monsanto Company ("Old Monsanto") operated an agricultural products

25  business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto

26  began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late

27  1970s.

28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 5

30.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

31.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

32.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[2]

33.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

34.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

---

[1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed January 20, 2016).

[2] *See id*.

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed January 20, 2016).

III.    JURISDICTION AND VENUE

1

2       35.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity

3  exists between Plaintiff and Defendants.  The Plaintiff is located in Washington, but no Defendant is a

4  citizen of Washington.  Monsanto is a Delaware corporation with its principal place of business in St.

5  Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis,

6  Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in

7  Peapack, New Jersey.

8       36.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)

9  because a substantial part of the property that is the subject of the action is situated in this judicial

10 district.

11 IV.    FACTUAL ALLEGATIONS

12
            A.      PCBs are Toxic Chemicals that Cause Environmental Contamination.
13
        37.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms
14
   attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single,
15
   unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]
16
        38.     PCBs were generally manufactured as mixtures of congeners.  From approximately
17
   1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally
18
   produced PCBs for commercial use.[5]  The most common trade name for PCBs in the United States was
19
   "Aroclor," which was trademarked by Old Monsanto.
20
        39.     Monsanto's commercially-produced PCBs were used in a wide range of industrial
21
   applications in the United States including electrical equipment such as transformers, motor start
22
   capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such
23

24 _____

   [4] Table of PCB Congeners, available at
25 http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

26 [5] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole
   manufacturer of PCB's is concerned . . . .");  121 Cong. Record 33879, 94th Congress, (October 23,
27 1975) ("The sole U.S. producer, Monsanto Co. . . . .").  See also MONS 058730-058752 at 058733
   (identifying other producers as "all ex-USA.").

28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 7                    OFFICE OF THE CITY ATTORNEY
                                                          701 Fifth Avenue, Suite 2050
                                                          Seattle, Washington 98104-7097
                                                          Telephone: (206) 684-8200

as caulks, paints, and sealants.

40.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

41.     PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

42.     PCBs present serious risks to the health of humans, wildlife, and the environment.

43.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

44.     EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [6] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

45.     The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains:  "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and

---

[6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed January 20, 2016).

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

cancer of the breast. ... PCBs are carcinogenic to humans ... ."[7]

46.     In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

47.     PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

48.     Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

49.     Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

50.     PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

51.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

---

[7] International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed January 20, 2016).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 9                    OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

52.     Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[8]

53.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[9]

**B.      Monsanto Has Long Known of PCBs' Toxicity.**

54.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.

55.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

56.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will

---

[8] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 381, available at www.atsdr.cdc.gov (last accessed January 20, 2016).

[9] See EPA, Understanding PCB Risks, available at http://www.epa.gov/ge-housatonic/understanding-pcb-risks-ge-pittsfieldhousatonic-river-site#WildlifeHumanHealthEffects (last accessed January 20, 2016).

[10] MONS 061332.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

57.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

58.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[13]

59.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

60.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are

---

[11] MONS 095196-7.

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number).

[13] MONS 095640.

[14] *See* JDGFOX00000037-63.

[15] *Id*. at JDGFOX00000039.

[16] *Id*. at JDGFOX00000037.

GOMEZ TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

1  exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly,

2  although there are variations depending on species of animals, the PCB's are about the same as DDT in

3  mammals."[17]

4  **C.   Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing**

5  **Harm to Animals and Fish.**

6  61.    At the same time, Monsanto became aware that PCBs were causing widespread

7  contamination of the environment, far beyond the areas of its use.

8  62.    Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen,

9  who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[18]  The report noted

10  that PCBs were also detected in the air over London and Hamburg and found in seals caught off the

11  coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the

12  world."[19]

13  63.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons

14  (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[20]

15  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine

16  falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon

17  populations in the United States.

