Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

CITY OF SEATTLE, a municipal corporation located in the County of King, State of Washington,

    Plaintiff,

v.

MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100,

    Defendants.

Case No.:  2:16-cv-00107-RSL

**DECLARATION OF LAURA WISHIK IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

NOTE ON MOTION CALENDAR: January 17, 2020

Complaint Filed:   January 25, 2016
Trial Date:       September 14, 2020

I, Laura Wishik, declare as follows:

    1.  I am an Assistant City Attorney for the City of Seattle and the lead attorney assigned to the Duwamish Allocation.  I make this declaration based on personal knowledge.

    2.      Attached to this declaration are true and correct copies of the following documents:

Exhibit A: Pharmacia's Requests for Production of Documents to Plaintiff, Set two; pages 1-2 and 6.;

Exhibit B: Lower Duwamish Allocation Agreement;

Exhibit C: Allocator Decision No. 14;

Exhibit D: Email from plaintiff's attorney Jason Julius to defense counsel.

DECLARATION ISO PLAINTIFF'S MOTION FOR
PROTECTIVE ORDER (2:16-cv-00107-RSL) – Page 1

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
 (206) 684-8200

3.      The Duwamish Allocation is a voluntary, confidential alternative dispute resolution process.  It began in 2014 and is ongoing.  Forty-four parties are participating in it.  The goal is to reach settlements of the parties' respective shares of past and future costs for investigation and remediation of contamination in the Lower Duwamish CERCLA Site.

4.      The Allocation is governed by an agreement (the "Allocation MOA") attached to this declaration as Exhibit B.

5.      The Allocation MOA is not privileged because the Allocation parties provided it to EPA and to parties that were invited but declined to participation in the Allocation.  It also was part of King County's litigation against its insurers.

6.      The City of Seattle has already produced to Defendants tens of thousands of documents that the City provided to the Allocation and that exist outside of the Allocation, such as the City's responses to EPA's requests for information under CERCLA Section 104(e), sampling data from the City's stormwater system and from City facilities, information on City facilities and operations, deposition transcripts from prior litigation, affidavits and declarations by City witnesses in prior litigation, and environmental reports on contaminated sites in the Duwamish drainage area.

7.      The City objected and refused to produce documents the City developed solely for the Allocation, because they are Mediation Privileged.  These include: the City's responses to an extensive questionnaire from the Allocator regarding each of the City's facilities; the City's responses to further questions by the Allocator and/or by other Allocation Parties; correspondence between the City and the Allocator and/or other Allocation Parties; the City's briefs on legal issues presented to the Allocator; declarations by City staff regarding Allocation issues; Position Papers by the City addressing the factual, legal and technical bases for its recommendations to the Allocator; and reports developed by City experts for the Allocation.

8.      The City has not disclosed mediation communications or made representations about them which prejudice the Defendants.

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1        9.     The City notified defense counsel that the City objects to their use of the City's

2  mediation communications in this case.  That objection is documented in Exhibit D.  Defense counsel

3  did not deny that they are using the City's mediation communications in this case.

4        I make this declaration under penalty of perjury under the laws of the State of Washington.

5               January 3, 2020, at Seattle, Washington.

6

7

8                              _____

                                Laura B. Wishik

9                                Director, Environmental Protection Section

10                              Seattle City Attorney's Office

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

# Exhibit A

Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CITY OF SEATTLE, a municipal corporation, located in the County of King, State of Washington,<br><br>        Plaintiff,<br><br>    v.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100,<br><br>        Defendants. | CASE NO. 2:16-CV-00107 RSL<br><br>**DEFENDANT PHARMACIA LLC'S REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF CITY OF SEATTLE, SET TWO** |

PROPOUNDING PARTY:      Defendant Pharmacia LLC

RESPONDING PARTY:       Plaintiff City of Seattle

SET NO. :               Two

      Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Pharmacia LLC requests that Plaintiff City of Seattle respond separately and in writing to each of the following requests and produce and permit the inspection and copying of each of the documents and things described below that is within the possession, custody, or control of the City of Seattle. The production of documents and things shall take place thirty (30) days after service of these requests, at the offices of Schwabe Williamson & Wyatt, US Bank Centre, 1420 Fifth Ave., Suite 3400, Seattle, WA 98101.

## **DEFINITIONS**

      The following definitions apply to each of the following requests for production and shall

be deemed incorporated therein:

1.     "ALLOCATION PROCEEDING" shall mean and refer to the alternative dispute resolution process entered into by YOU and other parties pursuant to the Alternative Dispute Resolution Memorandum of Agreement signed by YOU on April 7, 2014.

2.     "COMMUNICATIONS" shall mean and refer to the exchange of information by any means, including, without limitation, telephone, telecopy, facsimile, e-mail, or other electronic medium, letter, memorandum, notes or other writing method, meeting, discussion, conversation, or other form of verbal expression.

3.     "COMPLAINT" shall mean and refer to the First Amended Complaint YOU filed on May 4, 2016.

4.     "CONCERNING" means relating to, referring to, describing, evidencing, comprising, constituting, supporting, or tending to undercut.

5.     "CONVEYANCE SYSTEM" shall mean and refer to anything that YOU currently own or operate or historically owned or operated, currently manage or historically managed, or otherwise use that currently or historically collects, transports, and/or discharges storm-water, wastewater, or other process waters to the DUWAMISH RIVER, including, but not limited to, the municipal separated storm-water system ("MS4"), a partially separated system, and a combined sewer system and the Combined Sewer Outfalls as discussed in paragraph 18 of YOUR COMPLAINT.

6.     "DOCUMENT(S)" is to be construed broadly and is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a).

7.     "DOCUMENT(S)" includes all written or recorded materials of any nature whatsoever, and further encompasses all things and matters included, defined, or listed in the Federal Rules of Civil Procedure and/or Federal Rule of Evidence 1001. "DOCUMENT(S)" also includes, but is not limited to, all originals, non-identical copies and drafts, however produced or reproduced, whether sent, received or neither, of any of the following items: account statements, agreements, analyses, appointment books, bills, bills of material, books, cablegrams, calendars, cards, charts, checks, computer data, computer disks, computer hard copy, computer printouts,

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS CONCERNING any ordinances, regulations, resolutions, policies, proposals, or directives to give preferential treatment to the procurement of products and/or products in packaging that do not contain PCBs, an example of which is the ordinance attached as Exhibit A.

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS CONCERNING any process, inventory, evaluation, or plan to identify buildings, roads, runways, bridges, or other structures owned by YOU that were constructed from and/or maintained with PCB-CONTAINING PRODUCTS including but not limited to caulks, paints, inks, dyes, asphalt tack, sealants and PVC pipes (e.g. ASTM 3034-08, Diamond PVC).

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS CONCERNING or identifying any buildings, roads, runways, bridges, or other structures owned by YOU that were constructed with and/or repaired or maintained with PCB-CONTAINING PRODUCTS including but not limited to caulks, paints, inks, dyes, asphalt tack, sealants and PVC pipes (e.g. ASTM 3034-08, Diamond PVC).

**REQUEST FOR PRODUCTION NO. 39:**

All DOCUMENTS produced, served, filed, or otherwise provided by YOU in the ALLOCATION PROCEEDING, including but not limited to YOUR disclosure questionnaire responses, Section 104(e) responses, position papers, affidavits or declarations, deposition testimony, expert reports, and rebuttal reports.

**REQUEST FOR PRODUCTION NO. 40:**

All DOCUMENTS produced, served, filed, or otherwise provided to YOU by the parties participating in the ALLOCATION PROCEEDING CONCERNING the City of Seattle, including but not limited to, disclosure questionnaire responses, position papers, affidavits or declarations, deposition testimony, expert reports, and rebuttal reports.

**REQUEST FOR PRODUCTION NO. 41:**

All DOCUMENTS CONCERNING any litigation CONCERNING the contamination of

# Exhibit B

## ALTERNATIVE DISPUTE RESOLUTION MEMORANDUM OF AGREEMENT

THIS ALTERNATIVE DISPUTE RESOLUTION MEMORANDUM OF AGREEMENT ("MOA") is made and entered into by and among the parties that sign the MOA ("Participating Parties"). This MOA shall take effect once it has been signed by at least twenty-five (25) Participating Parties.

### RECITALS

WHEREAS, the United States Environmental Protection Agency ("EPA"), pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, ("CERCLA"), has required the completion of a Remedial Investigation/Feasibility Study ("RI/FS") for the Lower Duwamish Waterway Site, CERCLIS ID No. WA0002329803 (the "Site");

WHEREAS, the City of Seattle, the Port of Seattle, King County, and The Boeing Company (hereafter, the "LDWG Members") have completed an RI/FS for the Site;

WHEREAS, EPA will issue a Record of Decision ("ROD") detailing the remedial action to be required for the Site, which the Participating Parties anticipate will include only actions to address contamination within the Lower Duwamish Waterway and not actions to address contamination in upland areas or the control of current upland sources of contamination to the Waterway;

WHEREAS, the Participating Parties wish to allocate one hundred percent (100%) of (1) costs incurred to implement the Administrative Order on Consent for Remedial Investigation and Feasibility Study ("AOC"); (2) costs incurred to perform work required by EPA or the Washington Department of Ecology ("Ecology") between completion of the Feasibility Study and issuance of the Consent Decree for the Site; and (3) costs to perform actions required under the Site ROD or Consent Decree, provided that the Allocator determines that such costs would be recoverable under CERCLA or the Model Toxics Control Act ("MTCA"), and subject to certain exceptions as further described in this MOA;

WHEREAS, the Participating Parties also wish to provide the option for parties involved with Early Action Areas ("EAAs") to avoid litigation by engaging in a parallel process to allocate past and future costs that would be recoverable under CERCLA or MTCA related to the remediation of EAAs, unless any Participating Party involved at individual EAAs does not wish to do so pursuant to this MOA; and

WHEREAS, the Participating Parties are committed to a fair and reasonable Allocation Process;

NOW, THEREFORE, in consideration of the terms of this MOA, the Participating Parties mutually agree and covenant as follows:

## AGREEMENT

### 1. Definitions.

The definitions below will be used for the purposes of this MOA.

1.1 "Absent Parties" are PRPs that were not invited to participate in this allocation and did not become Participating Parties, but that have the capacity to be sued.

