THE HONORABLE RICHARD A. JONES

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

**AT SEATTLE**

CITY OF SEATTLE, a municipal corporation, located in the County of King, State of Washington,

Plaintiff,

v.

MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION,

Defendants.

Case No. 2:16-CV-00107-RAJ

**DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LISA RODENBURG**

**Noted for: August 26, 2022**

**Oral Argument Requested**



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

**TABLE OF CONTENTS**


**Page**

I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 2

III. ARGUMENT ........ 3

A. The Data Underlying Rodenburg's Opinions are Unreliable ........ 4

B. Rodenburg's Methodology Inaccurately Describes Conditions Within The LDW ........ 5

C. Rodenburg's $r^2$ Cutoff Values are Unreliable and Scientifically Indefensible ........ 9

IV. CONCLUSION ........ 10




Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007 (E.D. Cal. 2011) ........ 7

*Daubert v. Merrel Dow Pharms. Inc.*, 43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*") ........ 3, 5

*Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) ("*Daubert I*") ........ 2, 3

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........ 3, 7

*Goebel v. Denver & Rio Grande W. R.R.*, 346 F.3d 987 (10th Cir. 2003) ........ 3, 5

*Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........ 7, 8, 10

*United States v. Webb*, 115 F.3d 711 (9th Cir. 1997) ........ 3

*Waskowski v. State Farm Mut. Auto. Ins. Co.*, 970 F. Supp. 2d 714 (E.D. Mich. 2013) ........ 5

*Whisnant v. United States*, No. C03-5121, 2006 WL 2861112 (W.D. Wash. Oct. 5, 2006), *aff'd*, 274 F. App'x 536 (9th Cir. 2008) ........ 10

## RULES

Fed. R. Evid. 702 ........ 2, 5, 10



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

On August 4, 2022, counsel for Defendants and counsel for Plaintiff met and conferred on the substance of this motion but did not reach an agreement.

## I. INTRODUCTION

Monsanto challenges the admission of certain opinions from Plaintiff's retained expert, Lisa A. Rodenburg, Ph.D. ("Rodenburg"). Rodenburg is Plaintiff's expert on the issue of PCB product identification. (*See* Rodenburg *Seattle* Rpt., attached as Ex. A of DeBord Decl.).[1] Rodenburg is being offered at trial for only one opinion: that a high percentage ("in most cases, greater than 95% of the total") of the PCBs found in the Lower Duwamish Waterway ("LDW") were manufactured by Monsanto (known as "Aroclors") as opposed to those created by other manufacturers and those created through today inadvertently—*i.e.*, "byproduct" PCBs that are unintentionally created through hundreds of manufacturing processes involving heat, carbon and chlorine, or by simple combustion/incineration. (*Id.* at 3; *see also* Rodenburg *Seattle* Dep. 49:19-22, Ex. B of DeBord Decl.; Rodenburg *Spokane* Dep. 43:6-14, 51:4-6, 57:12-58:25, 61:4-63:25, Ex. C of DeBord Decl.; Rodenburg *San Diego* Dep. 18:21-25:5, Ex. D of DeBord Decl.).

Monsanto does not challenge Rodenburg's qualifications or opinions concerning the presence and ubiquity of byproduct PCBs within the environment, including her opinion that byproduct PCBs are the "main problem" facing municipalities like the City of Seattle, having been detected in numerous bodies of water (including those in Washington State) in excess of federal water quality standards. (Rodenburg *San Diego* Dep., Ex. D 24:14-21, 44:5-21, 57:12-58:15; Rodenburg *Seattle* Dep., Ex. B 58:18-59:12, 66:23-67:6). Monsanto likewise does not challenge Rodenburg's opinions that: (1) byproduct PCBs are found in numerous consumer products at concentrations of up to 2,500 ppm—14,705,882,352.94 times greater than the 0.00017 µg/L water quality standard for the State of Washington under WAC 173-201A-240; (2) byproduct PCBs from one cereal box can contaminate a volume of water past the federal water quality

---

[1] All exhibits in support of this *Daubert* Motion to Exclude the Testimony of Lisa Rodenburg as attached to the accompanying Declaration of Lisa DeBord ("DeBord Decl.").

standard; or (3) of the 209 individual PCB compounds (called "congeners"), at least 130 are produced unintentionally through manufacturing processes. (Rodenburg *Seattle* Dep., Ex. B. 53:6-18, 122:3-9; Rodenburg *Spokane* Dep., Ex. C 16:10-18:20; Rodenburg *San Diego* Dep., Ex. D 28:6-34:4, 37:6-18, 55:15-56:5).

