THE HONORABLE RICHARD A. JONES
THE HONORABLE MICHELLE L. PETERSON

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

# AT SEATTLE

| | |
|---|---|
| CITY OF SEATTLE,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, *et al.*,<br><br>Defendants. | CASE NO. 2:16-CV-00107-RAJ-MLP<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LISA RODENBURG**<br><br>Noted for: August 26, 2022<br><br>**Oral Argument Requested** |

REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF LISA RODENBURG - CASE NO. 2:16-CV-00107-RAJ-MLP

Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
TEL: (314) 690-0204

Monsanto challenges the admission of certain opinions from Plaintiff's retained expert, Lisa A. Rodenburg, Ph.D. ("Rodenburg") who opines that "in most cases, greater than 95% of the total" PCBs found within the Lower Duwamish Waterway ("LDW") are attributable to Monsanto (known as "Aroclors") rather than other manufacturers, or PCBs inadvertently generated during hundreds of manufacturing processes and that are contained within numerous consumer products (known as "byproduct" PCBs). *See* Defendant's Motion to Exclude Rodenburg, Dkt. 320 at p. 4. Rodenburg is really two people: one the one hand, she is an academic who has trumpeted the significance and pervasive, ubiquitous presence of byproduct PCBs for decades; on the other hand, she is a professional witness who makes a lucrative living saying the exact opposite. *See id.* at 4-5; *see also* Rodenburg PowerPoint, attached as Ex. A of DeBord Decl. at 10-11, 40; Rodenburg PowerPoint, attached as Ex. B of DeBord Decl. at 23; Rodenburg Webinar Transcript, attached as Ex. C of DeBord Decl. at 52:13-53:10.

While Monsanto does not challenge Rodenburg's qualifications or opinions concerning the presence and ubiquity of byproduct PCBs within the environment, the fact that the opinions Rodenburg offers here are diametrically opposed to those which she offers in non-litigation contexts perhaps explains why Plaintiff has dedicated a significant portion of its Opposition toward the proposition that Rodenburg's "qualifications are beyond reproach." *See* Plaintiff's Opposition, Dkt. 382 at 5. This position misses its mark entirely, as Plaintiff recognizes "Monsanto does not challenge Dr. Rodenburg's qualifications[.]" *Id.* at 5. Instead, Monsanto challenges those opinions which Rodenburg derived from: (1) data obtained from *outside* of the Lower Duwamish Waterway ("LDW") at issue; (2) through a comparison of sampling data to mixtures of Aroclors while excluding the full-suite of byproduct sources and congeners contributing to the LDW; and (3) while using $r^2$ cutoff values that are scientifically arbitrary and indefensible, and are contradicted by authoritative literature which Rodenburg cites favorably.

I.  **Rodenburg Relies on Unrepresentative Data from Outside of the LDW**

Plaintiff argues that the data underlying Rodenburg's analyses must be reliable because the

"majority of the data was collected and vetted in connection with a study by the Washington Department of Ecology" before the commencement of this litigation. Dkt. 382 at 4. This position is belied by publications concerning the Green-Duwamish River Watershed study from which Rodenburg derived such data, which recognize that "no independent investigations concerning the accuracy or completeness of the information relied upon" has been made by the study's authors. Dkt. 321-5 at 3. Notably, Plaintiff omitted this language from its citation to the Phase 2 report, *compare* Dkt. 383-1 *with* DeBord. Ex. D at 2, and attempts to downplay its significance by referring to the language as "boilerplate" in nature without any meaningful explanation. Dkt. 382 at 10

Plaintiff's argument is also illogical. While data generated during the study of the larger Green-Duwamish River Watershed (which extends to river mile 95.0) might be reliable for certain purposes, that data does not automatically become reliable when focusing on the LDW, which is encompassed entirely within river miles 0 to 5.0. Plaintiff attempts to downplay the percentage of data derived from outside the LDW by recognizing that "some of [the data] comes from samples taken outside" of the LDW. Dkt. 382 at 9. As noted in the instant Motion—and uncontested by Plaintiff—up to 96% of the data for certain environmental compartments at issue were taken from *outside* of the LDW. Dkt. 321-1 at 18-19. An image of the Green-Duwamish River Watershed as compared to the LDW at issue is illuminating, and can be found at Dkt. 321-5 at p. 16:



REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF LISA RODENBURG - CASE NO. 2:16-CV-00107-RAJ-MLP – Page 2

Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
TEL: (314) 690-0204

1  The LDW is located in the yellow-highlighted portion in the top-left corner of the map, while the
2  data for the larger Green-Duwamish River Watershed study—on which Rodenburg relies—were
3  derived largely from the larger black subwatersheds depicted in Figure 2-1.

