UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

                    Plaintiff,

        v.

MONSANTO COMPANY, *et al.*,

                    Defendants.

Case No. C16-107-RAJ-MLP

ORDER

## I.      INTRODUCTION

This matter is before the Court on: (1) Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC's ("Defendants" or "Monsanto") "*Daubert* Motion to Exclude Expert Mark Buckley's Testimony re: Real Estate Appraisals" (Defs.' Buckley Mot. (dkt. # 632)); (2) Defendants' "*Daubert* Motion to Exclude Expert Michael Trapp's Testimony Regarding Fourth Opinion" (Defs.' Trapp Mot. (dkt. # 626)); and (3) Plaintiff City of Seattle's ("City") "Motion to Exclude Proposed Expert Testimony by Stan Sidor" (Pl.'s Mot. (dkt. # 605)). The parties have filed responses (Pl.'s Buckley Resp. (dkt. # 658); Pl.'s Trapp Resp. (dkt. # 672); Defs.' Resp. (dkt. # 677)) and replies (Pl.'s Reply (dkt. # 713); Defs.' Buckley Reply (dkt. # 723); Defs.'

Trapp Reply (dkt. # 726)) on the respective motions. The Court heard oral argument from the parties on July 14, 2023. (Dkt. # 757.)

Having considered the parties' submissions, oral argument, the balance of the record, and the governing law: (1) Defendants' Buckley Motion (dkt. # 632) is GRANTED; (2) Defendants' Trapp Motion (dkt. # 626) is DENIED; and (3) the City's Motion (dkt. # 605) is DENIED as MOOT, as further explained below.

## II.       BACKGROUND

This case arises out of Defendants' manufacture and sale of polychlorinated biphenyls ("PCBs"). Through this lawsuit, the City seeks to hold Defendants liable for PCBs that have escaped from their use in industrial and commercial applications into the Lower Duwamish Waterway ("LDW") and the City's stormwater and drainage systems. (*See* Second Am. Compl. (dkt. # 267) at ¶¶ 5-15.)

The City's sole remaining cause of action alleges Defendants intentionally manufactured, distributed, marketed, and promoted PCBs in a manner that created a public nuisance harmful to the health and free use of the LDW and the City's stormwater and drainage systems. (Second Am. Compl. at ¶¶ 91-108.) Defendant Pharmacia LLC (a/k/a "Old Monsanto") was the sole producer of PCBs in the United States from the 1930s until they were banned by Congress in 1977. (*Id.* at ¶ 38.)

The City's complaint alleges Old Monsanto knew its PCBs would get into the environment and waterbodies, such as the LDW, through their ordinary use, and that Old Monsanto's knowledge was based in part on its sales of PCBs to businesses near the LDW and its own use of PCBs at its vanillin plant that operated adjacent to the LDW. (Second Am. Compl. at ¶¶ 61-79.) The City alleges it has incurred past costs, and will incur future costs, for

investigation and remediation of the LDW, its source control efforts in the LDW, and for the design and construction of a stormwater treatment plant to reduce PCBs from one drainage basin adjacent to the LDW. (*Id.* at ¶¶ 8, 10, 15, 104-05.)

Based on these allegations, the following experts have been set forth by the parties to testify regarding certain aspects of costs of abatement concerning PCB contamination:

### A.    Dr. Buckley

Dr. Buckley is an environmental economist, with a Ph.D. in environmental studies from the University of California, Santa Cruz with an economic focus. (Ohta Decl., Ex. A (dkt. # 633-1) at 1.) Dr. Buckley's work involves "constructing and leading benefit-cost analyses for federal, state, and local government agencies managing natural resources." (*Id.*) Dr. Buckley has a decade of experience managing and conducting economic analyses for water quality policies and investments in the Seattle region, including the benefits, costs, financing, and other aspects of investments in stormwater and wastewater management and ecological protection for the Green-Duwamish River watershed. (*Id.*)

Dr. Buckley offers five opinions ultimately opining a total of $574 million in abatement costs to the City from PCB contamination. (Ohta Decl., Ex. A at 3.) In sum, Dr. Buckley opines that:

> Opinion 1: The present cost of stormwater control lifecycle costs, when adjusted for inflation and timing of cost occurrence, is $322 million.
>
> Opinion 2: The present cost of stormwater control siting land acquisition costs, when adjusted for inflation and timing of cost occurrence, is $175 million.
>
> Opinion 3: Transaction costs associated with land acquisition for stormwater control siting are likely to be approximately $5.3 million in present cost obligation.
>
> Opinion 4: The present cost of the Source Control Program, including enhancements to address PCBs more fully, when adjusted for inflation and timing of cost occurrence, is $53 million.

> Opinion 5: The cost to expand existing community programs to reach additional ethnic groups and further reduce public health risk from unsafe fish consumption in the Lower Duwamish is $19 million.