18  64.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum

19  discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-

20  water; therefore, an uncontrollable pollutant . . .  causing extinction of peregrine falcon … [and]

21  endangering man himself."[21]  Richard explained that Monsanto could take steps to reduce PCB

22  _____

23  [17] MONS 098480

24  [18] New Scientist (December 15, 1966), MONSFOX00003427.

25  [19] *Id.*

26  [20] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).

27  [21] MONS 096509-096511.

28

PLAINTIFF'S ORIGINAL COMPLAINT - 12

1  releases from its own plants but cautioned, "It will be still more difficult to control other end uses such

2  as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is

3  greater and the disposal problem becomes complex."[22]

4      65.      On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

5  titled "Defense of Aroclor."[23]  He acknowledged the role of Aroclor in water pollution:  "Aroclor

6  product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a

7  long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida

8  causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds;

9  and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:

10  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation

11  rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower

12  chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting

13  immediately."[24]

14      66.      The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The

15  committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB

16  "may be a global contaminant."[25]  The meeting minutes acknowledge that PCB has been found in fish,

17  oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine

18  River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the

19  committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one

20  application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we

21  can assume that nearly all of this Aroclor winds up in the environment."[26]

22

23  _____

    [22] *Id*.

24  [23] DSW 014256-014263.

25  [24] *Id*.

26  [25] MONS 030483-030486.

27  [26] *Id*.at 030485.

28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 13

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

67.     A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  <u>There are, however a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[27]

68.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

69.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[28]

70.     Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

    1.    Protect continues sales and profits of Aroclors;
    2.    Permit continued development of new uses and sales, and

---

[27] DSW 014612-014624, at 014615.

[28] MONS 058737.

3.    Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[29]

71.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." [30]

72.    Even worse, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants.  Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[31]

73.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

74.    Growing awareness of the ubiquitous nature of PCBs led the Unites States to conduct an investigation of health and environmental effects and contamination of food and other products.  An

---

[29] Id.

[30] MONS 100123-100124.

[31] See Testimony of William Papageorge, Public Hearing to Review and Receive Public Comment Upon Proposed Administrative Rules Relating to the Discharge of Polychlorinated Biphenyls (PCB's) Into the Waters of the State, Before the Department of Natural Resources (August 28-29, 1975).

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[32]

75.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[33]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states;  in fish and birds;  in lakes and rivers;  in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico;  sewage treatment facilities;  in a variety of foods including milk, poultry, eggs, fish, meat, and grains;  and in human tissues, blood, hair, and milk.[34]

76.     At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats,  furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;  insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and coatings for chemical plants, boats, and highway marking. [35]

---

[32] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).

[33] *Id*. at 1.

[34] *Id*., *passim*.

[35] The Aroclor Compounds (hand dated May 1960), 0509822- 66.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

77.     A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [36]

78.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

79.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[37]

### D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.

80.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.

81.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[38]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[39]  A similar letter to the Regional Water Quality

---

[36] Plasticizer Patter (February 1961), 0627503-21.

[37] *See* Press release (July 16, 1970), MCL000647-50.

[38] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969).

[39] *Id*.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

1  Control Board explained that PCBs are associated with "no special health problems" and "no problems

2  associated with the environment."[40]

3  82.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the

4  National Air Pollution Control Administration, who promised to relay to Congress the message that

5  Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread

6  fashion."[41]

7  83.    Monsanto delivered the same message to the New Jersey Department of Conservation

8  in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not

9  believe the PCBs to be seriously toxic."[42]  The letter then reiterates Monsanto's position regarding

10  environmental contamination:  "We are unable at this time to conceive of how the PCBs can become

11  wide spread in the environment. It is certain that no applications to our knowledge have been made

12  where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides

13  have been."[43]

14

15  **E. The Duwamish River is "Impaired" Due to PCB Contamination**

16  84.    As described above, PCBs enter the City's stormwater and wastewater systems through

17  no fault of the City of Seattle.  The City then lawfully discharges wastewater and stormwater into the

18  Duwamish River in accordance with its NDPES permits.

19  85.    Under the Clean Water Act, Washington State has designated uses for the Lower

20  Duwamish and the East Waterway that include commercial, recreation, navigation, boating, fishing,

21  shellfish harvesting, and wildlife habitat.  It is also part of the Muckleshoot Tribe's commercial,

22  ceremonial, and subsistence fishing area.[44]

23  _____

[40] Letter from Monsanto to State of California Resources Agency (March 27, 1969).