1.2 "All PRP Allocation" means an allocation in which the Allocator assigns one hundred percent (100%) of the Allocation Shares to Participating Parties, Absent Parties, Defunct Parties, and Recalcitrant Parties.

1.3 "Capacity to be sued" means having the legal status that is necessary to be sued.

1.4 "Claims Addressed in the Allocation Process" means (1) costs to implement the AOC; (2) costs incurred to perform work required by EPA or Ecology in preparation for the Lower Duwamish Waterway ROD or Consent Decree between completion of the Feasibility Study and issuance of the Consent Decree for the Site; and (3) costs to perform actions required under the Site ROD or Consent Decree, including costs incurred as a result of contamination spread from EAAs and including costs of monitoring to assess compliance with the ROD or Consent Decree; except that "Claims Addressed in the Allocation Process" shall not include (1) costs attributable to the cleanup or investigation of EAAs, regardless of whether such EAAs have been designated pursuant to Section 5.3.1; (2) costs for work required by NPDES permits or for compliance with regulatory programs other than CERCLA and MTCA; and (3) costs for investigations and cleanups performed under MTCA not related to implementing the Lower Duwamish Waterway AOC, ROD or Consent Decree. Any ambiguity or disagreement regarding the scope of "Claims Addressed in the Allocation Process" shall be resolved by the Allocator.

1.5 "Defunct Parties" are PRPs that are not participating in the Allocation Process and that lack the capacity to be sued.

1.6 "Document Repository" means the database described in Section 5.2.

1.7 "Early Action Area" means one of the following five Early Action Areas identified in EPA's Proposed Plan: Norfolk CSO, Duwamish/Diagonal CSO/SD, Slip 4, Terminal 117, or Boeing Plant 2/Jorgensen Forge.

1.8 "Final Allocation" has the meaning given in Section 5.9.4.

1.9 "Final Agreed Allocation Summary" is the document developed to summarize Final Mediation Shares as the result of any mediation held pursuant to Section 6.

1.10 "Allocation Share" means a percentage of one hundred percent (100%) of all Claims Addressed in the Allocation Process that the Allocator determines are recoverable under CERCLA or MTCA and that the Allocator assigns in the Final Allocation.

1.10.1 "All PRP Share" means the percentage of one hundred percent (100%) of all Claims Addressed in the Allocation Process that the Allocator determines are recoverable under CERCLA or MTCA and that the Allocator assigns to any Participating Party, Absent Party, Defunct Party, or Recalcitrant Party in the Final Allocation.

1.10.2 "Participating Party Equitable Share" means the percentage of one hundred percent (100%) of all Claims Addressed in the Allocation Process that the Allocator determines are recoverable under CERCLA or MTCA and that the Allocator assigns to a Participating Party in the Final Allocation, which percentage includes a reassignment of Allocation Shares from Absent, Defunct, and Recalcitrant Parties to Participating Parties, considering all applicable legal and equitable factors under CERCLA or MTCA and any other applicable law or legal principle that, in the judgment of the Allocator, would be considered by a court in apportioning or allocating liability and costs for the Site.

1.11 "Final Mediation Share" means the Allocation Shares as modified by mediation pursuant to Section 6 and as reflected in a Final Agreed Allocation Summary.

1.12 "Participating Party" means a PRP that signs this MOA and has not withdrawn or been expelled from participation in the Allocation Process.

1.13 "PRP" means a Potentially Responsible Party.

1.14 "Participating Party Allocation" means an allocation in which the Allocator reassigns the Allocation Shares of Absent, Defunct, and Recalcitrant Parties as determined in the All PRP Allocation to the Participating Parties as the Allocator deems equitable after applying factors that, in the judgment of the Allocator, would be considered by a court.

1.15 "Preliminary Allocation" has the meaning given in Section 5.9.1.

1.16 "Recalcitrant Parties" are PRPs that were invited but declined to participate in the Allocation Process or participated but then withdrew or were expelled from the Allocation Process prior to the Final Allocation, and that have the capacity to be sued.

1.17 "Shared Costs" has the meaning given in Section 11.1.

1.18 "Steering Committee" means the group established pursuant to Section 10.1 or a person designated by that group.

1.19 "Writing" and "written" include email communications.

2.  **Preliminary Matters.**

2.1  <u>Status of Recitals</u>.  The recitals set forth above are adopted and incorporated into this MOA as terms and conditions.

2.2  <u>Voting Prior to the Final Allocation</u>.  Prior to the Allocator's issuance of the Final Allocation, each Participating Party shall have one vote. A decision to be made by a "majority" prior to the Final Allocation means that more than fifty percent (50%) of the Participating Parties

that vote on the issue vote the same way. A decision to be made by two-thirds means that two-thirds or more of the Participating Parties that vote on the issue vote the same way. Participating Parties that abstain or otherwise fail to vote are not counted in computing a majority or two-thirds.

2.3   Voting Following the Final Allocation. Once the Allocator has issued the Final Allocation, each Participating Party will have a weighted vote equal to the Participating Party Equitable Share assigned by the Allocator. For example, a Participating Party assigned a fifty-five percent (55%) Participating Party Equitable Share by the Allocator will have fifty-five (55) votes and a Participating Party assigned a two percent (2%) Participating Party Equitable Share will have two (2) votes. Parties may not split their votes. A decision to be made by a "majority" following the Final Allocation means that more than fifty percent (50%) of the total votes cast on an issue vote the same way. A decision to be made by seventy-five percent (75%) following the Final Allocation means that seventy-five percent (75%) or more of the total votes cast on an issue vote the same way.

2.4   Voting Procedures.

2.4.1   Proxies. A Participating Party may appoint another party or person to cast a vote on its behalf. A proxy may be appointed for a particular vote or on an ongoing basis. The appointment must be in writing delivered to the Steering Committee. More than one party may appoint the same proxy.

2.4.2   Votes by Email or Other Writing. The usual method for votes by the Participating Parties will be for the Steering Committee to send a notice by email of the issue to be voted on. The notice will include a deadline for votes to be sent back. The votes received by the Steering Committee by the deadline will be tallied to determine the outcome. The Steering Committee may agree to accept a vote provided by a different written method, such as facsimile, upon request of a Participating Party.

2.4.3   Notice of Votes. The Steering Committee will notify the Participating Parties of issues to be voted on by sending an email to the electronic address(es) designated by each Participating Party. Notice will be sent at least five (5) full business days prior to the deadline for voting unless extraordinary circumstances make such notice impractical. In no case shall notice be provided less than 48 hours prior to the deadline for voting. The Steering Committee will utilize a tool that notifies the sender of the email when the email has been delivered. If the Steering Committee does not receive notice that the email has been delivered successfully, the Steering Committee will endeavor to contact the Participating Party by telephone to resolve the problem. In all other cases, the emails will be deemed to have been successfully delivered. It is the responsibility of each Participating Party to provide the Steering Committee with correct email addresses, to assign someone to check the email address(es) provided, and to set SPAM filters and security software to allow delivery of emails from the Steering Committee.

2.4.4   Meetings. The Steering Committee has discretion to call for a meeting in person or by a telephonic or electronic conference of the Participating Parties when discussion is warranted. Notice of such meetings will be provided by email as described in Section 2.4.3 for

votes by email. When the Steering Committee calls for the Participating Parties to meet in person, a Participating Party may ask to participate by phone or electronic means (such as video conference or live chat) and the Steering Committee will accommodate all such reasonable requests. Usually, the Steering Committee will call for a vote by email following the meeting on issues discussed during the meeting rather than having the Participating Parties vote during the meeting. However, if prior notice of the vote has been given in conformity with Section 2.4.3, the Steering Committee has discretion to allow a vote by the Participating Parties during the meeting. Votes taken during a meeting shall only be cast by Participating Parties that are participating in the meeting or have an authorized proxy participating in the meeting.

## 3. Participating Parties.

3.1    Participating Party Decisions. The Participating Parties will endeavor to make decisions among themselves concerning the implementation of this MOA by consensus. If they are unable to do so, and except as expressly stated otherwise in this MOA, they shall make decisions by a majority vote.

3.2    Related Entities. Under this MOA, Related Entities shall be counted as one Participating Party. "Entities" includes corporations, limited liability companies, trusts, partnerships, governmental entities, or any other form of business enterprise. The following shall be considered "Related Entities": (1) an individual or group of individuals and any Entities owned, controlled, managed, or governed, in whole or in part, by that individual or group of individuals, (2) a group of Entities that are owned, controlled, managed, or governed, in whole or in part, by the same individual(s) or Entity, (3) a parent corporation and its subsidiaries, and (4) departments, instrumentalities, and agencies of the United States. Defining parties as "Related Entities" is for administrative convenience only and shall have no effect on potential liability of the Entities or their parent/subsidiary companies.

3.3    Funding. Within sixty (60) days of the effective date of this MOA, the Steering Committee shall send a notice to each Participating Party of the initial amounts of costs to be paid by each Participating Party to cover anticipated Shared Costs for a specified period of time ("Advance Costs"). From time to time, the Steering Committee shall send additional notices to each Participating Party of additional Advance Costs to be paid by each Participating Party. The financial obligations of the governmental parties for allocation costs incurred beyond 2014 are contingent on their receiving budget authority from their respective legislative bodies. Each governmental party will request such budget authority and if it is not granted, the affected governmental party will promptly notify the other parties and will withdraw from this MOA and the Allocation Process.

3.4    Participation by Other PRPs.

3.4.1    Proposing Other PRPs. Any Participating Party may propose that any number of additional PRPs be invited to participate in the allocation process established by this MOA (the "Allocation Process"), as long as the proposal is made by the deadline set forth in Exhibit A. For each additional PRP that is proposed to be invited, the Participating Party making the proposal must submit a written explanation, which may not exceed two (2) pages (single-spaced), demonstrating that (a) the proposed PRP is reasonably believed to have a likely share of

liability such that the proposed PRP is an appropriate Participating Party, (b) the proposed PRP is reasonably believed to be financially viable, and (c) the proposed PRP has the capacity to be sued.

      3.4.2   Approval of Proposed PRPs.

      3.4.2.1   Selection of Proposed PRPs.  Subject to the limits of Section 3.4.2.2 herein, by the deadline set forth in Exhibit A, proposed PRPs that meet the criteria set forth in Section 3.4.1 will be invited to join the Allocation Process as Participating Parties so long as the invitation is approved by a three-fourths vote of the Participating Parties.