Monsanto does challenge, however, the ultimate conclusion that Rodenburg was hired to reach—that Aroclors are the "dominant" sources of PCBs in the LDW (Rodenburg *Seattle* Rpt., Ex. A at 3)—as this opinion is based on unreliable data and a methodology that is not generally accepted in the scientific community. As will be demonstrated, Rodenburg employed various statistical sleights of hand which rigged her analyses to ensure environmental sampling data would resemble Aroclor rather than byproduct PCB sources unrelated to Defendants. Rodenburg's opinions should therefore be excluded—or at least limited—for three distinct reasons. *First*, in forming her opinions, Rodenburg relied extensively (in certain instances, more than 96%) on environmental sampling data that was taken from *outside of the LDW*—and is therefore not representative of conditions *within* the LDW. *Second*, Rodenburg compared sampling data, or "fingerprints," to sets of data and conditions that do not exist in the real world, but rather, exist only in a counter-reality Rodenburg created to reinforce her opinions. *Third*, when determining the strength of comparison between environmental fingerprints and patterns of Aroclor and byproduct PCB sources, Rodenburg employed numerical cutoff values of her own creation which: (1) are scientifically arbitrary and indefensible; (2) have never been subjected to peer-review; and (3) are contradicted by authoritative literature that Rodenburg cites favorably outside this lawsuit.

## II. LEGAL STANDARD

Rule 702's gatekeeping authority vested in courts ensures an expert's testimony "rests on a reliable foundation." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 597 (1993) ("*Daubert I*"). A district court must first determine "nothing less than whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

scientific method, and whether their work product amounts to good science." *Daubert v. Merrel Dow Pharms. Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").

*Daubert* "demands a searching inquiry as to method." *United States v. Webb*, 115 F.3d 711, 716 (9th Cir. 1997). "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Goebel v. Denver & Rio Grande W. R.R.*, 346 F.3d 987, 992 (10th Cir. 2003) (citations and internal quotation marks omitted). Testimony that requires "too great an analytical gap between the data and the opinion offered" is impermissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted). When considering the reliability of expert testimony, a trial court should evaluate whether "the theory or technique employed by the expert" (1) is "generally accepted in the scientific community[,]" (2) has been "subjected to peer review and publication[,]" (3) "can be and has been tested[,]" and (4) whether "the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17 (citing *Daubert I*, 509 U.S. at 593-595).

## III. ARGUMENT

Rodenburg used two statistical tools—Positive Matrix Factorization ("PMF") and Multiple Linear Regression ("MLR")—in an attempt to determine whether environmental sampling data was more similar to an Aroclor versus a byproduct PCB source. (Rodenburg *Seattle* Report, Ex. A at 10, 23; Rodenburg *Seattle* Dep., Ex. B 77:22-78:16). As part of the PMF analysis, sampling data is loaded into a computer program that then generates "factors" or "fingerprints," which represent PCB patterns within the data. (Rodenburg *Seattle* Dep., Ex. B 82:9-21; Rodenburg *Spokane* Dep., Ex. C 127:24-128:12). Next, in an attempt to identify the PCB source, Rodenburg compared the PMF factors to Aroclor and byproduct patterns both visually and using MLR. (Rodenburg *Seattle* Dep., Ex. B 83:8-25, 87:5-88:20, 307:11-22). The MLR analysis measures the strength of comparison between the sampling fingerprint and the Aroclor or byproduct pattern, and results in an output called an "$r^2$" [r-square] value, which Rodenburg then interpreted based on various cutoff values of her own subjective creation. (*Id.* at 85:25-86:7). As discussed in turn below, Rodenburg's relies on unreliable data and engaged in


Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

various data manipulations which rigged her analyses to ensure that sampling data would look like Aroclor, rather than byproduct PCBs.