4         This map also discounts Rodenburg's attempt to explain-away her failure to use data derived
5  from within the LDW.  As Plaintiff states: "including data from parts of the watershed outside the
6  LDW is appropriate because 'the Duwamish [is] a tidal system, and so the water is flowing back
7  and forth, the sediment moves with the water back and forth . . . .'"  Dkt. 382 at 9.  Yet, when
8  questioned as to any specific analysis Rodenburg conducted to determine the extent to which these
9  purported tidal qualities render data *outside* of the LDW relevant to and representative of conditions
10 *within* the LDW, Rodenburg admitted that: (1) the "tidal" qualities would have no impact on certain
11 sampling data (*e.g.* atmospheric deposition); (2) she does not know whether the "tidal" qualities
12 would impact storm drain or stormwater data at issue[1]; and (3) she did not discuss or report the
13 results of any such analysis in her written report for this case.  Dkt. 321-2 at 311:7-312:20.

14        Nevertheless, Plaintiff assures the parties and this Court that "Dr. Rodenburg evaluated the
15 quality of the available data and determined that the data [were] sufficient" for her purposes.  Dkt.
16 382 at 8.  This is not the applicable standard for expert testimony, and this Court "need not admit
17 an expert opinion that is connected to the underlying data 'only by the ipse dixit of the expert.'"
18 *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153 (E.D. Wash. 2009) (quoting *General*
19 *Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  At the very least, Rodenburg's opinions should be
20 confined to those concerning data obtained from *within* the LDW at issue.

21 **II.  Rodenburg's Methodology Arbitrarily Excludes Byproduct PCB Mass**

22        Plaintiff does not take issue with Monsanto's description of Rodenburg's Positive Matrix
23 Factorization ("PMF") and Multiple Linear Regression ("MLR") analyses—but instead, argues that
24 Monsanto's criticisms of Rodenburg "for excluding certain data is misplaced" because data
25 exclusion "is required by the analysis" that Rodenburg employed.  Dkt. 382 at 11.  Simply because

---

[1] A "tidal" system would have no logical impact on otter scat or organism tissue, so that 5 of the 7 total environmental compartments Rodenburg considered would not be impacted by her purported "tidal" rationale.

REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT
TESTIMONY OF LISA RODENBURG - CASE NO. 2:16-CV-00107-
RAJ-MLP – Page 3

Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
TEL: (314) 690-0204

the exclusion of data is *required* by the analyses Rodenburg employed does not render her methodology or the opinions generated from it reliable.

For example, despite the fact that 130 of the 209 possible PCB congeners have been associated with byproduct sources, Dkt. 321-2 at 229:5-9, Plaintiff asserts that "it is not possible to determine whether the source of excluded PCB mass was [Aroclor] or byproduct" in nature because "most of the PCB congeners that have been identified as potentially associated with byproduct PCBs are also contained in Monsanto's Aroclors." Dkt. 382 at 11. In anticipation of this argument, Monsanto focused its inquiry on PCB 11, which according to Rodenburg, is "virtually absent in Monsanto's Aroclors." Dkt. 321-1 at 14. Plaintiff does not dispute the fact that Rodenburg's analysis resulted in the exclusion of more than 78% byproduct PCB 11 from certain sampling data. Dkt. 321-2 at 193:21-194:3. This arbitrary exclusion of data results in an undercounting of byproduct PCB contributions to the LDW, and renders Rodenburg's opinions unreliable. *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 at FN60 (E.D. Cal. 2011) ("[A] reliable expert would not ignore contrary data, misstate the findings of others, [or] make sweeping statements without support[.]")

In an attempt to downplay the presence and ubiquity of byproduct PCB sources within the environment, Plaintiff asserts that byproduct sources "have been found in vanishingly few locations" and are "a significant source of PCBs to the environment in a very small number of cases." Dkt. 382 at 12. While this claim is in direct contradiction to opinions which Rodenburg offers outside of litigation, it should be again noted that Monsanto does not challenge Rodenburg's qualifications or opinions concerning the presence and ubiquity of byproduct PCBs within the environment, which Rodenburg has described as the "main problem" facing municipalities like the City of Seattle. Dkt. 320 at p. 4; *see also* Rodenburg PowerPoint, Ex. A at 40 ("Non-Aroclor sources are showing up everywhere (more than just PCB 11)"); Rodenburg Presentation, Ex. C at 52:13-53:10 ("[T]hey can go after Aroclor–type sources . . . But that's not their main problem. Their main problem is PCB-11 [from] pigments.").