(*Id.*)

Per his challenged opinions regarding land acquisition costs, Dr. Buckley cited to the best management practices ("BMPs") identified by Dr. Trapp of using bioretention basins for the capture and treatment of stormwater in a set of basins near the LDW.[1] (Ohta Decl., Ex. A at 7.) Dr. Buckley noted that "[s]iting for the stormwater capture BMPs identified by Dr. Trapp will require a considerable amount of land area near downtown Seattle." (*Id.*) Dr. Buckley determined the total land required for the 440 bioretention basins was 43.43 acres across 8 basins. (*Id.* at 9.) Dr. Buckley opined half of the required bioretention basins could be sited in publicly owned areas, leaving 21.7 acres that the City would need to acquire. (*Id.* at 11.)

Dr. Buckley estimated the costs of acquiring sites for the BMPs in the eight basins. (Ohta Decl., Ex. A at 11.) To estimate land acquisition costs, Dr. Buckley determined the medians of the King County Assessor's assessed values per square foot of vacant and redevelopable land for each basin. (*Id.* at 13.) For two basins lacking sufficient vacant and redevelopable land, Dr. Buckley determined the King County Assessor's median value by type of industrial or commercial/mixed use property and multiplied those medians by the total square footage of the property anticipated to be required in each basin. (*Id.*) Dr. Buckley opined land acquisitions would occur across a 10-year period, and as such, applied an anticipated inflation rate to the expected costs and discounted future costs to present value. (*Id.* at 14.) Dr. Buckley concluded

---

[1] Bioretention basins are vegetated, landscaped depressions designed to capture and treat stormwater runoff. (*See* Brunton Decl., Ex. A (dkt. # 627-1) at 32, 35.)

ORDER - 4

the cumulative present value of acquisition of 21.7 acres in total for the basins was $175,282,083. (*Id.* at 15, 26.)

Per his challenged opinion for land acquisition transactional costs, Dr. Buckley opined the program required for the bioretention basins would need more staff than the City presently has. (Ohta Decl., Ex. A at 15.) Dr. Buckley opined four full-time staff would be necessary (and using staffing cost estimates of $125,000 per year per person based on information from other City utilities) estimated a cost of "roughly $500,000 per year and $5 million over ten years in total before inflation." (*Id.*) Despite providing an estimated cost of staffing, Dr. Buckley estimated a 3 percent cost to capture the "full range of transaction costs" for the $175 million land acquisition to ultimately opine land acquisition transactional costs at approximately $5.3 million in present cost obligation. (*Id.* at 16, 26.)

### B.    Dr. Trapp

Dr. Trapp is a water and sediment quality project manager, with a Ph.D. in marine science and water quality from the University of Miami. (Brunton Decl., Ex. A (dkt. # 627-1) at 9-10.) In his current role, Dr. Trapp develops and manages projects to meet local and regional regulatory compliance requirements for water and sediment quality. (*Id.*) Dr. Trapp was retained by the City to provide an expert opinion regarding actions taken by the City, as the owner and operator of a municipal separate storm sewer system ("MS4"), regarding impairments caused by PCBs in the LDW. (*Id.* at 9.)

Relevant to the instant case, Dr. Trapp opines that:

Opinion 1: [PCBs] are a main contaminant of concern in the [LDW], where concentrations of PCBs in surface sediment are elevated above the lowest sitewide remedial action level (RAL).

Opinion 2: Stormwater from [MS4] is an ongoing source of PCBs to sediment in the LDW.

ORDER - 5

Opinion 3: As the owner and operator of the MS4 that is an ongoing source of PCBs to the LDW, the City of Seattle is and will continue to be required to implement source controls and reduce PCBs from the MS4 outfalls in order to not recontaminate sediment in the LDW[.]

Opinion 4: To reduce PCBs from the City of Seattle's MS4, as is required to comply with the [EPA's 2014] Record of Decision ["ROD"] and corresponding regulations, the City will incur costs of $230,437,240 and land acquisition.

(Brunton Decl., Ex. A at 8.)

Specific to his fourth opinion, to calculate the City's cost to reduce PCBs from MS4 for compliance with the ROD and corresponding regulations,[2] Dr. Trapp analyzed 12 of the 19 City stormwater basins where the City owned the outfall.[3] (Brunton Decl., Ex. A at 25-26.) To determine the required PCB reduction needed in MS4 to meet the City's PCB goal, Dr. Trapp applied a "load-reduction equivalence approach" to estimate the total PCB load that would need to be removed from the City's stormwater entering the LDW. (*Id.* at 27-31.)

Dr. Trapp then calculated the amount of stormwater that would need to be treated to reach the City's PCB goal via stormwater capture and infiltration. (Brunton Decl., Ex. A at 32-36.) For this stormwater capture, Dr. Trapp considered only green stormwater infrastructure, namely the distributed use of bioretention basins, in his opinion. (*See id.*) Based on his analysis, Dr. Trapp concluded 440 bioretention basins would be required across the 12 analyzed sites to meet the stormwater volume reduction target necessary for the City's PCB reduction goal. (*Id.* at 36.) Dr. Trapp estimated the capital and maintenance and operation costs for implementation of the project to meet the targeted PCB reduction to cost a total of $230,437,240. (*Id.* at 37-39.)