24

25  [41] Monsanto Memorandum to W.R. Richard (May 26, 1969).

26  [42] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969).

27  [43] *Id.*

28  [44] U.S. Environmental Protection Agency, *Record of Decision — Lower Duwamish Waterway Superfund Site.*  WA00002329803 (November 2014) at 34, available at

PLAINTIFF'S ORIGINAL COMPLAINT - 18

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

86.     The Lower Duwamish and the East Waterway are listed on the Washington State Water Quality Assessment list of impaired water bodies, in accordance with section 303(d) of the Clean Water Act, due to PCBs in sediments.[45]

87.     PCBs are the most widespread contaminant in Lower Duwamish sediment, found in 94% of the surface sediment locations sampled for PCBs and 48% of the subsurface sediment samples.[46]

88.     The Washington State Department of Health advises "no consumption of resident fish and shellfish from the LDW,"[47] due to elevated PCB levels.

89.     The City has participated in cleanups of PCB-contaminated sediment from the Lower Duwamish Waterway.[48]

90.     PCB was also detected in almost all samples of fish, shellfish, and benthic invertebrate tissues.[49] EPA identified PCBs as presenting a human health risk for individuals engaged in netfishing, clamming, and beach play.[50]

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

91.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

---

http://www.epa.gov/region10/pdf/sites/ldw/ROD_final_11-21-2014.pdf (last accessed January 20, 2016).

[45] *Id. at 14.*

[46] *Id*. at 22, 28.

[47] *Id*. at 34.

[48]*Id*. at 5.

[49] *Id*. at 28.

[50] *Id*. at 50-53.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

92.     The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

93.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Duwamish River.

94.     Monsanto intentionally manufactured, marketed, and sold PCBs with the knowledge that they were causing global environmental contamination.

95.     Monsanto knew that PCBs would likely end up in stormwater systems, waterways, water bodies, sediments, fish and animal tissues.

96.     Monsanto's conduct and the presence of PCBs annoys, injures, and endangers the comfort, repose, health, and safety of others.

97.     Monsanto's conduct and the presence of PCBs interferes with and obstructs the public's free use and comfortable enjoyment of the Duwamish River for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

98.     The presence of PCBs also interferes with the free use of Duwamish River for a healthy ecological environment.

99.     Monsanto's conduct and the presence of PCBs in the Duwamish River is injurious to human, animal, and environmental health.

100.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and marine habitats.

101.     The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

102.     The rights, interests, and inconvenience to the City of Seattle and general public far outweighs the rights, interests, and inconvenience to Monsanto, which profited heavily from the manufacture of PCBs and which can no longer produce PCBs.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 20

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

103.     Monsanto's conduct caused and continues to cause harm to Seattle.

104.     The City of Seattle suffers damage from Monsanto's PCBs.  The City incurs costs to remove PCBs that have invaded its drainage systems and to prevent additional PCBs from entering its systems.  Many of the City's streets are contaminated with PCBs that get into the City's drainage systems. The City of Seattle suffers injuries that are different from those suffered by the public at large.

105.     Seattle has already incurred costs associated with testing and monitoring for PCBs, reducing PCBs in stormwater, and removing PCBs from the Lower Duwamish Waterway.  The Washington Department of Ecology is requiring the City to increase its efforts to identify and reduce sources of PCBs to its drainage systems.  Under the EPA/Ecology Consent Decree, Seattle will incur nearly $27 Million to construct a stormwater treatment plant to reduce PCBs in stormwater discharges from one drainage basin adjacent to the Lower Duwamish.