      3.4.2.2   More than 80 Participating Parties.  In the event that it is likely the total number of Participating Parties would exceed eighty (80) if all PRPs are invited that have been approved pursuant to Section 3.4.2.1, then the proposed PRPs will be ranked by the number of votes approving their invitations and a sufficient number of them will be invited in ranked order so that it is likely that the number of PRPs who agree to participate will approximate eighty (80). The remaining proposed PRPs will only be invited if the Allocator approves inviting them upon a finding that they meet the criteria set forth in Section 3.4.1 and that adding them would advance a fair and equitable allocation without unduly increasing the costs of the Allocation Process.

      3.4.2.3   Agreeing to Participate.  The Steering Committee will send invitations to the additional approved PRPs and they will have until the deadline set forth in Exhibit A to agree to participate.

      3.4.3   Newly Discovered Evidence.  After the deadline established in Exhibit A, additional PRPs will only be invited to join the Allocation Process if the Allocator determines that (1) the invitation is based on newly discovered evidence that was not reasonably available at the time of the deadline, (2) the proposed PRP meets the criteria set forth in Section 3.4.1, and (3) adding the additional PRP would advance a fair and equitable allocation without unduly increasing the costs of the Allocation Process.

      3.4.4   Revised Deadlines.  For any additional PRPs that join the Allocation Process pursuant to this Section 3.4, the Allocator may, in his discretion, revise the deadlines set forth in Exhibit A for the submission of materials in order to give them a fair opportunity to participate while keeping the Allocation Process on schedule.

      3.4.5   New Participating Parties' Contributions.  PRPs that join as Participating Parties part way through the Allocation Process shall pay the per capita costs they would have paid had they joined at the beginning of the Allocation Process, plus their per capita share of costs going forward.

**4.    Allocator.**

    4.1   Allocator.  The Allocator shall be John Barkett.

    4.2   Allocator Contract Administration.  The City of Seattle will execute the contract with the Allocator and will administer the contract at no cost to the other Participating Parties for

administration. The City of Seattle will pay the Allocator according to the terms of the Allocator's contract.

### 4.3   Impartial Neutral.

4.3.1   No Conflict of Interest for Unrelated Matters. The Participating Parties acknowledge that John Barkett is performing services under this MOA as an impartial neutral. The Participating Parties acknowledge and agree that neither John Barkett nor Shook, Hardy & Bacon L.L.P. are representing or acting as counsel or a consultant for any individual Participating Party in the Allocation Process or the Lower Duwamish Superfund Site matter, nor will they do so. Nothing in this MOA prohibits Shook, Hardy & Bacon L.L.P. from representing any Participating Party or being adverse to any Participating Party in any matter not related to the Site. Neither John Barkett's role nor that of any member or employee of Shook, Hardy & Bacon L.L.P. will be raised by any of the Participating Parties as a conflict of interest or basis for disqualification of John Barkett or Shook, Hardy & Bacon L.L.P. in any matter not related to the Site.

4.3.2   Ethical Screening Procedure. The Participating Parties acknowledge that Shook, Hardy & Bacon L.L.P. has in the past or currently represents one or more Participating Parties in matters unrelated to the Site. John Barkett has implemented the ethical screening procedures of Shook, Hardy & Bacon L.L.P. with respect to Participating Parties now represented by Shook, Hardy & Bacon L.L.P. in unrelated matters and he will be screened from any such matters, and from any future matters should other Participating Parties become clients of Shook, Hardy & Bacon L.L.P. in matters unrelated to the Site.

### 4.4   Ex Parte Contact.

4.4.1   Substantive Matters. Participating Parties may not initiate ex parte contact with the Allocator regarding any substantive matter. The Participating Parties may only initiate substantive communication with the Allocator in writing with copies provided to all the Participating Parties and to the Document Repository. The Allocator's response, if any, shall also be provided to the Document Repository.

4.4.2   Procedural Matters. Participating Parties may contact the Allocator ex parte regarding minor procedural matters, such as requesting an extension of time, and the Allocator has discretion whether or not to grant such requests. The Allocator will notify all Participating Parties of such communications and the Allocator's response.

4.4.3   Contact Initiated by Allocator. The Allocator may contact any Participating Party in writing at any time, provided that a copy of the written communication and any response from the Participating Party is provided to all Participating Parties and the Document Repository. The Allocator may request authorization from the Steering Committee to communicate orally with a Participating Party when the Allocator deems it would be a cost-effective means for collecting information or would otherwise expedite the Allocation Process. The Steering Committee shall have discretion whether to grant such authorization and whether to appoint a member of the Steering Committee to hear the communication between the Allocator and the Participating Party.

**5.    Allocation Process.**

    5.1    Information Gathering.

        5.1.1    Questionnaire Development. In accordance with the schedule set forth in Exhibit A, the Allocator will develop a questionnaire, which shall include a certification, to be used by the Allocator to collect information from Participating Parties (the "Questionnaire"). Among other questions to be developed by the Allocator, the Questionnaire shall require that, to the extent a Participating Party references its response to EPA's 104(e) letter in responding to the Questionnaire, the Participating Party shall provide any updated information responsive to the Questionnaire.

        5.1.2    Suggesting Additional Topics. Participating Parties may raise objections and suggest questions or areas of inquiry to the Allocator. The Allocator shall have discretion to decide how to address any objections, questions, or areas of inquiry, except for information pertaining to EAAs under Section 5.3.3, which shall be included.

        5.1.3    Responding to Questionnaire. The Allocator will collect Questionnaire responses and follow up with any Participating Parties that do not submit sufficient information. The Questionnaire responses and any supplementations will be added to the Document Repository. If any responsive documents are withheld from the Questionnaire responses, the withholding Participating Party shall simultaneously provide a privilege log that follows the format required by the Allocator.

        5.1.4    Continuing Disclosure Obligation. Until the deadline for submitting additional material pursuant to Section 5.1.6.2, Participating Parties shall have a continuing duty to supplement their Questionnaire responses by promptly adding any newly discovered or developed material information to the Document Repository. After this deadline, if the Allocator determines that the interests of justice warrant further supplementation of Questionnaire responses, he may require the Participating Parties to do so.

        5.1.5    Confidentiality.

            5.1.5.1    Statutory Prohibitions. If a Participating Party contends that a federal or state statute, other than one concerning the attorney client privilege, expressly prohibits it from disclosing a document otherwise required to be produced in this proceeding, it shall provide notice to the Participating Parties and the Allocator and identify the document. The Allocator shall not have the authority to compel the production of the document but may, in his discretion, draw inferences adverse to the Participating Party based on the non-disclosure.

            5.1.5.2    Responses to EPA's CERCLA Section 104(e) Requests. With the exception of documents and information previously designated confidential pursuant to 42 U.S.C. § 9604(e)(7) ("Confidential Business Information" or "CBI"), Participating Parties shall submit a copy of their complete responses to EPA's CERCLA section 104(e) information requests to the Document Repository. The Participating Parties shall separately disclose their CBI to the Allocator who shall review the CBI. If the Allocator determines that the materials do not qualify as CBI, he shall advise the Participating Parties, after which the Participating Party that submitted the information must promptly provide it to the Document Repository. If in

- 8 -

making either the Preliminary Allocation or the Final Allocation under Section 5.9, the Allocator relies upon CBI, the Allocator shall make reference to the CBI with sufficient detail to describe the basis of the Allocator's decision and, in the case of the Preliminary Allocation, to allow the other Participating Parties to submit informed arguments in response.

                  5.1.5.3  Other Confidential Documents. If, in addition to CBI documents described above, a Participating Party considers any portion of the documents it wishes to use in the Allocation Process to be exempt from disclosure or otherwise protectable under Washington State public records disclosure law or the federal Freedom of Information Act, that Participating Party shall provide notice to the other Participating Parties and identify and clearly mark such portions as "CONFIDENTIAL," "PROPRIETARY," or "BUSINESS SECRET."

                  5.1.5.4  Communications Are Confidential. The Participating Parties intend that their communications with the Allocator and with one another during the Allocation Process, whether written or oral, be kept confidential among the Participating Parties and the Allocator to the fullest extent allowed by law. The Allocation Process shall be considered a mediation that is covered by RCW 42.56.600 (exemption from public disclosure for records of mediation communications) and RCW 7.07.030 (mediation communications are privileged). Mediation communications, as defined in RCW 7.07.010(2), including but not limited to Position Papers, Rebuttals, Replies, Questionnaire responses, and deposition transcripts, shall also be kept confidential to the fullest extent allowed by law.

                  5.1.5.5  Federal PRP Participation and Confidentiality. The United States on behalf of certain of its departments, instrumentalities, or agencies may participate in this Allocation Process as a Participating Party ("Federal PRPs"). The Federal PRPs' access to information and documents in the Allocation Process will be governed by the terms of Exhibit B. If the Federal PRPs do not participate in the Allocation Process, Exhibit B shall be null and void.

                  5.1.5.6  Notice of Requests for Public Records. If a Participating Party that is a public entity receives a request for public records under state or federal law that includes records marked as described above or of communications made during the Allocation Process, the public entity shall immediately notify all Participating Parties whose documents or communications are or may be subject to the request. Notice shall be given in the most expeditious manner available. The Participating Parties whose documents or communications are or may be subject to the request for records may take whatever action they deem appropriate, such as seeking a restraining order from a court with jurisdiction.

                  5.1.5.7  Compliance with Public Records Requests. Subject to Section 5.1.5.6, the public entity that received the request shall proceed in its usual manner to comply with applicable state or federal law, including the assertion of exemptions from disclosure that the public entity reasonably believes are applicable.

           5.1.6  Additional Information.

                  5.1.6.1  Requests by the Allocator. The Allocator may, at any time, request additional information from a Participating Party if the Allocator deems it necessary.

5.1.6.2   Submission by Participating Parties. In accordance with the schedule set forth in Exhibit A, the Participating Parties may submit additional factual information regarding themselves and other PRPs, including but not limited to information on costs included in Claims Addressed in the Allocation Process they seek to recover in the Allocation Process. In their submissions to the Allocator, the Participating Parties may only include or rely upon documents that are provided to the Document Repository in accordance with the schedule set forth in Exhibit A.