**A. The Data Underlying Rodenburg's Opinions are Unreliable**

Rodenburg's opinions are confined to the presence and purported source of PCBs within the LDW, which consists of river miles ("RM") 0.0 to 5.0 of the Duwamish River. (Rodenburg *Seattle* Dep., Ex. B 91:19-92:19, 96:2-10). However, the vast majority of data which Rodenburg relied upon to form her opinions—up to 96% for certain environmental compartments—was obtained from environmental samples taken from *outside* the LDW area at issue. (*See, e.g.*, Rodenburg *Seattle* Rpt., Ex. A at 19 (of the 201 surface water samples, only "10 were from RM 3.3, within the LDW"); *see also id.* at 18 (only 4.1% of sediment samples (6 out of 146 total) were taken from within the LDW); Rodenburg *Seattle* Dep., Ex. B 109:4-7, 110:4-9). Indeed, the data underlying Rodenburg's analyses were derived from a study of the larger Green-Duwamish Watershed (the "GD study"), which extends to RM 95.0—more than 90 miles outside of the LDW. (Rodenburg *Seattle* Dep., Ex. B 80:12-81:12, 98:4-11, 99:13-101:6; *see also* Leidos (2016), Ex. E to DeBord Decl. at 13, 15). As a result, Rodenburg does not know whether the data she relied on are representative of the LDW, or instead, merely represent the condition of specific sites *outside* of the LDW where the data were collected at the relevant time.

Remarkably, Rodenburg did not undertake any analysis to determine whether data from *outside* the area at issue was representative of actual conditions *within* the LDW. (Rodenburg *Seattle* Rpt., Ex. A at 4; Rodenburg *Seattle* Dep., Ex. B 311:7-312:20). It is anticipated Plaintiff will argue that data from outside of the LDW is relevant to Rodenburg's opinions due to the purported "tidal" nature of the waterway. However, Rodenburg admits that she did not include any such analysis in her expert report for this case. (Rodenburg *Seattle* Dep., Ex. B 312:13-20). Moreover, publications concerning the GD study—which Rodenburg incorporates by reference into her own report, (Rodenburg *Seattle* Rpt, Ex. A at 3)—specifically note that the authors "relied on verbal



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

and written information provided by secondary sources" and "made no independent investigations concerning the accuracy or completeness of the information relied upon." (Leidos (2016), Ex. E at PDF 2).

Rodenburg's inability to vouch for the accuracy or representativeness of the data she relies on renders her opinions and methodology unreliable. *See* Fed. R. Evid. 702 (b) (expert testimony must be based on "sufficient facts or data"); *Waskowski v. State Farm Mut. Auto. Ins. Co.*, 970 F. Supp. 2d 714, 723 (E.D. Mich. 2013) (excluding opinions which are not "based on sufficient facts or data" where damages expert failed to consider data representative of damages at issue, and based estimates on representations made by third parties) (citations omitted). Because the data underlying her opinions are unreliable, Rodenburg's opinions should be excluded from trial. *Daubert II*, 43 F.3d at 1317-18; *see also Goebel*, 346 F.3d at 992. At the very least, Rodenburg's opinions should be confined to those concerning data obtained from *within* the LDW.

**B. Rodenburg's Methodology Inaccurately Describes Conditions Within The LDW**

In an attempt to identify the source of PCBs within sampling data, Rodenburg compared PMF factors to Aroclor and byproduct patterns both visually and using MLR. (Rodenburg *Seattle* Dep., Ex. B 83:8-25, 87:5-88:20, 307:11-22). The Aroclor and byproduct patterns that Rodenburg selected for comparison, however, do not reflect real-world conditions, and instead, assume that sampling data is comprised entirely of either: (1) Aroclors or a mixture of Aroclors; or (2) byproduct PCBs from either silicone or pigments. (Rodenburg *Seattle* Dep., Ex. B 223:10-15). These comparisons—which exclude the possibility that sampling data is comprised of a mixture of Aroclors *and* byproduct sources—do not accurately reflect the sampling data at issue, which indicate the presence of numerous byproduct PCB congeners within samples that Rodenburg attributes *solely* to an Aroclor source, *e.g.*:



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204




Reproduced from Rodenburg (2019), Ex. F to DeBord Decl. at 192.

This figure, which is incorporated by reference into her report, depicts Rodenburg's comparison of sampling data from "Air1" (blue bars) with Aroclor 1016 (orange bars). (Rodenburg *Seattle* Dep., Ex. B 229:10-25, 236:18-25). Individual PCB congeners are listed on the x-axis, and their respective concentrations within the sampling data are represented by the height of each bar. (*Id.* at 138:11-20). Despite the fact that Aroclor 1016 does not account for the presence of PCBs 77 through 209 within the sampling dataset, Rodenburg attributes the entirety of "Air1" to an Aroclor source. (*Id.* at 237:19-239:2; Rodenburg *Seattle* Rpt., Ex. A at 4, 18). While Rodenburg posits that PCBs can become "weathered" over time, thus changing their chemical makeup, she admits that the higher chlorinated congeners (*i.e.,* those further to the right on the bar chart) could not form as a result of environmental weathering of lower chlorinated congeners (*i.e.,* those further to the left on the bar charts) present in Aroclor 1016. (Rodenburg *Seattle* Dep., Ex. B 89:6-10, 237:19-239:2; Rodenburg *Spokane* Dep., Ex. C 146:10-24). Rodenburg is thus unable to explain the presence of these higher-chlorinated congeners within the sampling data, and instead, excludes them entirely from her analysis.