1    Additionally, in an attempt to overcome the fact that Aroclor 1016 cannot account for the presence of approximately 30% of the PCB mass within the "Air1" and 50% of the PCB mass within "Sediment 1", Plaintiff posits that these compartments were discussed in reports that were "approved by the Washington Department of Ecology" and therefore, Rodenburg's attribution of 100% of each of these environmental compartments to an Aroclor source must be the product of a reliable methodology. Dkt. 382 at 14-15. Should Plaintiff prevail along this line of reasoning, this Court's authority in ruling on pretrial issues including the admission of expert testimony would be delegated entirely to a state regulatory agency. This absurd result must be avoided. Simply because the data within "Air1" was discussed in a report submitted to the Washington Department of Ecology does not render Rodenburg's opinions reliable or admissible at trial.

Next, Plaintiff glosses over Monsanto's critique that Rodenburg failed to consider whether sampling data is comprised of a mixture of Aroclor and byproduct PCB sources. In response to this criticism, Plaintiff simply states: "Dr. Rodenburg also compares the fingerprints to non-Monsanto PCBs" and offers a characterization that: "[j]ust as she does with Monsanto's PCBs, Dr. Rodenburg calculates an $r^2$ value comparing each fingerprint to non-Monsanto PCBs . . . ." Dkt. 382 at 13. Plaintiff's position is misleading. As noted in the instant Motion—and uncontested by Plaintiff— Rodenburg compared PMF sampling data to: (A) Aroclors or mixtures of Aroclors; and separately, to (B) byproduct PCBs from either silicon or pigments (but never a mixture of the two). Dkt. 321-2 at 223:10-15. These comparisons exclude the possibility that environmental sampling data is comprised of both Aroclor *and* byproduct PCBs. By failing to consider whether sampling data is comprised of a *mixture* of Aroclor and byproduct PCB sources, Rodenburg's methodology excludes up to 50% of PCB mass within sampling data—including byproduct PCB congeners—that Rodenburg then attributes solely to an Aroclor source. *Id.* at 243:16-244:13.

Plaintiff also fails to address Monsanto's critique that Rodenburg further understates byproduct PCB contributions to the LDW by considering only 4 congeners (PCBs 11, 206, 208 and 209) and two sources (silicon and pigment) of byproduct PCBs, despite admitting that more than

130 individual congeners contained within hundreds of consumer products have been identified as byproduct in nature. Dkt. 320 at 11. Even Rodenburg admits that, by considering only 4 out of 130 potential byproduct congeners, her methodology could result in an "underestimation of byproduct sources" within the LDW. Dkt. 321-2 at 264:15-265:4. Plaintiff attempts to overcome these glaring deficiencies by shifting the burden to Monsanto, stating: "Monsanto offers no evidence that PCBs from all of these products ever have been found in the environment." Dkt. 382 at 15. Yet, during her deposition, Rodenburg admitted that she failed to consider byproduct sources—such as asphalt—that were "certainly" used throughout the LDW. Dkt. 321-2 at 251:16-253:15. At the very least, Rodenburg's opinions should be limited to those based on a comparison of sampling data to a mixture of Aroclor and *all* relevant byproduct PCB sources and congeners found within the LDW.

### III. Rodenburg's Methodology Utilizes Arbitrary $r^2$ Cutoff Values

Finally, in discussing Rodenburg's interpretation of $r^2$ cutoff values, Plaintiff asserts that "Rodenburg used the same interpretation in a peer-reviewed paper published in 2020." Dkt. 382 at 15. Yet, the publication to which Plaintiff cites merely refers back to Rodenburg's use of the same arbitrary cutoff values during the Green-Duwamish River Watershed study from which Rodenburg obtained the data underlying her opinions in this case. Dkt. 383-3 at 3. Even if the Court does consider this circuitous reference to constitute "peer-review"—which it should not—Plaintiff wholly fails to address two alternative bases raised in the instant Motion demonstrating the unreliable nature of Rodenburg's $r^2$ interpretation: (1) Rodenburg admits she cannot prove or disprove the use of cutoff values different than her own; and (2) the cutoff values Rodenburg employed are contradicted by authoritative literature which Rodenburg cites favorably. Dkt. 321-3 at 135:12-136:2, 138:18-139:16, 140:2-142:2. At the very least, Rodenburg's opinions should be confined to those generated using $r^2$ cutoff values that have been subjected to peer review or are otherwise generally accepted within the scientific community.