---

[2] Per Dr. Trapp's opinion, "the City will implement stormwater BMPs to reduce PCBs from . . . MS4 and minimize the potential to exceed the PCB LAET ["Lowest Apparent Effects Threshold"] goal (i.e., 130 μg/kg-dw)." (Brunton Decl., Ex. A at 25.)

[3] The remaining seven outfalls owned by the City were excluded because the City "expects existing or planned source control efforts will achieve necessary PCB reduction." (Brunton Decl., Ex. A at 25.)

### C.   Mr. Sidor

Mr. Sidor, a real estate valuation expert with 29 years of experience as a Washington State real estate appraiser, was retained by Defendants as a rebuttal expert to rebut Mr. Buckley's opined land acquisition and transactional costs. (*See* Grotto Decl., Ex. A (dkt. # 606-1).) In sum, Mr. Sidor's rebuttal report opines that:

> Opinion 1: Dr. Buckley is not a certified real estate appraiser, is not qualified to offer any opinions on the value of real estate, and in doing so, may have violated Washington law.

> Opinion 2: Dr. Buckley's methodology for evaluating the land acquisition costs for stormwater BMPs is improper and unreliable, especially for industrial use properties.

> Opinion 3: Dr. Buckley's methodology ignores other factors relevant to valuing real estate.

> Opinion 4: Dr. Buckley inconsistently applies an inflation rate and errs in his reliance upon the S&P/Case-Shiller Index, which leads to unreliable net present value calculations.

> Opinion 5: Dr. Buckley erroneously calculated the net present value of the project lifecycle costs.

> Opinion 6: Dr. Buckley relies on outdated cost bases for his models.

(*Id.* at 3-11.)

### III.   DISCUSSION

### A.   Legal Standards

Federal Rule of Evidence 702 provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

1    Fed. R. Evid. 702. For expert testimony to be admissible under Rule 702, it must satisfy three

2    requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3)

3    the testimony must be relevant. *See Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509

4    U.S. 579, 589-91 (1993). The proponent of expert testimony has the burden of establishing that

5    the admissibility requirements are met by a preponderance of the evidence. *Id.* at 592 n.10; *see*

6    *also Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

7          Before admitting expert testimony into evidence, the Court acts as a "gatekeeper" in

8    determining its admissibility under Rule 702 by ensuring the testimony is both "relevant" and

9    "reliable." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing

10   *Daubert I*, 509 U.S. at 597). Expert testimony is relevant where "the evidence logically

11   advance[s] a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740

12   F.3d 457, 463 (9th Cir. 2014) (internal quotations and citation omitted), *overruled on other*

13   *grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc). Testimony is reliable

14   where it has "a reliable basis in the knowledge and experience of the relevant discipline." *Id.*

15   (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

16         The Supreme Court has noted the reliability inquiry is a "flexible one," and while the

17   Supreme Court has suggested several factors helpful in determining reliability, trial courts are

18   generally given "broad latitude in determining the appropriate form of the inquiry."[4] *United*

19   *States v. Wells*, 879 F.3d 900, 934 (9th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 150); *see*

20   *also Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (finding Rule 702

21

22   [4] In relevant part, *Daubert I* suggested several reliability factors a trial court may examine to determine
the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether
23   it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or
technique; (4) the existence and maintenance of standards and controls; and (5) whether the theory or
technique enjoys general acceptance within the relevant scientific community. *Daubert I*, 509 U.S. at
592-94; *see also Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).

1   should be applied with a "liberal thrust" favoring admission) (quoting *Daubert I*, 509 U.S. at

2   588); *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) (Rule 702 is "construed liberally"

3   in considering admissibility of testimony based on specialized knowledge).

4          Furthermore, the reliability inquiry favors admission of testimony as "[s]haky but

5   admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

6   the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing

7   *Daubert I*, 509 U.S. at 596). The reliability inquiry test does not seek to measure "the correctness

8   of the expert's conclusions but the soundness of [his or her] methodology," and therefore, when

9   an expert meets the standards established by Rule 702, "the expert may testify[,] and the fact

10  finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas.*

11  *Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano*, 598 F.3d at 564-65).

12         **B.     Dr. Buckley**

13         Defendants move to exclude two of Dr. Buckley's five opinions: (1) that the present cost

14  of stormwater control siting land acquisition costs is $175 million; and (2) that transaction costs

15  associated with land acquisition for stormwater control siting are approximately $5.3 million in

16  present cost obligation.[5] (Defs.' Buckley Mot. at 1-2.) Defendants primarily argue that Dr.