106.     The City is incurring and will continue to incur costs to investigate and remediate PCB contamination in the East Waterway.

107.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing and would cause the type of contamination now found in the Duwamish River.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats and would endanger birds and animals.  In addition, Monsanto knew PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion of fish and/or dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters, playing on contaminated beaches, and by eating fish and shellfish from contaminated areas.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any contaminated water body.  Monsanto had a duty to cease manufacturing, distributing, selling and promoting PCBs and failed to do so.  Monsanto also had a duty to warn about the dangers of PCBs and failed to do so.

108.     As a direct and proximate result of Monsanto's creation of a public nuisance, Seattle has suffered, and continues to suffer, monetary damages to be proven at trial.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

## SECOND CAUSE OF ACTION

### PRODUCTS LIABILITY- DEFECTIVE DESIGN

109.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

110.     The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

111.     Monsanto's PCBs were not reasonably safe as designed at the time the PCBs left Monsanto's control.

112.     PCBs' toxicity and inability to be contained rendered them unreasonably dangerous at all times.

113.     Monsanto's PCBs were unsafe as designed as demonstrated by the United State Congress banning the production and sale of PCBs pursuant to the Toxic Substances Control Act in 1979.

114.     Due to their toxicity and inability to be contained, Monsanto knew its PCBs were not safe at the time the product was manufactured because it was certain that the product would become a global contaminant and cause toxic contamination of waterways and wildlife, such as Seattle's stormwater and the fish in the Duwamish River, due to the nature of PCBs.

115.     Monsanto knew its PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating global contamination.

116.     Monsanto manufactured, distributed, sold, and promoted PCBs despite such knowledge in order to maximize its profits despite the known harm.

117.     Monsanto's PCBs caused and continue to cause injury to the City of Seattle.

118.     The City of Seattle has suffered and will continue to suffer damages.

## THIRD CAUSE OF ACTION

### PRODUCTS LIABILITY- FAILURE TO WARN

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

119.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

120.    The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

121.    Monsanto's PCBs were not reasonably safe because they lacked adequate warnings at the time the PCBs left Monsanto's control.

122.    At the time Monsanto manufactured, distributed, sold, and promoted its PCBs, Monsanto knew it was a certainty that PCBs would become a global contaminate and contaminate waterways and wildlife such as Seattle's stormwater and fish in the Duwamish River.

123.    Despite Monsanto's knowledge, Monsanto failed to provide adequate warnings that its PCBs would become a global contaminant and contaminate waterways and wildlife, such as Seattle's stormwater and fish in the Duwamish River.

124.    Monsanto could have warned of this certainty but intentionally concealed the certainty of global contamination in order to maximize profits.

125.    Monsanto learned and concealed the dangers of PCBs after it manufactured, distributed, promoted, and sold PCBs.

126.    Without adequate warnings or instructions, Monsanto's PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person.

127.    Monsanto knowingly failed to issue warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

128.    Monsanto's PCBs caused and continue to cause injury to the City of Seattle.

129.    The City of Seattle has suffered and will continue to suffer damages.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

130.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 23

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

131.    The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

132.    Monsanto failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

133.    Monsanto failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

134.    Monsanto failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PCBs in mass quantities and to the extent that Monsanto manufactured them.

135.    Monsanto was grossly negligent because it failed to exercise even slight care.

136.    Monsanto's negligence caused and continues to cause injury to the City of Seattle.

137.    The City of Seattle has suffered and will continue to suffer damages.

## FIFTH CAUSE OF ACTION

### EQUITABLE INDEMNITY

138.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count. The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

139.    The City of Seattle is subject to an administrative order issued jointly by EPA and the Washington Department of Ecology that required preparation of a Remedial Investigation and a Feasibility Study for the Lower Duwamish.  The City is continuing to incur costs to implement further requirements under the order.  The City will incur costs to design and implement the remedy.