5.1.6.3   No Additional Discovery. The Participating Parties shall not engage in discovery concerning the matters to be allocated in the Allocation Process against other Participating Parties in the Allocation Process, except for the information gathering and depositions expressly allowed by this MOA. A Participating Party may, however, ask the Allocator to request documents from another Participating Party, and the Allocator has discretion to grant the request for good cause. The Allocator shall consider whether the requested information will advance the Allocation Process and decide whether to grant the request for all, some, or none of the requested information. The Participating Party from whom the Allocator requests documents shall comply with the Allocator's requests; provided, however, that if any responsive documents are withheld from the subsequent response, the withholding Participating Party shall simultaneously provide a privilege log that follows the format required by the Allocator.

5.1.6.4   Public Records Requests. The Participating Parties shall not use state or federal public records laws to request documents that address matters that are intended to be resolved through the Allocation Process from the Participating Parties that are governmental entities, unless the requesting party first consults with counsel for the governmental entity and either (a) the governmental entity agrees in writing to such a request or (b) the documents are being sought for a purpose other than for the Allocation Process. For purposes of this Section, "Participating Parties that are governmental entities" means the Washington State Department of Transportation, the City of Seattle, the Port of Seattle, King County, and all agencies of the United States except for EPA. A governmental entity that receives such a request may request information from the requesting party to determine if the criterion in (b) is met. Records obtained pursuant to (b) shall not be used in the Allocation Process unless the Participating Party wishing to use them has obtained copies from another source that is not subject to this provision or the Allocator grants a request to use them pursuant to Section 5.1.6.3.

(i) If the governmental Participating Party denies a request on the ground that it is prohibited by this Section 5.1.6.4, the requesting party may notify the Allocator and request that he resolve the issue of whether the request is prohibited under this Section. The Allocator's decision shall be final and in lieu of any other legal proceedings concerning the governmental entity's denial on the basis of the prohibition in this Section 5.1.6.4. In resolving such a dispute, the Allocator may request information from the requesting party to determine if the criterion in 5.1.6.4(b) is met and the requesting party may provide the Allocator with information responsive to the Allocator's request and with whatever other information the requesting party deems necessary to support its position.

(ii) If the governmental Participating Party's denial was based solely on the prohibition in this Section and the Allocator rejects the governmental entity's denial, in whole or in part, the governmental entity shall comply with the public records request in the same manner as it would in the absence of this MOA. In such an event, the governmental Participating Party's initial five days for responding to a public disclosure act request shall begin the first business day following the date of the Allocator's decision.

(iii) If the governmental Participating Party's denial is upheld, in whole or in part, the requesting party may ask the Allocator to request the excluded documents from the governmental entity pursuant to Section 5.1.6.3 above.

(iv) Each and every Participating Party to this Allocation Process knowingly and voluntarily waives its rights under the Public Records Act, RCW 42.56, the Freedom of Information Act, 5 U.S.C. Section 552, and the Privacy Act of 1974, 5 U.S.C. Section 552a, to the extent necessary to fully implement and enforce this Section 5.1.6.4.

(v) Any limitations, waivers, or rights created by this Section 5.1.6 with respect to the production or use of documents under state or federal public records laws shall be extinguished as to any Participating Party that withdraws from or is removed from this MOA. Also, these limitations, waivers, and rights shall not survive termination of the MOA.

      5.1.6.5  Exclusion of Documents. If a governmental Participating Party believes that records requested under Section 5.1.6.4 were sought for the purpose of the allocation, notifies the requesting Participating Party of its objection, and produces the documents requested without seeking to deny or limit the request under Section 5.1.6.4, the governmental Participating Party may later ask the Allocator to exclude those documents from consideration in the allocation. This would include excluding from consideration any part of an expert report or testimony or other submission that refers to or relies on such records. The Allocator shall provide the Participating Party that received the documents an opportunity to challenge the request for exclusion and/or that Participating Party may ask the Allocator to include the documents in the allocation in accordance with Section 5.1.6.3. This Paragraph shall not prevent the requesting Participating Party from using copies of the excluded documents in the allocation, if such copies are obtained from sources other than the governmental Participating Party that sought exclusion of the documents and/or by other means not inconsistent with this MOA.

      5.1.6.6  Notice to Participating Parties. If a Participating Party names another Participating Party in a written submission to the Allocator, including but not limited to Questionnaire responses, witness affidavits, Position Papers, expert reports, deposition transcripts, or other advocacy-related submittals, the submitting Participating Party shall notify the other Participating Party by email at the same time it makes such a submission. Copies of all such notices shall also be submitted to the Document Repository.

- 11 -

5.1.7   Fact Witnesses.

5.1.7.1   Requesting a Deposition. Any Participating Party may ask the Allocator to depose a fact witness. The request shall be in writing and limited to two pages (single-spaced). It must succinctly describe the background and suspected knowledge of the witness. The request shall be provided to all other Participating Parties at the same time it is provided to the Allocator. No more than five (5) business days thereafter, any Participating Party may file a statement opposing the deposition. Such statement shall be limited to two (2) pages (single-spaced). The Allocator may authorize the deposition for good cause.

5.1.7.2   Conduct of the Deposition. The Allocator shall ask all questions at the deposition. The Participating Parties may submit up to two (2) pages (single-spaced) to the Allocator listing suggested areas of inquiry. Any Participating Party may elect to attend the deposition, but may not ask questions unless the Allocator determines it is necessary to prevent manifest injustice. Additionally, counsel for a Participating Party may object during the deposition to the unauthorized disclosure of the Participating Party's confidential business information or privileged communications. The Allocator will rule on any such objections.

5.1.7.3   Request to Resume the Deposition. Upon the request of any Participating Party, the Allocator will allow resumption of the deposition.

5.1.7.4   Resumed Deposition. At the resumed deposition, the Allocator shall serve as a Special Master, ensuring that the deposition proceeds efficiently and resolving all disputes (including the order of questioning and amount of time allotted to each Participating Party). The Allocator may ask the deponent questions after the Participating Parties have completed their questions.

5.1.7.5   Deposition Transcripts. The Steering Committee shall ensure that, as soon as available, deposition transcripts are posted in the Document Repository and notice is provided to the Participating Parties of such posting.

5.1.8   Rule 27 Perpetuation Depositions. This MOA does not preclude a Participating Party from following the procedures set forth in Federal Rule of Civil Procedure 27(a) to seek to perpetuate testimony.

5.1.9   Expert Depositions.

5.1.9.1   Right to Question Experts. Any Participating Party who elects to submit an expert report (including rebuttal expert reports) to the Allocator shall, in accordance with the schedule set forth in Exhibit A, produce an expert report meeting the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). Any Participating Party shall have the right to depose (subject to the Allocator's exercise of his role as Special Master) any expert who authored an expert report. If the expert cannot meaningfully testify regarding a material portion of the report, any Participating Party may request that the Allocator allow for a deposition of others who materially contributed to that portion of the report, and the Allocator shall have the discretion to grant or deny the request.

5.1.9.2 Conduct of the Expert Deposition. The Allocator shall attend the expert's deposition and serve as a Special Master, ensuring that the deposition proceeds efficiently and resolving all disputes (including the order of questioning and amount of time allotted to each Participating Party). The Allocator may question the deponent after the Participating Parties have completed their questions. The Participating Party who is offering the expert may object during the deposition to the unauthorized disclosure of the Participating Party's confidential business information or privileged communications. The Allocator will rule on any such objections.

5.1.9.3 Resumption of the Deposition. Upon the request of any Participating Party other than the Participating Parties that asked questions at the initial deposition, the Allocator may allow the resumption of the deposition for questions by the Allocator or, to prevent manifest injustice, by any Participating Party.

5.1.9.4 Location and Cost of the Expert Deposition. Unless the Participating Party who offers the expert and the Participating Parties who will depose the expert agree otherwise, all expert depositions shall take place in Seattle, Washington, and the Participating Party offering the expert shall bear all fees and costs associated with the expert's preparation for and participation in the deposition.

5.1.9.5 Expert Deposition Transcripts. The Steering Committee shall ensure that, as soon as available, expert deposition transcripts are posted in the Document Repository and notice is provided to the Participating Parties of such posting.

5.1.10 Witness Availability. Each Participating Party agrees to use its utmost efforts to make available for deposition any witness from whom it submits a declaration or an affidavit, or who the party relies upon as the source of factual information.

5.1.11 Allocator Review Limited to Specific Materials. In preparing the Preliminary Allocation and the Final Allocation, the Allocator will not do any independent research and will consider only Position Papers (as defined in Section 5.8), rebuttals, replies, comments by Participating Parties on the Preliminary Allocation, documents included or referenced in the aforementioned submittals, confidential records, decisions made by the Allocator on legal issues, case law and other applicable legal resources, and the RI/FS, Proposed Plan, and the Site ROD. The Allocator will determine what weight to give materials submitted by the Participating Parties.

5.2 Document Repository. All materials will be kept in a Document Repository that is accessible to all Participating Parties.

5.2.1 Document Repository Vendor. The Participating Parties will utilize a Document Repository vendor to establish a Document Repository that is accessible by all of them. The Document Repository will be designed so that each Participating Party can search and tag documents without other Participating Parties seeing their work.

5.2.2 Document Repository Contracts. The LDWG Members solicited proposals from database vendors, selected one, and have negotiated a contract for the Document Repository. Each Participating Party shall execute the contract with the database vendor.

- 13 -

5.2.3    Coordination and Issue Resolution.  The Steering Committee will communicate with the database vendor regarding issues that affect the database as a whole and will instruct the vendor as needed.  Participating Parties shall communicate directly with the database vendor regarding their own submissions and issues that do not affect other parties.  If a Participating Party requests that the vendor make additions or changes to the Document Repository database that may impact or alter the ability of other Participating Parties to access or use the Document Repository, the request will be referred to the Steering Committee by the vendor.  The Steering Committee, in consultation with the vendor, will decide whether to grant the Participating Party's request.  If the Steering Committee cannot reach consensus, the request will be granted, in whole or in part, if five (5) members of the Steering Committee agree to do so.