Rodenburg's analysis is akin to facial recognition software that determines the strength of comparison based solely on the composition of one's nose, rather than simultaneously considering additional facial features, including the eyes, lips, chin, ears, etc. By failing to consider whether sampling data is comprised of a mixture of Aroclor and byproduct PCB sources, Rodenburg's methodology excludes at least 30% of the PCB



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

mass present in Air1 (the blue bars between congeners 77 and 209)—including numerous byproduct congeners. (Rodenburg *Seattle* Dep., Ex. B at 234:24-236:12, 238:6-239:2). Rather than attempt to explain the presence of these congeners within the sampling data, Rodenburg simply ignores them and attributes the entirety of Air1 to an Aroclor source. (*Id.* at 240:10-15).

In other instances, Rodenburg excludes up to 50% of the PCB mass within sampling data before attributing that data solely to an Aroclor source. (*See, e.g.*, Rodenburg *Seattle* Dep., Ex. B at 243:16-244:13 (one half of the PCB mass in "Sediment1"—which Rodenburg attributes entirely to an Aroclor source, Ex. A at 18—cannot be explained by Aroclor 1016)). Rodenburg's arbitrary exclusion of data contrary to her ultimate conclusion renders her methodology unreliable. *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 at n.60 (E.D. Cal. 2011) ("[A] reliable expert would not ignore contrary data, misstate the findings of others, [or] make sweeping statements without support[.]") (citation omitted); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153-54 (E.D. Wash. 2009) ("The court need not admit an expert opinion that is connected to the underlying data 'only by the ipse dixit of the expert.'") (quoting *Joiner*, 522 U.S. at 146).

These methodological flaws are exacerbated by the fact that Rodenburg excluded additional byproduct PCB mass from her analyses under the guise of a "data validation" step completed before running her PMF program. This process admittedly resulted in the removal of byproduct PCB mass—including PCB 11, which is "virtually absent in Monsanto's Aroclors." (Rodenburg *Seattle* Rpt., Ex. A at 5, 14; Rodenburg *Seattle* Dep., Ex. B 120:19-121:2). Rodenburg admits that she excluded from her analyses sampling data comprised of more than 78% byproduct PCBs. (Rodenburg *Seattle* Dep., Ex. B 193:21-194:3). In total, Rodenburg excluded 40% of the aggregate PCB mass from surface water data, 24% from groundwater data, 55% from otter scat data, 12% from air deposition data, 8% from storm drain data, 6% from sediment data and 4% from tissue data. (*Id.* at 198:18-22, 199:5-200:15, 201:9-13, 205:25-206:5). By arbitrarily excluding



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

byproduct PCB mass from her PMF analyses, Rodenburg's methodology undercounts byproduct and overstates Aroclor contributions to the LDW. (*Id.* at 210:4-22).

Rodenburg further understates byproduct contributions to the LDW by considering only 4 congeners (PCBs 11, 206, 208 and 209) and two sources (silicon and pigment) of byproduct PCBs, despite admitting that more than 130 individual congeners contained within hundreds of consumer products have been identified as byproduct in nature. (Rodenburg *Seattle* Dep., Ex. B 53:11-18, 59:10-12, 122:3-9, 153:13-154:6, 224:3-9, 229:5-9, 256:5-8; *see also* Rodenburg *Spokane* Dep., Ex. C 43:6-14, 51:4-6, 132:16-23; Rodenburg *San Diego* Dep., Ex. D 35:8-37:18). Indeed, Rodenburg admits that, by considering only 4 out of 130 potential byproduct congeners, her methodology could result in an undercounting of byproduct PCB sources within the LDW. (Rodenburg *Seattle* Dep., Ex. B 264:15-265:4). Rodenburg further admits that she failed to consider byproduct sources—such as asphalt—that were "certainly . . . used throughout the [LDW]." (*Id.* at 252:18-253:15; *id.* at 251:16-252:7 (Rodenburg failed to consider byproduct sources including caulking, joint compounds, motor vehicle fluid, asphalt and deicer)). It is only by ignoring these sources and limiting her byproduct analysis to just 4 out of 130 congeners that Rodenburg is able to offer opinions that >99% of an environmental compartment (*e.g.*, tissue) is attributable to an Aroclor source, despite the presence of byproduct congeners within the sampling dataset. (Rodenburg *Seattle* Rpt., Ex. A at 4, 20; *see also* Rodenburg *Seattle* Dep., Ex. B 259:4-22, 261:15-262:4).