For the foregoing reasons, Rodenburg's opinions should be excluded or limited at trial.

| | |
|---|---|
| 1 | DATED: August 26, 2022 |
| 2 | **SHOOK, HARDY & BACON L.L.P.** |
| 3 | By: /s/ Lisa N. DeBord |
| | Adam E. Miller (Admitted *Pro Hac Vice*) |
| 4 | Lisa N. DeBord (Admitted *Pro Hac Vice*) |
| | Susan L. Werstak (Admitted *Pro Hac Vice*) |
| 5 | Michael W. Cromwell (Admitted *Pro Hac Vice*) |
| | Rachel R. Berland (Admitted *Pro Hac Vice*) |
| 6 | 190 Carondelet Plaza, Suite 1350 |
| | St. Louis, (Clayton), MO 63105 |
| 7 | Phone: (314) 690-020 |
| | Email: amiller@shb.com |
| 8 | ldebord@shb.com |
| | swerstak@shb.com |
| 9 | rberland@shb.com |
| 10 | |
| 11 | **LATHAM & WATKINS LLP** |
| | Robert M. Howard, CSBA No. 145870 |
| 12 | (Admitted *Pro Hac Vice*) |
| | Jason M. Ohta, CSBA No. 211107 |
| 13 | (Admitted *Pro Hac Vice*) |
| | Daniel P. Brunton, CSBA No. 218615 |
| 14 | (Admitted *Pro Hac Vice*) |
| | Shannon K. Lankenau, CSBA No. 294263 |
| 15 | (Admitted *Pro Hac Vice*) |
| | Natalie C. Rogers, CSBA No. 301254 |
| 16 | (Admitted *Pro Hac Vice*) |
| | 12670 High Bluff Drive |
| 17 | San Diego, California 92130 |
| | Phone: (858) 523-5400 |
| 18 | Email: robert.howard@lw.com |
| | jason.ohta@lw.com |
| 19 | daniel.brunton@lw.com |
| | shannon.lankenau@lw.com |
| 20 | natalie.rogers@lw.com |
| 21 | **SCHWABE WILLIAMSON & WYATT** |
| | Jennifer L. Campbell, WSBA No. 31703 |
| 22 | Connie Sue M. Martin, WSBA No. 26525 |
| | David F. Stearns, WSBA No. 45357 |
| 23 | 1420 5th Avenue, Suite 3400 |
| | Seattle, WA 98101 |
| 24 | Phone: (206) 622-1711 |
| | Email: jcampbell@schwabe.com |
| 25 | csmartin@schwabe.com |
| 26 | |
| 27 | |
| 28 | |

REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF LISA RODENBURG - CASE NO. 2:16-CV-00107-RAJ-MLP – Page 7

Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza, Suite 1350
St. Louis, MO 63105
TEL: (314) 690-0204

**KING & SPALDING LLP**
Donald F. Zimmer (Admitted *Pro Hac Vice*)
Megan Nishikawa (Admitted *Pro Hac Vice*)
Troy D. McMahan (Admitted *Pro Hac Vice*)
Nicholas D. Kayhan (Admitted *Pro Hac Vice*)
101 Second Street, Suite 2300
San Francisco, CA 94105
Phone: (415) 318-1200
Email: fzimmer@kslaw.com
       mnishikawa@kslaw.com
       tmcmahan@kslaw.com
       nkayhan@kslaw.com

**KING & SPALDING LLP**
Peter Hsiao (Admitted *Pro Hac Vice*)
663 West Fifth Street, Ste. 1600
Los Angeles, CA 90071
Phone: (213) 443-4310
Email: phsiao@kslaw.com

**SHOOK HARDY & BACON L.L.P.**
Richard Campbell (Admitted *Pro Hac Vice*)
Stephen I. Hansen (Admitted *Pro Hac Vice*)
Brandon Arber (Admitted *Pro Hac Vice*)
One Federal Street, Suite 2540
Boston, MA 02110
Phone: (617) 531-1441
Email: rcampbell@shb.com
       shansen@shb.com
       barber@shb.com

**SHOOK HARDY & BACON L.L.P.**
Thomas M. Goutman (Admitted *Pro Hac Vice*)
David S. Haase (Admitted *Pro Hac Vice*)
Kim Kocker (Admitted *Pro Hac Vice*)
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: (215) 575-3136
Email: tgoutman@shb.com
       dhaase@shb.com
       kkocher@shb.com

*Attorneys for Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC*

## CERTIFICATE OF SERVICE

The undersigned declares under penalty of perjury, under the laws of the State of Washington, that the following is true and correct:

I hereby certify that on August 26, 2022, I electronically served the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LISA RODENBURG** with the Clerk of the Court using the CM/ECF system, which will send notification to all parties who have appeared in this case.