17  Buckley is not qualified to provide either opinion because he is not a licensed Washington State

18  real estate appraiser. (*Id.* at 5-8.) In the alternative, Defendants contend Dr. Buckley's

19  assessment relies on faulty valuation principles because his appraisal methodology assumes King

20  County's tax valuations for property equates to fair market value. (*Id.* at 8-10 (citing *Suntrust*

21  *Mortg. Inc. v. Busby*, 469 F. App'x. 205, 207 (4th Cir. 2012); *Tarrify Props., LLC v. Cuyahoga*

22  *Cnty*, 2020 WL 7490096, at *3 (N.D. Ohio Dec. 21, 2020), *aff'd*, 37 F.4th 1101 (6th Cir. 2022)).)

23

---

[5] Defendants note that Dr. Buckley's opined transactional costs are simply "a percentage (3%) of his $175 million calculation." (Defs.' Buckley Mot. at 5 n.3 (citing Ohta Decl., Ex. A at 15-16)).

The City argues Washington appraisal statutes are not applicable to Dr. Buckley's work because he did not express an opinion as to the value of any identified parcel or tract of land. (Pl.'s Buckley Resp. at 4-6.) The City further counters that Dr. Buckley's methodology for calculating his opinions remains sound and reliable because, unlike the situations presented by Defendants' cited authority, Dr. Buckley did not opine on the fair market value of an identified piece of property in an eminent domain or foreclosure case and that Defendants' challenge regarding Dr. Buckley's calculations goes to the weight of the evidence rather than its admissibility. (*Id.* at 6-8.)

An expert is considered qualified to testify if the expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire*, 526 U.S. at 156. Because Rule 702 "contemplates a *broad conception* of expert qualifications," only a "*minimal foundation* of knowledge, skill, and experience" is required. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (internal quotations and citation omitted; emphasis in original).

Here, though Dr. Buckley did not identify any specific parcels of land that need be acquired to meet the statutory definition of "real estate" provided by RCW § 18.140.010, Dr. Buckley clearly provides an opinion on the value of real estate that would need to be acquired by the City for the siting of Dr. Trapp's BMPs. To this end, Dr. Buckley used the median assessed value for applicable categories of property in each basin to arrive at a cost estimate to the City to acquire the land necessary for the BMPs. (*See* Ohta Decl., Ex. A at 13-15.) Such practices clearly fit within the definition of "appraisal." *See* RCW § 18.140.010(1) ("'Appraisal' means the act or process of estimating value; an estimate of value; or of or pertaining to appraising and related functions.").

In essence, the City proposes that an unlicensed individual can opine to the cost estimate of real estate to be acquired so long as said individual avoids specific reference to a parcel of real estate. (City's Resp. at 5 (citing RCW 18.140.010) (arguing "the appraisal statutes have to do with the valuation of 'an identified parcel or tract of land.'").) The City fails to cite any clear authority supporting such an interpretation of Washington's real estate appraisal statutory and regulatory regime. Moreover, this Court remains unconvinced that Dr. Buckley, who is an environmental economist by trade, need not be licensed under Washington law to provide a cost estimate regarding the value of land for the BMPs solely because he gave a valuation estimate in the abstract. *See* RCW 18.140.020(4) ("A person who is not certified, licensed or registered under this chapter shall not prepare any appraisal of real estate located in this state . . ."); *see also Kingsport Pavilion, LLC v. Crown Enters., Inc.*, 2010 WL 11435700, at *3-5 (E.D. Tenn. Mar. 2, 2010) (excluding real estate expert because he was not licensed or certified under Tennessee state law to give opinion regarding the value of real property).

In any case, Dr. Buckley's use of King County tax assessments as a proxy for fair market value is also unreliable. Per his report, Dr. Buckley states that "[t]he assessed value represents a reasonable estimate of the likely price of acquiring a parcel," and that the "King County Department of Assessment states that the assessed value is intended to provide the best feasible approximation of market value for a property." (Ohta Decl., Ex. A at 8 n.28.) As noted by several federal courts, the use of tax valuations is unreliable for establishing the fair market value of property.[6] *See, e.g., United States v. 0.59 Acres of Land More or Less in the Cnty. of Pima*

---

[6] "Tax valuation and sale appraisal are performed for different purposes and calculated in different ways . . . Tax valuations therefore give a coarser ballpark value adequate for property tax purposes that would likely be inadequate to determine fair market sale value." *Tarrify Props., LLC*, 2020 WL 7490096 at *4; *see also Eaton v. Boles*, 2005 WL 8164008, at *4 (W.D. Mich. Nov. 3, 2005) ("It is widely

*Ariz.*, 109 F.3d 1493, 1496 (9th Cir. 1997) (observing "the district court itself stated that tax assessments are wrong in 98 percent of cases"); *Suntrust Mortg. Inc.*, 469 F. App'x at 207 (finding "the district court did not err in determining that tax valuations do not, by themselves, provide competent evidence sufficient to establish market value") (citation omitted).

Defendants' Buckley Motion is therefore granted. Dr. Buckley's opinion that the City will incur $175,282,083 in land acquisition costs for stormwater BMP siting is excluded as unqualified and unreliable. Dr. Buckley's opinion that the City will incur approximately $5.3 million in related land acquisition transactional costs (derived as a percentage of his opined land acquisition costs) is likewise excluded.