140.    In addition, Seattle has incurred cleanup costs for removing PCB-laden sediments from four Early Action Areas in the Lower Duwamish.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 24

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

141.     The Washington Department of Ecology is requiring Seattle to increase its efforts to identify and reduce sources of PCBs to its drainage systems.

142.     Pursuant to the joint EPA/Ecology Consent Decree, Seattle will be constructing a stormwater treatment plant to remove PCBs in stormwater from one drainage basin adjacent to the Duwamish, at an estimated cost of almost $27 Million.

143.     Seattle is paying a substantial portion of costs to investigate contamination in the East Waterway and will continue paying costs to implement the remedy that EPA selects.

144.     Monsanto is responsible for the PCB contamination that Seattle must address pursuant to these regulatory requirements.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof;

2. Award of the present and future costs to abate the ongoing public nuisance;

3. Declaratory judgment requiring Monsanto to pay for abatement of the ongoing nuisance;

4. Litigation costs and attorney's fees as provided by law;

5. Pre-judgment and post-judgment interest;

6. Any other and further relief as the Court deems just, proper, and equitable.

Dated:     January 25, 2016                    Respectfully submitted,

PETER S. HOLMES
Seattle City Attorney


By: s/Peter S. Holmes
By: s/Laura B. Wishik
   Peter S. Holmes, WSBA # 15787
   Laura B. Wishik, WSBA #16682
**OFFICE OF THE CITY ATTORNEY**
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200
Email: Laura.Wishik@seattle.gov

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
Carla Burke *(pending Pro Hac Vice)*
Celeste Evangelisti *(pending Pro Hac Vice)*

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605
Email: SSummy@baronbudd.com
        cburkepickrel@baronbudd.com
        cevangelisti@baronbudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez *(pending Pro Hac Vice)*
John P. Fiske *(pending Pro Hac Vice)*
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 237-3490
Email:  john@gomeztrialattorneys.com
        jfiske@gomeztrialattorneys.com

Attorneys for Plaintiff

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 26

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff demands a jury trial.

3

4   Dated:  January 25, 2016                    PETER S. HOLMES
                                               Seattle City Attorney
5

6                                              By: s/Peter S. Holmes
                                               By: s/Laura B. Wishik
7                                                 Peter S. Holmes, WSBA # 15787
                                                  Laura B. Wishik, WSBA #16682
8                                              **OFFICE OF THE CITY ATTORNEY**
                                               701 Fifth Avenue, Suite 2050
9                                              Seattle, Washington 98104-7097
                                               Telephone: (206) 684-8200
10                                             Email: Laura.Wishik@seattle.gov

11                                             **BARON & BUDD, P.C.**
                                               Scott Summy *(pending Pro Hac Vice)*
12                                             Carla Burke *(pending Pro Hac Vice)*
                                               Celeste Evangelisti *(pending Pro Hac Vice)*
13                                             3102 Oak Lawn Avenue, Suite 1100
                                               Dallas, Texas 75219-4281
14                                             Telephone: (214) 521-3605
                                               Email: SSummy@baronbudd.com
15                                                     cburkepickrel@baronbudd.com
                                                       cevangelisti@baronbudd.com
16
                                               **GOMEZ TRIAL ATTORNEYS**
17                                             John H. Gomez *(pending Pro Hac Vice)*
                                               John P. Fiske *(pending Pro Hac Vice)*
18                                             655 West Broadway, Suite 1700
                                               San Diego, CA 92101
19                                             Telephone: (619) 237-3490
                                               Email:  john@gomeztrialattorneys.com
20                                                     jfiske@gomeztrialattorneys.com

21                                             Attorneys for Plaintiff

22

23

24

25

26

27

28

GOMEZ
TRIAL ATTORNEYS