5.3    Early Action Areas.

5.3.1    Choice to Allocate EAA Costs.  If a Participating Party wants past or future costs for an EAA to be allocated by the Allocator according to a process parallel to and in general accordance with the Allocation Process set forth in this MOA (including Exhibit A) or by a different process using the same Allocator, and those costs are not included in the past costs to perform the RI/FS or the future costs to implement the Site ROD, that Participating Party must notify the Allocator and all Participating Parties by the deadline set forth in Exhibit A and identify those Participating Parties who would be involved in the EAA allocation.  Any of the Participating Parties who would be involved in the EAA allocation may decline, in which case the EAA past and future costs will not be allocated pursuant to this MOA.  If the EAA allocation proceeds under the MOA, the EAA allocation will not be included in the Allocation Shares as defined in Section 1.10, and, with respect to Participating Parties, only those Participating Parties that were identified as part of the EAA process and were given the opportunity to decline to participate in the EAA allocation may receive a liability share for the EAA being allocated.

5.3.2    Conduct of EAA Allocations.  If past or future costs of any EAAs are to be allocated, those allocations shall be conducted separately from the allocation of Claims Addressed in the Allocation Process and from the allocation of past or future costs from any other EAAs that are to be allocated.  The costs for EAA allocations shall be tracked separately and shall be paid only by those parties that participate in each separate EAA allocation.  The Allocator will contract separately with the Participating Parties involved in the EAA allocation and bill them separately.  The billing rates will be no higher than those the Allocator charges for the overall Allocation Process.  Participating Parties agree to enter into such separate contracts with the Allocator when they are involved in an EAA allocation.

5.3.3    Contamination from EAAs.  If requested by a Participating Party, the Allocator shall require Participating Parties to provide information regarding the contamination in an EAA and its alleged effect on other areas.  Participating Parties may assert that contamination from an EAA has spread to other parts of the Site, whether or not costs for that EAA are being allocated pursuant to this MOA.

5.4   Timeline.

5.4.1   Allocation Process Schedule. The Allocation Process shall proceed under the schedule set forth in Exhibit A. Upon motion of a Participating Party and reasonable opportunity for others to respond, the Allocator may extend the schedule deadlines for all parties if necessary. Individual Participating Parties may ask the Allocator for minor extensions of time, and the Allocator has discretion whether to grant such requests.

5.5   Legal Issues/Summary Adjudication.

5.5.1   Submission of Legal Issues or Summary Adjudication. In accordance with the schedule set forth in Exhibit A, the Participating Parties may submit requests to the Allocator for a determination as to whether a legal issue or summary adjudication is appropriate for resolution.

5.5.2   Setting Briefing Schedule. If the Allocator determines that a legal issue or summary adjudication may be appropriate for consideration, the Allocator will then set a briefing schedule for resolution of the legal issues involved.

5.6   Convening of Experts. If the Allocator determines that it would materially assist in his preparation of the Preliminary Allocation or the Final Allocation, the Allocator may convene some or all of the experts to discuss with them their expert reports and each Participating Party shall bear its own expert costs in such sessions. The sessions shall be transcribed, and the Steering Committee shall ensure that, as soon as available, the transcripts of the sessions are posted to the Document Repository and notice is provided to the Participating Parties of such posting. The Participating Parties may, if they elect, attend the sessions to observe.

5.7   Summary of Areas of Inquiry. Within ten (10) days following completion of the expert deposition process, the Allocator will provide the Participating Parties with a Summary of Areas of Inquiry Memorandum ("Summary"). To the extent practicable and strictly for the purpose of providing guidance to the Participating Parties with respect to the drafting of Position Papers, the Summary shall identify the areas of inquiry the Allocator recommends be addressed in the Position Papers. If the Allocator believes that it will serve the goals of the Allocation Process, the Summary shall also describe the Allocator's anticipated approach for allocating costs, including the technical and factual elements he may rely on in developing the Preliminary Allocation determinations. The Summary is not binding on the Allocator.

5.8   Position Papers.

5.8.1   Submitting Position Papers. Each Participating Party may submit to the Allocator a position paper that advocates the share it and other Participating Parties should be allocated ("Position Papers"). Position Papers may also advocate that shares be assigned to Absent Parties, Defunct Parties, or Recalcitrant Parties. Position Papers shall be submitted in accordance with the schedule set forth in Exhibit A, and shall be in the form of a memorandum that may attach or incorporate by reference expert reports, fact declarations, documents, or other evidence, but only if the memorandum's contents (other than legal analysis, argument, and facts subject to judicial notice), expert reports, fact declarations, documents, and other evidence have previously been submitted to the Document Repository in accordance with the schedule set forth

- 15 -

in Exhibit A ("Disclosed Materials"). As provided in Section 5.1.6.6 of this MOA, if a Participating Party names another Participating Party in a written submission to the Allocator, the submitting Participating Party shall notify the other Participating Party at the same time it submits the material to the Allocator. If the Allocator determines, upon motion and after the opportunity for other Participating Parties to respond, that the interests of justice warrant the inclusion of late materials, the Allocator may allow such materials and opportunities for rebuttal.

      5.8.2   Rebuttal. Each Participating Party shall have the opportunity to rebut the Position Papers submitted by other Participating Parties. Rebuttals to Position Papers shall be submitted in accordance with the schedule set forth in Exhibit A, and shall be in the form of a memorandum that may attach or incorporate by reference Disclosed Materials.

      5.8.3   Reply. Each Participating Party shall have the opportunity to reply to the rebuttals. Replies shall be submitted in accordance with the schedule set forth in Exhibit A, and shall be in the form of a memorandum that may attach or incorporate by reference Disclosed Materials.

    5.9   Allocation.

      5.9.1   Preliminary Allocation. The Allocator will issue a preliminary allocation (the "Preliminary Allocation") for Claims Addressed in the Allocation Process with an explanation of how the shares were calculated. The allocation criteria to be considered by the Allocator shall include all applicable legal and equitable factors under CERCLA or MTCA and any other applicable law or legal principle that, in the judgment of the Allocator, would be considered by a court in apportioning or allocating liability and costs for the Site.

      5.9.2   Components of the Allocation. In both the Preliminary Allocation and the Final Allocation, the Allocator will do two calculations: first, an All PRP Allocation; and second, a Participating Party Allocation.

      5.9.3   Response to Preliminary Allocation. Each Participating Party will have the opportunity to provide a written response to the Preliminary Allocation.

      5.9.4   Final Allocation. Following review of the Participating Parties' responses to the Preliminary Allocation, the Allocator will issue a final allocation (the "Final Allocation"). The Allocator's Final Allocation report shall be marked, "For Settlement Purposes Only; Not to Be Used in Litigation." The report shall be kept confidential except as provided in Section 9.

      5.9.5   Contract Questions. Any Participating Party may raise contract questions in its Positions Paper, provided that it first provides or receives notice of such questions in the responses to the Questionnaire and copies of any relevant contracts are placed in the Document Repository. In that case, the Allocator shall rule on contract questions where a contract could shift responsibility for cleanup costs from one or more Participating Party to another. The Allocator's ruling(s) will be documented in the Preliminary and Final Allocations and will identify the percentage of responsibility shifted between parties. The Allocator shall first assign Allocation Shares to the contracting parties without considering contract questions and will then reassign Allocation Shares to the contracting parties based on his determinations on the contract questions. The Allocator's rulings on contract issues will not increase or decrease the

Participating Party Equitable Shares assigned to Participating Parties that are not parties to the contract, beneficiaries to the contract, or have another legal or equitable basis for their shares to be affected by the contract. The Allocator shall determine whether he expects to spend more than twenty hours to resolve a contractual issue and, for those issues that he expects to take longer, he shall contract separately with the Participating Parties involved with that issue to bill them separately. The Allocator's hourly billing rates shall be the same as those the Allocator charges for the overall Allocation Process. Participating Parties shall enter into such separate contracts with the Allocator whenever they are involved with a contract issue presented for resolution by the Allocator by any Participating Party.

      5.9.6  Accepting or Declining Allocation. After the Allocator issues the Final Allocation, each Participating Party will have sixty (60) days to accept or decline its All PRP Share and its Participating Party Equitable Share. Those who decline will cease to participate in the Allocation Process, unless they participate in mediation pursuant to Section 6.

      5.9.7  Contribution from Non-Participating Parties. Nothing in this MOA shall prevent any Participating Party from seeking contribution for an Allocation Share from an Absent Party or a Recalcitrant Party.

## 6.   Mediation.

      6.1  Required Mediation. If Participating Parties who have been allocated a collective total of more than fifty percent (50%) of the Participating Party Equitable Shares in the Final Allocation decline their shares, then all Participating Parties that were allocated a Participating Party Equitable Share shall participate in mediation. The goal of such mediation shall be for as many Participating Parties as possible to accept their Allocation Shares (as they may be redistributed in the mediation) within the one hundred and twenty (120) day period designated in Paragraph 6.7, but at least enough so that the Participating Parties collectively accept more than fifty percent (50%) of the Participating Party Equitable Shares.

      6.2  Voluntary Mediation. Mediation may also be initiated: 1) By Participating Parties that choose to mediate among themselves; or 2) If one or more Participating Parties request that the entire group engage in mediation and Participating Parties who have been allocated a collective total of more than fifty percent (50%) of the Participating Party Equitable Shares agree to mediate.

      6.3  Selecting a Mediator. The parties involved in a voluntary mediation may select a mediator by whatever method they choose. For a required mediation, the selection of the mediator shall require the approval of those Participating Parties who have been allocated a collective total of more than fifty percent (50%) of the Participating Party Equitable Shares, provided that their selection is approved by more than fifty percent (50%) of the Participating Parties (one vote per party) that will be involved in the mediation.

      6.4  Mediator Contract. The Participating Parties shall enter into a contract with the mediator and pay the mediator's costs in proportion to their Final Mediation Shares, or if mediation fails, in proportion to their Participating Party Equitable Shares.

6.5  Reaching Agreement. The mediator shall convene the Participating Parties and work with them to reach an agreement on the distribution of Allocation Shares among the Participating Parties and implementation of the Site ROD. A Final Agreed Allocation Summary may be developed to memorialize any such agreement.