Because she failed to consider the full mass of byproduct sources to the LDW, and ignored data contrary to the opinions she was retained to offer, Rodenburg's opinions are not the product of a reliable methodology, and they should be excluded at trial. *Abarca*, 761 F. Supp. 2d at 1066; *Henricksen*, 605 F. Supp. 2d at 1153. At the very least, Rodenburg's opinions should be limited to those based on a comparison of sampling data to a mixture of Aroclor and all relevant byproduct PCB sources and congeners found within the LDW.


Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

### C. Rodenburg's $r^2$ Cutoff Values are Unreliable and Scientifically Indefensible

In addition to performing a visual comparison, Rodenburg used MLR to determine whether PMF factors were more similar to Aroclor versus byproduct PCB patterns found in silicon and pigment. (Rodenburg *Seattle* Dep., Ex. B 78:4-16, 87:5-14). The MLR generates an $r^2$ value ranging from zero to 1.0. (*Id.* at 88:14-20). Rodenburg then interpreted the $r^2$ values using numerical cutoff values of her own creation which: (1) are scientifically arbitrary and indefensible; (2) have never been subjected to peer-review; and (3) are contradicted by authoritative literature that Rodenburg cites favorably.[2]

According to Rodenburg, an $r^2$ value of 0 to 0.4 indicates that sampling data contained a highly weathered Aroclor or a non-Aroclor source; 0.4 to 0.8 indicates a weathered Aroclor; and 0.8 to 1.0 indicates a single unweathered Aroclor. (Rodenburg *Seattle* Dep., Ex. B 88:21-91:9). These cutoffs, however, have never been published in any handbook, textbook or peer-reviewed article. (Rodenburg *Spokane* Dep., Ex. C 135:12-136:2, 139:12-16). Instead, they were contrived entirely by Rodenburg, who concedes that she cannot scientifically disprove the use of $r^2$ cutoff values different than those she selected for her analyses. (*Id.* at 138:18-139:11). In fact, a published study that Rodenburg cites favorably used different $r^2$ values, requiring a value of 0.9 or greater to determine whether a sample contained PCBs, and rejecting an $r^2$ value of 0.725 as insufficient. (*Id.* at 140:2-142:2; *see also* Rodenburg *Seattle* Rpt., Ex. A at 24 (citing Burkhard and Weininger (1987)).

Critically, had Rodenburg employed an $r^2$ cutoff of 0.9 to signify the presence of Aroclor PCBs, only 21.4% (9 out of 42)[3] of the environmental compartments Rodenburg considered would have been deemed to acceptably resemble Aroclors. (*See* Rodenburg

---

[2] As with her visual inspection, Rodenburg's MLR also failed to consider whether environmental sampling data was best explained by a mixture of Aroclor and byproduct sources. (Rodenburg *Seattle* Dep., Ex. B 223:10-15).

[3] The compartments are: Air5, Sed3, Sed5, Water 4, StormD1, StormD5, StormW1, StormW5, and GW4.

Demonstrative, Ex. G to DeBord Decl. (Rodenburg *Seattle* Dep., Ex. 33) (providing $r^2$ values across various environmental compartments considered by Rodenburg); *see also* Ex. B at 301:21-302:3). This figure is in stark contrast to Rodenburg's opinion that "in most cases, greater than 95%" of the total PCBs in the LDW are Aroclors. (Rodenburg *Seattle* Rpt., Ex. A at 3). Nevertheless, Rodenburg employed arbitrary $r^2$ cutoff values favorable to the conclusion she was hired to reach—that Aroclors are the "dominant" sources of PCBs in the LDW. (*Id.*)

Because her MLR analyses are based on quantitative cutoffs that are arbitrary, scientifically indefensible, and have never been subjected to peer review, Rodenburg's opinions do not reflect "scientific knowledge" and should therefore be excluded from trial. *Whisnant v. United States*, No. C03-5121, 2006 WL 2861112, at *3 (W.D. Wash. Oct. 5, 2006), *aff'd*, 274 F. App'x 536 (9th Cir. 2008) ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology."); *Henricksen*, 605 F. Supp. 2d at 1162. Alternatively, Rodenburg's opinions should be confined to those based on $r^2$ values which have been subjected to peer review, or are otherwise generally accepted within the scientific community.