**C.     Dr. Trapp**

Defendants next move to exclude Dr. Trapp's fourth opinion that the City "will incur costs of $230,437,240 and land acquisition" to reduce PCBs from MS4 on several bases. (Defs.' Trapp Mot. at 1.) The Court will address each of Defendants' contentions in turn:

i.     *Dr. Trapp's Declaration*

As an initial matter, Defendants argue on reply that the City submitted an improper declaration from Dr. Trapp in response to Defendants' motion that should be stricken. (Defs.' Trapp Reply at 1-2.) Defendants note Dr. Trapp previously submitted amended errata to his deposition testimony that was rejected by the discovery master as "going beyond mere clarification or correction" under Fed. R. Civ. P. 30(e). (*Id.* (citing dkt. # 627-6 at 4-5).) Similarly, Defendants argue that Dr. Trapp's six-page supplemental declaration submitted with the City's response must also be rejected. (*Id.*)

---

recognized that appraisements of property by tax assessors for purposes of taxation are not reliable guides of market value[.]" (citations omitted)).

1        The City did not file a response or surreply to Defendants' motion to strike.[7] However,

2    the City responded at oral argument that Dr. Trapp's declaration was filed to provide answers to

3    questions posed by Defendants at his deposition and that its filing was not improper because he

4    did not conduct any new analysis or attempt to change his opinions in his report. (*See* dkt.

5    # 757.)

6        Federal Rule of Civil Procedure 26(a)(2)(B)(i) provides that a written expert report must

7    contain "a complete statement of all opinions the witness will express and the basis and reasons

8    for them." An expert witness has a duty to supplement his or her report "in a timely manner if the

9    party learns that in some material respect the disclosure or response is incomplete or incorrect,

10   and if the additional or corrective information has not otherwise been made known to the other

11   parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). When a party

12   fails to comply with Rule 26, the sanction of exclusion is automatic and mandatory unless the

13   sanctioned party can show that its violation was either substantially justified or harmless.

14   *See* Fed. R. Civ. P. 37(c)(1).

15       Courts have broad discretion to exclude untimely disclosed expert witness testimony

16   designated as "supplemental" reports. *See e.g.*, *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252

17   (11th Cir. 2007) ("[A] supplemental expert report may be excluded pursuant to Federal Rule of

18   Civil Procedure 37(c) if a party fails to file it prior to the deadline imposed."). "[A] party cannot

19   abuse Rule 26(e) to merely bolster a defective or problematic expert witness report." *Companhia*

20   *Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016) (citing

21   *Jones Creek Investors, LLC v. Columbia Cnty.*, 98 F. Supp. 3d 1279, 1289 (S.D. Ga. 2015)

22

23   ---

[7] This Court's Local Rules require that requests to strike material attached to submissions of opposing parties not be presented in a separate motion, but that such requests instead be included in the responsive brief to be considered with the underlying motion. *See* Local Civil Rule 7(g).

ORDER - 13

1    ("[Rule] 26(e) does not permit supplementation to add points that could have been made in the

2    original expert report or to otherwise shore up weaknesses or inadequacies[.]"). Therefore, Rule

3    26(e) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or

4    adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v.*

5    *Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005) (citation omitted); *see also Lo v. United States*, 2021 WL

6    5121745, at *2 (W.D. Wash. Nov. 3, 2021) ("The rule for supplementation does not give license

7    to sandbag one's opponent with claims and issues which should have been included in the

8    original witness report."(citation and internal quotations omitted)).

9          Based on the Court's review, Dr. Trapp's declaration submission improperly attempts to

10    respond to several of Defendants' leveled criticisms of his deposition testimony or to otherwise

11    bolster his report with respect to such criticisms. (*See* Trapp Decl. (dkt. # 674).) As noted by

12    Defendants in at least one instance, Dr. Trapp's prior deposition testimony did not indicate the

13    volume dimensions of his basins were a "typographical error" as now alleged in his declaration.

14    (*Compare id.* at ¶ 3 (claiming correct total volume used for each infiltration basin to be 16,500

15    cubic feet and that "4,000-6,000 cubic feet" was a place holder) *with* Howard Decl. (dkt. # 727),

16    Ex. 1 (Trapp Dep. at 212:2-13 (testifying storage volume for his opined basins to be 4,000 to

17    6,000 cubic feet depending on soil)).)

18          Dr. Trapp's declaration was not submitted on a basis that his filed report was incomplete

19    or incorrect, but instead only after the filing of Defendants' motion to rebut his report's alleged

20    deficiencies. The expert discovery cutoff in this matter was June 1, 2022 (*see* dkt. # 229), but Dr.

21    Trapp's declaration was not submitted until August 26, 2022 (*see* Trapp Decl.). Dr. Trapp's

22    declaration "is in all practical effect a supplemental expert report aimed at remedying the

23    deficiencies in [his] report" and therefore, "little more than a back-door effort around the Court's

discovery deadlines." *See Bell v. Boeing Co.*, 2022 WL 1206728, at *3 (W.D. Wash. Apr. 22, 2022) (citing *Eno v. Forest River Inc.*, 2021 WL 6428636, at *2 (W.D. Wash. July 1, 2021) (finding expert declaration submitted after expert report deadline, and in response to motion to exclude, untimely and that it "d[id] not excuse Plaintiff's non-compliance with Rule 26(a)")). Moreover, the City has failed to argue or make any demonstration that its submission of Dr. Trapp's declaration was substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). Dr. Trapp's declaration (dkt. # 674) is therefore stricken.

ii.    *Reliability*

Next, Defendants argue that Dr. Trapp's fourth opinion is unreliable under *Daubert* on several bases. (Defs.' Trapp. Mot. at 3-7.) Specifically, Defendants contend: (1) Dr. Trapp is not an expert in construction-related cost estimation, and therefore, his "planning level" cost estimate is speculative; (2) Dr. Trapp lacks sufficient data to measure PCB concentrations in stormwater obtained at the end-of-the-pipe in the City's system "to fully characterize the discharge" entering the LDW; (3) Dr. Trapp selectively removed five sediment samples from his dataset with the highest PCB concentrations as "not representative"; and (4) Dr. Trapp admitted to significant modeling errors during his deposition. (*Id.*)

The City responds that Dr. Trapp's cost estimate employed several scientifically reliable tools and that he properly used his expertise to interpret the results of his modeling. (Pl.'s Trapp Resp. at 2-5.) As such, the City contends Defendants' challenges to Dr. Trapp's methodology and data applied are based on a mischaracterization of his work, and at most, are issues properly reserved for cross-examination.[8] (*Id.*) Similarly, the City responds Defendants' identified errors

---

[8] The City additionally raises that Defendants' *Daubert* motion is an improper vehicle for seeking to challenge whether Dr. Trapp's opined damages are too speculative or hypothetical. (*See* City's Resp. at 2-3.) The City notes Defendants have already raised this issue with respect to Dr. Trapp's opined damages

with respect to Dr. Trapp's modeling go to the weight, and not the admissibility, of his fourth opinion. (*Id.* at 5-6.)

First, based on this Court's review, Dr. Trapp's cost estimate in his report is sufficiently reliable. Dr. Trapp's analysis plainly utilizes and applies tools developed by regulatory agencies and other government entities for determining abatement costs to the City. (*See* Brunton Decl., Ex. A at 25-39.) Specifically, Dr. Trapp's fourth opinion employed the use of: (1) WinSLAMM, a stormwater model (used by the EPA and the United States Geological Survey ("USGS")) to evaluate runoff volume in urban settings; and (2) a cost-estimating tool in the NCHRP Research Report 992 to estimate the total cost of his opined bioretention basins.[9] (*See id.* at 32, 37.) Defendants' criticisms for how Dr. Trapp arrived at his particular cost estimate through his use of certain models, tools, or his lack of consideration of alternatives, goes to the weight, and not the admissibility, of his testimony. *See Primiano*, 598 F.3d at 564 (citing *Daubert I*, 509 U.S. at 596); *United States v. Sanft*, 2021 WL 5278766, at *2 (W.D. Wash. Nov. 13, 2021) ("Defendants may disagree with [an expert's] opinions and challenge the accuracy of the evidence supporting his conclusions, [but] their challenge goes to the weight of his testimony, not its admissibility.").

Similarly, Defendants' reservations as to the data used by Dr. Trapp for his opinion, and his omission of certain sediment samples in his analysis, are not relevant to whether his opinion is admissible. Pursuant to Rule 702(b), the requirement that expert testimony be based on

---

in Defendants' motion for summary judgment, which remains pending Judge Jones's consideration. (*See* Defs.' Mot for Summary Judgment (dkt. # 326) at 80-95.)

[9] *See also* WinSLAMM, *available at* http://www.winslamm.com (last visited July 19, 2023); WinSLAMM, USGS (Mar. 5, 2019) ("WinSLAMM model is used to identify sources of pollutants in urban stormwater runoff and to evaluate management alternatives for reducing pollutants."), *available at* https://www.usgs.gov/centers/upper-midwest-water-science-center/science/winslamm-source-loading-and-management-model (last visited July 19, 2023); Research Report 992: Guide to Pedestrian Analysis, Nat'l Coop. Highway Rsch. Program (2022), *available at* https://nap.nationalacademies.org/read/26518/chapter/1 (last visited July 19, 2023).

"sufficient facts or data" only requires the Court to engage in "an analysis of the sufficiency of underlying facts or data that is quantitative rather than qualitative." *United States v. W.R. Grace*, 455 F. Supp. 2d 1148, 1152 (D. Mont. 2006); *see also* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments. The requirement "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *W.R. Grace*, 455 F. Supp. 2d at 1152.

Here, Dr. Trapp used relevant data obtained in PCB sediment samples collected by the City at MS4 from 2002-2020 for his opinion. (*See* Brunton Decl., Ex. A at 27 n.11, 32.) Dr. Trapp also explained in his report that he chose to remove PCB sediment samples from his data sampling "that [were] above the 99th percentile . . . of PCB concentration data from the basins" as not representative. (*Id.* at 27 n.11.) Whether Dr. Trapp's data employed for his opinion was in fact the right data to consult also goes to the weight, and not the admissibility, of his testimony. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31 (9th Cir. 1998) (citation omitted) ("Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of [his] testimony."); *Sanft*, 2021 WL 5278766 at *2.

Last on these issues, whether or not Dr. Trapp in fact committed modeling errors in his analysis does not make his testimony inadmissible. Though Defendants have identified several areas in Dr. Trapp's deposition testimony where he indicated he would need to "double check" or "go back and review" his report, that Dr. Trapp could not recall specific details of his work during his deposition does not inherently undermine the reliability of his analysis. (*See* Defs.' Trapp Mot. at 6-7.) As considered above, the central modeling error Defendants do identify in Dr. Trapp's report itself is that it states each opined basin is designed to contain 4,000-6,000

1    cubic feet of stormwater. (Brunton Decl., Ex. A at 34 ("The BMP surface area would be 4,300

2    square feet (about 1.5 times the size of a standard tennis court), which equates to either 4,000 or

3    6,000 cubic feet of storage volume (depending on soil).").)

4          Defendants note that Dr. Trapp's team actually modeled 35,475 cubic feet for the

5    stormwater capacity of each basin. (*See* Brunton Decl. at 39; *see also* Howard Decl., Ex. 1

6    (Trapp Dep. at 220:25-226:13).) The City responds Dr. Trapp used a basin designed to contain

7    16,500 cubic feet, that the 4000-6,000 cubic feet reference in his report was a typographical

8    error, and that Dr. Trapp's calculations and results were correct per the methodology presented.

9    (*See* Pl.'s Trapp Resp. at 6; *see also* Brunton Decl., Ex. C (dkt. # 627-3) at 6-7.) Though

10   Defendants appear to have identified modeling errors underlying Dr. Trapp's calculations, any

11   errors regarding such modeling also go to the weight, and not the admissibility, of Dr. Trapp's

12   testimony. *See Sanft*, 2021 WL 5278766 at *2.

13                      *iii.     Qualifications*

14         Next, Defendants argue that Dr. Trapp is unqualified to provide his fourth opinion

15   because he is not a licensed professional engineer and lacks relevant engineering or

16   cost-estimation experience. (Defs.' Trapp Mot. at 7-9.) The City argues Dr. Trapp did not engage

17   in any engineering work for his opinion, and that Dr. Trapp instead engaged in the review,

18   planning, and design of pollution controls for municipal stormwater systems, with which he has

19   extensive experience with, qualifying him to render his opinion. (*Id.*)

20         On this issue, Dr. Trapp's significant experience in the review, planning, and design of

21   pollution controls in municipal stormwater systems with municipalities across the West Coast

22   plainly qualifies him to opine in this case. (*See* Brunton Decl., Ex. A at 9-10, 43-52 (noting, *inter*

23   *alia*, Dr. Trapp's work as a Project Manager, Chief Scientist, and Principal Reviewer of multiple

1    watershed pollution reduction projects).) Though Defendants characterize certain aspects of Dr.

2    Trapp's opinion as requiring engineering expertise, Dr. Trapp's fourth opinion estimated the total

3    cost of infrastructure needed for the identified BMPs in his project based on his relevant

4    experience (*see id.* at 25-39), which did not require him to engage in any actual planning,

5    designing, or locating of such infrastructure, or ensuring such infrastructure complied with

6    building codes or standards. *See Hangarter*, 373 F.3d at 1015-16. Any of Defendants' remaining

7    qualms as to Dr. Trapp's lack of particularized experience goes to the weight of his testimony

8    and not its admissibility. *See United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (citing

9    *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984)).

10                   *iv.*      *Methodology*

11           Defendants argue that Dr. Trapp's "load reduction equivalence approach" that he used to

12   calculate the 440 bioretention basins he opines as necessary to reduce the PCBs entering the

13   LDW is unreliable because it has never been used previously in litigation nor is peer-reviewed.

14   (Defs.' Trapp Mot. at 9-10.) Defendants further argue Dr. Trapp's approach remains faulty

15   because he applied it exclusively to City-owned outfalls discharging into the LDW, and only to

16   PCBs, while otherwise ignoring other LDW outfalls and contaminants of concern. (*Id.* at 10-12.)

17           The City argues that though Dr. Trapp coined his method as a "load reduction

18   equivalence approach," his methodology is reliable because it incorporates methods used by the

19   USGS, EPA, and other water quality professionals to estimate the cost of stormwater infiltration

20   projects, and that such methods were properly applied in this case. (Pl.'s Trapp Resp. at 9-12.)

21   The City argues Defendants may disagree with Dr. Trapp's conclusions, approach, decision to

22   employ specific tools in his modeling, and the data he relies on, but that Defendants are free to

23   cross-examine Dr. Trapp on these topics. (*Id.* at 11-12.) The City additionally notes Dr. Trapp

1    examined only City-owned outfalls because the City cannot seek to recover costs other entities

2    will incur dealing with PCBs nor does the City have the authority to install stormwater treatment

3    technology on land or outfalls owned by other jurisdictions. (*Id.* at 12.)

4           On this point, the Court agrees with the City. Though Dr. Trapp described his approach

5    novelly as a "load reduction equivalence approach," the Court finds the process underlying Dr.

6    Trapp's methodology sufficiently reliable in this case. Per his opinion, Dr. Trapp translated the

7    City's PCB concentration goal in its stormwater discharge (130 ppb) into a load equivalent

8    because no technology is currently available that can selectively target and reduce PCB

9    concentrations on stormwater sediment, and thus, the City's PCB concentration goal could only

10   be achieved via stormwater discharge reduction.[10] (*See* Brunton Decl., Ex. A at 27 ("[T]he City

11   could achieve the same outcome of meeting the LAET goal via load reduction — reducing the

12   current PCB MS4 load to a load such that the PCB concentration in the City of Seattle's MS4

13   discharges is no more than the LAET goal of 130 µg/kg-dw.").) Using precipitation data and

14   PCB sediment samples collected by the City at MS4 from 2002-2020 (*see id.* at 27-31), Dr.

15   Trapp calculated the total mass of PCBs that would need to be removed from the City's

16   stormwater discharges to meet the City's PCB concentration goal (*see id.* at 32-38). In doing so,

17   as noted above, Dr. Trapp clearly applied tools used by water quality professionals to provide his

18   cost estimate. (*See id.* at 32, 37.)

19          Defendants' identified issues with regard to Dr. Trapp's methodology, how he identified

20   his methodology, his use of certain cost estimating tools, alleged failure to consider dilution,

21   and/or the propriety of his examined outfalls for his opinion all go to the weight, and not the

22

23

---

[10] As noted in Dr. Trapp's report, "'load' is the mass of a pollutant that is discharged into a waterbody during a period of time." (Brunton Decl., Ex. A at 27 n.10.)

ORDER - 20

1    admissibility, of his testimony. *See Kennedy*, 161 F.3d at 1230-31; *Sanft*, 2021 WL 5278766 at

2    *2. Defendants may make such challenges in the course of Dr. Trapp's cross-examination.

3                    v.        *Hearsay*

4            Finally, Defendants argue Dr. Trapp's calculations are based on hearsay from the City

5    and its legal conclusion as to what Washington State regulators expect concentrations of PCBs

6    from City-owned outfalls obtained and measured at the end-of-the-pipe should be. (Defs.' Trapp

7    Mot. at 12.) The City responds that Dr. Trapp does not offer an opinion as to whether the EPA or

8    any other entity will require the PCB concentration from the City's outfalls to meet the City's

9    goal of 130 ppb. (Pl.'s Trapp Resp. at 12.) Instead, the City argues Dr. Trapp used that objective

10   for his estimate because he was retained to determine how the City could get to its requested

11   PCB reduction goal in the most cost-efficient manner. (*Id.*)

12           Here, Dr. Trapp may rely on the City's provided PCB goal in the way that he cites to it,

13   *i.e.*, that Washington State regulators expect concentrations of PCBs from City-owned outfalls

14   will meet the LDW sediment cleanup objective of 130 ppb. (*See* Brunton Decl., Ex. A at 25.) Dr.

15   Trapp need not conduct his own independent investigation or analysis of that goal or expectation

16   to cite to it in his report. *See Daubert*, 509 U.S. at 592 ("An expert is permitted wide latitude to

17   offer opinions, including those that are not based on firsthand knowledge or observation.").

18   Defendants' Trapp Motion is therefore denied.

19           **D.    Mr. Sidor**

20           Because Mr. Sidor's opinions are offered solely to rebut Dr. Buckley's opinions

21   regarding land acquisition and transactional costs (*see* Grotto Decl., Ex. A at 3-11), which this

22   Court has found should be excluded, Mr. Sidor's rebuttal testimony will be unnecessary at trial.

23   Consequently, the City's Motion is denied as moot.

## IV.   CONCLUSION

For the foregoing reasons: (1) Defendants' Buckley Motion (dkt. # 632) is GRANTED; (2) Defendants' Trapp Motion (dkt. # 626) is DENIED; and (3) the City's Motion (dkt. # 605) is DENIED as MOOT. Dr. Buckley's opinions that the City will incur $175,282,083 in land acquisition costs for stormwater BMP siting, and approximately $5.3 million in related land acquisition transactional costs, are both excluded. Dr. Trapp's declaration (dkt. # 674) is STRICKEN pursuant to Fed. R. Civ. P. 37(c)(1).

The Clerk is directed to send copies of this Order to the parties and to the Honorable Richard A. Jones.

Dated this 19th day of July, 2023.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER - 22