6.6  Mediation Requirements. The mediation will be conducted based solely on the documents already located in the Document Repository and materials submitted to the Allocator prior to the issuance of Allocation Shares. No Participating Party shall be required to provide any further documents or information in connection with the mediation. The mediator will not conduct any independent research or analysis. A Participating Party may choose to submit a statement of that party's position to the mediator but cannot be required to do so.

6.7  Termination of Mediation. A voluntary mediation may terminate whenever the parties involved choose to do so. A required mediation may be terminated any time more than ninety (90) days following the hiring of a mediator if those Participating Parties who have been allocated a collective total of more than fifty percent (50%) of the Participating Party Equitable Shares or more than fifty percent (50%) of the parties involved in the mediation (one vote per party) agree to terminate the mediation. If an agreement in principle has not been reached within 120 days following hiring of the mediator, then the mediation shall terminate unless the mediator believes that further work would result in an agreement and more than fifty percent (50%) of the parties involved in the mediation (one vote per party) agree, in which case the mediation shall be extended for up to thirty (30) days.

**7.  Withdrawal and Expulsion.**

7.1  Withdrawal. A Participating Party may withdraw from the Allocation Process at any time upon written notice to the Allocator and the other Participating Parties.

7.2  Expulsion. A Participating Party may be expelled from the Allocation Process (a) at any time prior to the Allocator's issuance of the Final Allocation, by a seventy-five percent (75%) vote of the Participating Parties; or (b) at any time after the issuance of the Final Allocation, by Participating Parties who have been allocated and accepted seventy-five percent (75%) of the total shares. The Federal PRPs can be expelled only for non-payment of their share of Shared Costs or upon a vote of seventy-five percent (75%) of the Participating Parties and the concurrence of the Allocator.

7.3  Paying Shared Costs. A Participating Party that withdraws or is expelled shall pay Shared Costs incurred through the withdrawal or expulsion date, even if the Shared Costs have not yet been billed; provided, however, that if all but one LDWG Member has withdrawn or been expelled, or more than fifty percent (50%) of the initial Participating Parties have withdrawn or been expelled, then the remaining Participating Parties may decide, by majority vote, to terminate the contract with the Allocator and the contracts with other contractors and vendors. The Participating Parties that have withdrawn or been expelled and those that have not shall all pay equal shares of any moneys owed to the Allocator or other vendors or contractors due to early termination of their contracts.

**8. Settlements.**

8.1 <u>Disclosing Settlements</u>. Notwithstanding any other provision in this MOA, any Participating Party or group of Participating Parties is free to settle, at any time, its claims with respect to the Site with any other Participating Party or non-Participating Party, provided that any such Participating Party or group of Participating Parties must disclose the fact of the settlement to the Allocator and to the other Participating Parties as soon as feasible but no more than thirty (30) days after executing the settlement. Any group settlement between a Recalcitrant Party and Participating Parties that have accepted a collective total of at least seventy-five percent (75%) of the Participating Party Equitable Shares shall include a requirement that the Recalcitrant Party pay its pro rata share of the Shared Costs incurred prior to the settlement as well as any additional amounts as determined appropriate by the Participating Parties. This MOA does not preclude any Participating Party from approaching non-participating PRPs and attempting to settle with them at any time.

8.2 <u>Cash-Out Settlements</u>.

8.2.1 <u>Cash-Out Proposals</u>. After the Allocator issues the Final Allocation as described in Section 5.9.4 and concurrently with the negotiations described in Sections 8.3. and 8.4 below, any Participating Party may propose a cash-out settlement with any other Participating Party or group of Participating Parties. It is anticipated, although not required, that those Participating Parties requesting cash-out settlements will request them from those Participating Parties that have expressed an intent to implement the Site remedy. All cash-out settlement proposals shall be in writing and directed to the Steering Committee for administrative purposes and to the specific Participating Parties with whom the cash-out settlement is proposed. Any Participating Party that receives a cash-out settlement proposal shall provide an initial response by the deadline set forth in Exhibit A.

8.2.2 <u>Cash-Out Negotiations</u>. By the deadline set forth in Exhibit A, all Participating Parties involved in a proposed cash-out settlement will meet to discuss the proposal. The Participating Parties to whom a cash-out settlement proposal is directed shall negotiate in good faith; however, there is no guarantee that the parties will reach agreement on cash-out settlements. If the negotiating parties are unable to reach an agreement, they may engage the Allocator (or another neutral) to assist them by the deadline set forth in Exhibit A. The Participating Parties anticipate that if they engage the Allocator or another neutral to assist with negotiations, that process will be streamlined and cost effective, and will be based solely on the documents already located in the Document Repository and materials submitted to the Allocator prior to the issuance of Allocation Shares. No Participating Party shall be required to provide any further documents or information in connection with these negotiations. The Allocator or other neutral will not conduct any independent research or analysis. A Participating Party may choose to submit a statement of that party's position to the Allocator or other neutral but cannot be required to do so. The Allocator's (or other neutral's) fees will be shared by all Participating Parties, whether they are involved in the negotiations or not.

8.2.3 <u>Cash-Out Premium</u>. Cash-out settlements may include payment of an amount to offset the risks assumed by those Participating Parties that do not cash out. Such risks may include, but are not limited to, the degree of confidence in cost estimates, potential cost

- 19 -

increases, construction uncertainties, additional requirements by EPA or other agencies, unanticipated conditions, and compliance with EPA's five-year reviews.

    8.2.4   Effect of Cash-Out Settlements.

        8.2.4.1   Indemnification. Participating Parties that agree to cash out other Participating Parties shall release, defend, and indemnify them for all past and future costs resolved by the Consent Decree.

        8.2.4.2   Liability to United States. During Consent Decree negotiations pursuant to Section 8.4 below, the Participating Parties negotiating with EPA and the U.S. Department of Justice ("USDOJ") shall seek to persuade them to resolve the liability of those who have cashed out to the United States for all matters resolved under the Consent Decree, including offering contribution protection.

        8.2.4.3   Voting. For purposes of Section 2.3, the weighted votes of Participating Parties that are cashed out shall be assumed by the Participating Parties who agree to cash them out.

        8.2.4.4   Confidentiality and Disclosure. Participating Parties that are cashed out will continue to be parties to this MOA for purposes of confidentiality and disclosure.

    8.2.5   Early Cash-Outs. Nothing in this Section 8.2 shall prohibit any Participating Party from proposing a cash-out settlement with the other Participating Parties or some subset thereof at an earlier time than set forth in Exhibit A. The Participating Parties to whom an early cash-out settlement proposal is directed shall negotiate in good faith; however, there is no guarantee that the parties will reach agreement on early cash-out settlements.

    8.3   Negotiation of Response Cost Settlement and Implementation Agreement. Provided that Participating Parties representing a minimum of fifty percent (50%) of the Participating Party Equitable Shares have accepted their shares following issuance of the Final Allocation, or that Participating Parties representing a minimum of fifty percent (50%) of the Final Mediation Shares have accepted such shares, such Participating Parties will endeavor to negotiate an agreement among themselves that resolves all Claims Addressed in the Allocation Process ("Response Cost Settlement"). Either as a component of the Response Cost Settlement agreement or in a separate agreement, and subject to the same threshold requirement of fifty percent (50%) of the Participating Party Equitable Shares or Final Mediation Shares having been accepted by the Participating Parties, the Participating Parties that have accepted their shares will also endeavor to negotiate an agreement among themselves for the implementation of the remedy ("Implementation Agreement").

    8.4   Consent Decree. If agreement is reached regarding a Response Cost Settlement and an Implementation Agreement as described in Section 8.3 above, the Participating Parties that execute those agreements may negotiate with EPA regarding resolution of liability at the Site through entry of one or more consent decrees. Nothing in this MOA shall preclude any Participating Party from negotiating a consent decree with EPA at any time.

**9.    Disclosure of Final Allocation.**

9.1    Limited Disclosure.  Except as provided in this Section 9 and in Section 13, no Participating Party may disclose or cause to be disclosed the Preliminary Allocation, Final Allocation, or the Allocation Share or Final Mediation Share of another party who was a Participating Party at the time the Final Allocation was issued.

9.2    No Breach of Confidentiality.  A disclosure pursuant to this Section 9 shall not be a breach of confidentiality under this MOA.

9.3    Disclosure During Consent Decree Negotiations.  During consent decree negotiations, the Participating Parties may disclose either the Allocator's Final Allocation report and any Allocation Shares or, in the event of mediation pursuant to Section 6, the Final Agreed Allocation Summary and any Final Mediation Shares to EPA, USDOJ, Ecology, and Ecology's representatives at the Washington Attorney General's Office, except that identifying information may be redacted upon written request for Participating Parties that were assigned less than a 3 percent Participating Party Equitable Share and did not accept it.  If the Participating Parties engage in mediation pursuant to Section 6.1, they may disclose the Final Agreed Allocation Summary developed pursuant to Section 6.5, with the same redactions as for the Final Allocation report.

9.4    Judicial Reasonableness Hearing.  To the extent necessary, the information described in this Section 9 may also be used in the judicial reasonableness hearing regarding a proposed consent decree or other resolution of liability.

9.5    Written Consent.  Any Participating Party may disclose the Allocation Share of any other Participating Party with the written consent of that other Participating Party.

9.6    Self-disclosure.  Any Participating Party may disclose its own Allocation Share to any other person.

9.7    Disclosure During Cost Recovery or Contribution Litigation. Those Participating Parties that accept their Allocation Shares or Final Mediation Shares after issuance of the Final Allocation may disclose in a cost recovery or contribution action: (a) their own Allocation Shares or Final Mediation Shares and the Allocation Shares or Final Mediation Shares of all Absent Parties, Defunct Parties, and Recalcitrant Parties; and (b) those portions of the Preliminary and Final Allocation reports and the Final Agreed Allocation Summary describing the Allocation Process, including the information considered and the factors used to assign Allocation Shares. The Allocation Shares of Participating Parties who decline their Allocation Shares after issuance of the Final Allocation shall not be disclosed without their written consent.

**10.    Other Decision-Making.**

10.1  Steering Committee.

10.1.1  Composition.  By the deadline set forth in Exhibit A, a Steering Committee shall be formed.  The Steering Committee shall be composed of a representative from each of the LDWG Members, along with four (4) other Participating Parties who receive the four

highest votes of the remaining Participating Parties. In voting for the non-LDWG Steering Committee members, each of the non-LDWG Member Participating Parties shall cast up to four (4) votes but may not cast more than one (1) vote for the same Participating Party.

10.1.2  Role of the Steering Committee.  The Steering Committee shall call for meetings and votes of all the Participating Parties, set agendas, communicate with the Allocator, and perform other tasks described in this MOA.  Any Participating Party may propose that an issue be considered by the Steering Committee and it shall be considered if at least two members of the Steering Committee support doing so.

10.2  Replacing Allocator.  If the Allocator becomes unable to serve, the Steering Committee shall establish a process for recommending a replacement.  The Steering Committee's recommendation of a replacement Allocator must be ratified by at least seventy-five percent (75%) of the other Participating Parties.  The Allocator may be terminated only with the agreement of at least seventy-five percent (75%) of the Steering Committee members and at least seventy-five percent (75%) of the other Participating Parties.

10.3  Amending the Allocation Process.  The Allocation Process set forth in this MOA may be amended only with the agreement of at least seventy-five percent (75%) of the Steering Committee members and at least seventy-five percent (75%) of the other Participating Parties.

## 11.   Shared Costs.

11.1  Shared Costs.  "Shared Costs" are costs incurred pursuant to the contract with the Allocator pursuant to Section 4.2 above and any other contract or invoice approved by a majority of the Steering Committee for services related to the Allocation Process.  If the Steering Committee determines certain costs should be shared on other than a per capita or Final Participating Party Equitable Share basis, it shall notify the Participating Parties and give them an opportunity to comment before issuing any notice of Shared Costs that would contain an adjustment for those costs.  Any such determination requires the approval of a majority of the Steering Committee.

11.2  Initial Distribution of Shared Costs.  The Participating Parties initially shall share the Shared Costs of the Allocation Process as follows, subject to reallocation as provided in Section 11.3:

11.2.1  LDWG Members.  The LDWG Members shall share fifty percent (50%) of all Shared Costs of the Allocation Process equally on a per capita basis up to $200,000 per LDWG Member per year ($800,000 total per year).

11.2.2  Other Participating Parties.  All other Participating Parties that are not members of LDWG shall share the remaining fifty percent (50%) of all Shared Costs equally on a per capita basis.

11.2.3  Amounts Over $1.6 Million.  If Shared Costs exceed a total of $1.6 million in any particular year, the amount over and above $1.6 million will initially be shared equally on a per capita basis per Participating Party.

11.3 Reallocation of Shared Costs. Once the Final Allocation has been issued, the Shared Costs shall be recalculated according to the Final Allocation and each Participating Party shall pay or receive reimbursements as necessary so that its total contribution conforms to its Participating Party Equitable Share, whether or not that Participating Party has accepted such share and regardless of whether the Final Allocation is ultimately accepted by a sufficient number of Participating Parties. Shared Costs from the date of issuance of the Final Allocation forward shall be shared based on each party's Participating Party Equitable Share.

11.4 United States' Share of Costs. Any requirement for the payment or obligation of funds by the United States shall be subject to the availability of appropriate funds legally available for such purpose, and no provision of this MOA shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, and 1511-1519. This MOA will become effective and bind the United States only after execution of form OBD-47 with a contract between the United States and the Allocator.

11.5 Participating Parties Bear Their Own Costs. Each Participating Party will bear all of its own costs related to the Allocation Process, including but not limited to costs for attorneys, staff, experts, report preparation, and document production.

11.6 Failure to Pay. In the event that a Participating Party fails to pay its Shared Costs, those parties that are holding contracts for the Allocator or other vendors providing services that are part of the Shared Costs may bill the rest of the Participating Parties for the unpaid costs on the same basis as Shared Costs are distributed. The Steering Committee shall have a direct cause of action against the Party that failed to pay and shall have the right, but not the obligation, to seek recovery on behalf of the Participating Parties from the Party that failed to pay, including hiring counsel for that purpose. The costs of seeking recovery of unpaid Shared Costs shall be charged as Shared Costs to the remaining Participating Parties. The Steering Committee shall be entitled to recover pre and post-judgment interest and its attorney fees and litigation expenses from the Party that failed to pay. The Party holding the contract will cooperate with the Steering Committee, providing documentation and testimony as needed, and assigning contract rights if necessary to recover the unpaid amount. Any amount recovered by the Steering Committee shall be credited to the Participating Parties; First, to reimburse them for the Shared Costs they paid for the recovery efforts; and, Second, to reimburse them for the amount they each paid of the unpaid Shared Costs. If the recovered funds are insufficient to reimburse the Participating Parties fully, then the recovered funds shall be credited in proportion to the amount that each Participating Party paid.

## 12.    Litigation.

12.1 Participating Parties Reserve All Claims, Rights, and Defenses. The Participating Parties reserve all claims, rights, and defenses, including claims, rights, and defenses against one another, with respect to past and future costs that are subject to the Allocation Process and with respect to EAA costs. The Participating Parties agree that the time from the effective date of this MOA through and including the date a party withdraws from this MOA, or the date the Final Allocation is issued, or, for EAA allocations under Section 5.3.1 and 5.3.2, the date the Allocator makes a final decision, shall not be included in computing the deadline under any statute of limitations that may be applicable to the commencement of any action by one Participating Party

- 23 -

against another, with respect to past and future costs that are being allocated by the Allocator. This MOA is without prejudice to any Participating Party's right to assert that a statute of limitations has run prior to the effective date of this MOA or after a Participating Party has withdrawn from this MOA or the Allocation Process has been completed.

12.2 No Initiation of Litigation Among Participating Parties During Term of This MOA. Except with respect to claims identified on Exhibit C or for the limited purpose of perpetuation depositions authorized by Section 5.1.8, the Participating Parties shall not initiate litigation against one another during the term of this MOA with respect to the resolution of Claims Addressed in the Allocation Process and allocated by the Allocator, but reserve the right to initiate litigation against each other upon completion of the Allocation Process or upon a Participating Party's withdrawal from this MOA. This provision does not limit the rights of any Participating Party to initiate litigation against any person or entity that is not a Participating Party, nor does it limit the rights of any Participating Party to initiate litigation regarding a contract with one or more other Participating Party where all Participating Parties that are parties to the contract have expressly chosen not to have the Allocator rule on issues arising under that contract per Section 5.9.5 above.

## 13. Insurance.

The Participating Parties do not intend hereby to make any agreement that will prejudice any Participating Party with respect to its insurers and, by entering into this MOA, anticipate that the actions taken pursuant to this MOA will benefit such insurers. Nothing in this MOA is intended to prevent a Participating Party from sharing this MOA and information developed pursuant to this MOA with a Participating Party's insurance carriers with direction that the carrier keep the information confidential, and doing so shall not be construed as violating any confidentiality provisions of this MOA.

## 14. Relationship of Participating Parties.

14.1 Legal Advice. No Participating Party, or representative or counsel for any Participating Party, has acted as counsel for any other Participating Party with respect to such Participating Party's entering into this MOA, except as expressly engaged by such Participating Party with respect to this MOA, and each Participating Party represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this MOA.

14.2 No Attorney/Client Relationship. No Participating Party or its representative shall act or be deemed to act as legal counsel or representative of any other Participating Party, unless expressly retained by such Participating Party for such purpose, and except for such express retention, no attorney/client relationship is intended to be created between or among the Participating Parties, their representatives, and respective attorneys.

14.3 No Partnership or Joint Venture and/or Principal and Agent Relationship. Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Participating Parties.

14.4 No Liability for Acts or Omissions Under this MOA. No Participating Party or its representative(s) serving on any committee shall be liable to any Participating Party for any

claim, demand, liability, cost, expense, legal fee, penalty, loss, or judgment incurred or arising as a result of any acts or omissions taken or made under this MOA.

**15.  Denial of Liability.**

Each Participating Party understands and agrees that, by entering into this MOA, it does not admit and specifically denies liability or fault for any and all of the facts, legal contentions, and occurrences alleged against it with respect to the Site. Neither this MOA nor any information submitted or any action taken by any Participating Party pursuant to this MOA shall constitute, be interpreted, construed, or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Participating Party.

**16.  Entire Agreement.**

This MOA constitutes the entire understanding of the Participating Parties with respect to its subject matter.

**17.  Governing Law.**

This MOA is to be construed in accordance with the laws of the State of Washington, except with respect to the Federal PRPs, in which case it is to be construed in accordance with the laws of the United States.

**18.  Disputes Regarding Interpretation of MOA.**

If disputes regarding interpretation of this MOA arise, the Participating Parties shall use their best efforts to agree on a resolution. If the Participating Parties cannot resolve any such disputes within thirty (30) days, such disputes shall be resolved by the Allocator.

**19.  Notices.**

All notices, bills, invoices, reports, and other communications to or by a Participating Party shall be sent to the authorized representative(s) designated at the time the Participating Party executes this MOA or any different representative(s) subsequently provided to the Steering Committee.

**20.  Successors and Assigns.**

This MOA shall be binding upon the successors and assigns of the Participating Parties. No assignment or delegation of the obligation to make any payment or reimbursement hereunder shall release the assigning Participating Party without the prior written consent of two-thirds of the other Participating Parties.

**21.  Counterparts.**

This MOA may be executed in multiple counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument.

# Exhibit C

**In Re Lower Duwamish Waterway Superfund Site**

**Allocation Process**

_____/

### Allocator's Decision No. 14

### Decision on King County's Request Regarding the Scope of Paragraph 13 of the Alternative Dispute Resolution Memorandum of Agreement

Under Section 5.5.1 of the Alternative Dispute Resolution Memorandum of Agreement (ADR-MOA), in accordance with the schedule for the allocation, "Participating Parties may submit requests to the Allocator for a determination as to whether a legal issue or summary adjudication is appropriate for resolution." Under Section 5.5.2, "If the Allocator determines that a legal issue or summary adjudication may be appropriate for consideration, the Allocator will then set a briefing schedule for resolution of the legal issues involved." Under Section 5.4.1, the Allocator may extend the schedule deadlines for all parties if the Allocator believes it necessary. Separately, Section 18 provides that, "If disputes regarding interpretation of this MOA arise, the Participating Parties shall use their best efforts to agree on a resolution. If the Participating Parties cannot resolve any such disputes within thirty (30) days, such disputes shall be resolved by the Allocator."

King County has requested that I make a determination on the scope of Section 13 of the ADR-MOA.  Section 13 provides:

> The Participating Parties do not intend hereby to make any agreement that will prejudice any Participating Party with respect to its insurers and, by entering into this MOA, anticipate that the actions taken pursuant to this MOA will benefit such insurers. Nothing in this MOA is intended to prevent a Participating Party from sharing this MOA and information developed pursuant to this MOA with a Participating Party's insurance carriers with direction that the carrier keep the information confidential, and doing so shall not be construed as violating any confidentiality provisions of this MOA.

More specifically, King County is in coverage litigation with one or more insurers and requests that I make a determination as to the scope of the permission allowed by Section 13 to share with an insurance company information, whether in paper or electronic form, that has been generated thus far in this ADR process by third parties, in response to a discovery request made by the insurer(s).[1]

_____

[1] It is my understanding that information provided in this process by King County but also required in the litigation to be provided under Rule 26(a)(1) or in response to discovery requests within the scope of Rule 26(b)(1) is not in issue here.

Whether viewed as a legal issue for consideration for which I have extended the time to submit the request, or a dispute regarding interpretation of the ADR-MOA, the Participants have advised me that time is of the essence and have agreed that I should address this question immediately without the need for briefing or further consultation among the parties.

I.

This ADR process represents an effort by over 40 participants to avoid litigation and to resolve through the help of a neutral the allocation of responsibility for certain response costs associated with the investigation and cleanup of the Lower Duwamish Waterway (LDW) Superfund Site (Site). There is a significant sum of money in issue: the Record of Decision for the LDW Site contains a cost estimate for the cleanup in the hundreds of millions of dollars.

In Section 15 of the ADR-MOA, each Participating Party specifically has denied liability as part of its agreement to participate in the Allocation Process. Section 15 of the ADR-MOA provides further that no information submitted pursuant to the ADR-MOA "shall constitute, be interpreted, construed, or used as evidence of any admission of liability, law or fact":

> Neither this MOA nor any information submitted or any action taken by any Participating Party pursuant to this MOA shall constitute, be interpreted, construed, or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Participating Party.

All communications in this ADR process are confidential. Section 5.1.5.4 specifically provides that the Participating Parties intend that their communication with the Allocator and with one another during the Allocation Process be kept confidential; that the Allocation Process is a mediation covered by RCW 42.56.600 and RCW 7.07.030 which protects from disclosure mediation communications:

> 5.1.5.4 Communications Are Confidential. The Participating Parties intend that their communications with the Allocator and with one another during the Allocation Process, whether written or oral, be kept confidential among the Participating Parties and the Allocator to the fullest extent allowed by law. The Allocation Process shall be considered a mediation that is covered by RCW 42.56.600 (exemption from public disclosure for records of mediation communications) and RCW 7.07.030 (mediation communications are privileged). Mediation communications, as defined in RCW 7.07.010(2), including but not limited to Position Papers, Rebuttals, Replies, Questionnaire

---

responses, and deposition transcripts, shall also be kept confidential to the fullest extent allowed by law.

ADR processes work because each participant knows that the process is confidential. Indeed, in this matter, I have relied on the confidentiality of the process to demand the utmost in due diligence from each Participant in responding to Disclosure Questionnaires. Voluntary disclosure is fundamental to the integrity of the process. It is also fundamental to the economics of the process. If the Participants had to engage in discovery to produce the information that they, in their consensual, mediation-confidential process have agreed to produce under the supervision of a neutral, they would have expended a multiple of the legal dollars that they have incurred and will incur in this process in lengthy depositions of fact and expert witnesses, discovery disputes over interrogatory responses and document production, and motion practice. And a trial of a matter like this would consume months of the time of a district court judge. Disclosure of information produced by others in response to a discovery request is anathema to this confidential process and undermines the goals of the Participants to avoid litigation and conserve judicial resources in trying to resolve the allocation for the Site through a consensual ADR process.

## II.

It is against this backdrop that Section 13 must be read.

The first sentence of Section 13 recognizes that participation in this confidential process will benefit insurers. It reads: "The Participating Parties do not intend hereby to make any agreement that will prejudice any Participating Party with respect to its insurers and, by entering into this MOA, anticipate that the actions taken pursuant to this MOA will benefit such insurers." Having now been a part of this process for several years, I can attest to the wisdom of this prediction. Pursuant to the ADR-MOA, I conduct any fact witness depositions, and I had to take only one such deposition. That is a remarkable testament to the Participants' efforts to honor my demands for self-disclosure within the safe confines of a mediation-confidential process, with the corresponding effect that hundreds of thousands of dollars in combined legal fees, transcript and copying costs, and travel expenses have been saved by the Participants. An even larger savings will occur in connection with the completion of information gathering from expert witnesses—again via streamlined protocols made possible by the confidentiality of the process.

The second sentence does not permit a Participant to share information produced by other Participants in response to a discovery request by an insurance company engaged in litigation. The second sentence provides:

> Nothing in this MOA is intended to prevent a Participating Party from sharing this MOA and information developed pursuant to this MOA with a Participating Party's insurance carriers with direction that the carrier keep the information confidential, and doing so shall not be construed as violating any confidentiality provisions of this MOA.

There is a genuine question whether this sentence relates to information beyond that generated by the Participating Party under the ADR-MOA. But I do not need to answer that question. The question I need to answer is whether this sentence relates to information developed by other Participating Parties vis-à-vis a carrier in litigation with a Participant. That question has a clear answer: it does not.

There are at least three reasons why this is the case. First, Section 13 contains a direction that information to which Section 13 refers must be kept confidential. "Confidential" in this context refers to mediation-confidential. The insurer is bound by the same confidentiality requirements as the insured Participant. That means that under no circumstances could the insurer provide information to its litigation counsel and the information could never be used in a court proceeding, a deposition, or any other setting where it would or might become public or shown to a third person.[2]

Second, that this is the case is made ever clearer by Section 5.1.5.4, which provides that all communications of this process are mediation-confidential.

> The Allocation Process shall be considered a mediation that is covered by RCW 42.56.600 (exemption from public disclosure for records of mediation communications) and RCW 7.07.030 (mediation communications are privileged). Mediation communications, as defined in RCW 7.07.010(2), including but not limited to Position Papers, Rebuttals, Replies, Questionnaire responses, and deposition transcripts, shall also be kept confidential. . . .

All recipients of information—including a Disclosure Questionnaire Response and related documents or expert reports—from another Participant are required to maintain the confidentiality of the information. The risk that an advocate might seek to disclose in a public proceeding confidential information of a third party involved in a mediation-confidential process violates the very premise of a Participant's decision to engage in the process, in addition to violating the laws and evidentiary rules that protect the confidentiality of ADR-mediation processes.

Finally, Section 15 ensures that no information submitted by a Participating Party pursuant to the ADR-MOA "shall constitute, be interpreted, construed, or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Participating Party." This provision is expressly designed to limit information developed by each Participating Party to the confines of this mediation-confidential process. Even if Section 13 could somehow be read to allow disclosure of third-party information, Section 15 would prohibit an insurer in litigation from being able to use it in such litigation just as it

---

[2] This is also why a protective order in litigation does not satisfy Section 13. "For attorneys' eyes only" allows someone other than the insurer to see the documents in violation of the confidentiality directives of the ADR-MOA. And others like expert witnesses could not see the documents either.

*Lower Duwamish Water Superfund Site Allocation Process*     *Allocator's Decision No. 14*
*Page 4*

would bar any Participant in this process from doing so should the Allocation Process fail to resolve the allocation for the Site and the Participants end up in litigation.

Section 13 contemplates a carrier that is providing coverage and is aligned with the insured to honor the insured's confidentiality obligations under the ADR-MOA. I express no views on the limits of disclosure in such a context, but I have no hesitation in concluding that it would be a violation of the ADR-MOA to provide mediation-confidential information of a third party to an insurer who is not so aligned and is seeking documents through discovery in litigation.

III.

Section 13 does not permit King County to make disclosure of information provided by others in this mediation-confidential process in response to a discovery request from insurers with whom it is engaged in coverage litigation.

Respectfully Submitted,

s/s John M. Barkett
John M. Barkett
Allocation Neutral
January 31, 2018

# Exhibit D

**Archived:** Wednesday, January 08, 2020 4:01:13 PM
**From:** Jason Julius
**Sent:** Fri, 3 Jan 2020 19:26:31 +0000ARC
**To:** Lisa N. DeBord   Campbell, Jennifer L.   Alex Kennedy-Breit
**Cc:** Jennifer Hutchison   Kelley Peters   Wishik, Laura
**Subject:** Meet and Confer Summary - Seattle v. Monsanto
**Sensitivity:** Normal

---

> CAUTION: External Email

Jen, Alex, and Lisa,

To summarize our meet and confer discussions over the last couple of weeks, my understanding is as follows:

1. With respect to RFP 39 regarding the requested production of allocation related documents, the City stands by its objection based on mediation privilege and confidentiality.  Defendants have communicate that they believe the City waived this privilege.  The City disagrees and does not intend to produce any documents prepared explicitly for the allocation proceeding.  However, the City has already, and will continue to produce as necessary, documents that exist outside of the Allocation, including, but not limited to, the City's responses to EPA's requests for information under CERCLA Section 104(e), sampling data from the City's stormwater system and from City facilities, information on City facilities and operations, deposition transcripts from prior litigation, affidavits and declarations by City witnesses in prior litigation, and environmental reports on contaminated sites in the Duwamish drainage area.

2. The City is concerned that Defendants have been provided mediation protected materials from the allocation by Pharmacia, and that those materials are being used by Defendants in this litigation.  To the extent that such materials are being used in this litigation, the City objects and may seek direction/clarification from the Court as necessary.  If you contend that no privileged materials have been provided or are being used by Defendants in this litigation, please advise immediately.

If I have missed anything or if you disagree with the foregoing, please let me know by 2 pm on Monday, January 6. Thanks

Jason J. Julius, Esq.
Ecolawyers | Baron & Budd, P.C.

214.521.3605 main
858.251.7427 direct
858.951.6215 mobile

www.ecolawyers.com
www.baronandbudd.com

Dallas | Austin | Los Angeles | Baton Rouge | New Orleans | San Diego