## IV. CONCLUSION

For the foregoing reasons, Rodenburg's opinions do not meet the standard for expert opinions mandated by *Daubert* and should therefore be excluded from trial under Rule 702. At the very least, Rodenburg's opinions should be limited to those which are derived: (1) from data obtained *within* the LDW; (2) through a comparison of sampling data with mixtures of both Aroclor and all relevant byproduct PCB sources and congeners; that is (3) interpreted using $r^2$ cutoff values that have been subjected to peer review or are otherwise generally accepted within the scientific community.



Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
Tel: (314) 690-0204

DATED: August 11, 2022

LATHAM & WATKINS LLP

By: /s/ Daniel P. Brunton

Robert M. Howard, CSBA No. 145870
(Admitted *Pro Hac Vice*)
Jason M. Ohta, CSBA No. 211107
(Admitted *Pro Hac Vice*)
Daniel P. Brunton, CSBA No. 218615
(Admitted *Pro Hac Vice*)
Shannon K. Lankenau, CSBA No. 294263
(Admitted *Pro Hac Vice*)
Natalie C. Rogers, CSBA No. 301254
(Admitted *Pro Hac Vice*)
12670 High Bluff Drive
San Diego, California 92130
Phone: (858) 523-5400
Email: robert.howard@lw.com
jason.ohta@lw.com
daniel.brunton@lw.com
shannon.lankenau@lw.com
natalie.rogers@lw.com

SCHWABE WILLIAMSON & WYATT

By: /s/ Connie Sue M. Martin

Jennifer L. Campbell, WSBA No. 31703
Connie Sue M. Martin, WSBA No. 26525
David F. Stearns, WSBA No. 45357
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Phone: (206) 622-1711
Email: jcampbell@schwabe.com
csmartin@schwabe.com
dstearns@schwabe.com

SHOOK, HARDY & BACON

Adam E. Miller (Admitted *Pro Hac Vice*)
Lisa N. DeBord (Admitted *Pro Hac Vice*)
Susan L. Werstak (Admitted *Pro Hac Vice*)
Michael W. Cromwell (Admitted *Pro Hac Vice*)
Rachel R. Berland (Admitted *Pro Hac Vice*)
190 Carondelet Plaza, Suite 1350
St. Louis, (Clayton), MO 63105
Phone: (314) 690-0200
Email: amiller@shb.com
ldebord@shb.com
swerstak@shb.com
rberland@shb.com

KING & SPALDING LLP
Donald F. Zimmer (Admitted *Pro Hac Vice*)
Megan Nishikawa (Admitted *Pro Hac Vice*)
Troy D. McMahan (Admitted *Pro Hac Vice*)
Nicholas D. Kayhan (Admitted *Pro Hac Vice*)
101 Second Street, Suite 2300
San Francisco, CA 94105
Phone: (415) 318-1200
Email: fzimmer@kslaw.com
mnishikawa@kslaw.com
tmcmahan@kslaw.com
nkayhan@kslaw.com

KING & SPALDING LLP
Peter Hsiao (Admitted *Pro Hac Vice*)
663 West Fifth Street, Ste. 1600
Los Angeles, CA 90071
Phone: (213) 443-4310
Email: phsiao@kslaw.com

SHOOK HARDY & BACON LLP
Richard Campbell (Admitted *Pro Hac Vice*)
Stephen I. Hansen (Admitted *Pro Hac Vice*)
Brandon Arber (Admitted *Pro Hac Vice*)
One Federal Street, Suite 2540
Boston, MA 02110
Phone: (617) 531-1441
Email: rcampbell@shb.com
shansen@shb.com
barber@shb.com

SHOOK HARDY & BACON LLP
Thomas M. Goutman (Admitted *Pro Hac Vice*)
David S. Haase (Admitted *Pro Hac Vice*)
Kim Kocher (Admitted *Pro Hac Vice*)
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: (215) 575-3136
Email: tgoutman@shb.com
dhaase@shb.com
kkocher@shb.com

*Attorneys for Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC*