UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

                              Plaintiff,

          v.

MONSANTO COMPANY, *et al.*,

                              Defendants.

Case No. C16-107-RAJ-MLP

ORDER

## I.    INTRODUCTION

This matter is before the Court on: (1) Plaintiff City of Seattle's ("City") "Motion to Exclude Proposed Expert Testimony by Michael Kavanaugh, Scott Recker, and Robert Karls" (Pl.'s Mot. (dkt. # 599)); (2) Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC's ("Defendants" or "Monsanto") "*Daubert* Motion to Exclude Testimony (First, Second, Third Opinions) of Plaintiff Expert Mark Velleux" (Defs.' Velleux Mot. (dkt. # 629)); and (3) Defendants' "*Daubert* Motion to Exclude the Opinions and Testimony of Daniel Apt" (Defs.' Apt Mot. (dkt. # 644)). The parties have filed responses (Defs.' Resp. (dkt. # 680); Pl.'s Velleux Resp. (dkt. # 650); Pl.'s Apt Resp. (dkt. # 660)) and replies (Pl.'s Reply (dkt. # 701); Defs.'

ORDER - 1

Velleux Reply (dkt. # 728); Defs.' Apt Reply (dkt. # 719)) on the respective motions. The Court heard oral argument from the parties on July 27, 2023. (Dkt. # 765.)

Having considered the parties' submissions, oral argument, the balance of the record, and the governing law: (1) the City's Motion (dkt. # 599) is GRANTED in part and DENIED in part; (2) Defendants' Velleux Motion (dkt. # 629) is GRANTED in part and DENIED in part; and (3) Defendants' Apt Motion (dkt. # 644) is GRANTED, as further explained below.

## II.      BACKGROUND

This case arises out of Defendants' manufacture and sale of polychlorinated biphenyls ("PCBs"). Through this lawsuit, the City seeks to hold Defendants liable for PCBs that have escaped from their use in industrial and commercial applications into the Lower Duwamish Waterway ("LDW") and the City's stormwater and drainage systems. (*See* Second Am. Compl. (dkt. # 267) at ¶¶ 5-15.) The City's sole remaining cause of action alleges Defendants intentionally manufactured, distributed, marketed, and promoted PCBs in a manner that created a public nuisance harmful to the health and free use of the LDW and the City's stormwater and drainage systems. (*Id.* at ¶¶ 91-108.) Defendant Pharmacia LLC (a/k/a "Old Monsanto") was the sole producer of PCBs in the United States from the 1930s until they were banned by Congress in 1977. (*Id.* at ¶ 38.)

The City's complaint alleges Old Monsanto knew its PCBs would get into the environment and waterbodies, such as the LDW, through their ordinary use, and that Old Monsanto's knowledge was based in part on its sales of PCBs to businesses near the LDW and its own use of PCBs at its vanillin plant that operated adjacent to the LDW. (Second Am. Compl. at ¶¶ 61-79.) The City alleges it has incurred past costs, and will incur future costs, for investigation and remediation of the LDW, its source control efforts in the LDW, and for the

design and construction of a stormwater treatment plant to reduce PCBs from one drainage basin adjacent to the LDW. (*Id.* at ¶¶ 8, 10, 15, 104-05.)

In 2001, the EPA listed the LDW as a Superfund Site. Relevant to the parties' motions, the U.S. Environmental Protection Agency ("EPA") issued a Record of Decision ("ROD") in 2014 for the remediation of the LDW Superfund Site, which references 43 chemicals that have accumulated in the LDW due to assorted industrial and municipal practices. (*See* Howard Decl., Ex. 1 (dkt. # 681-1).) The ROD contains a human health risk assessment prepared by the EPA, which determined that four of the contaminants in the LDW presented unacceptable risks to human health: PCBs, arsenic, dioxins/furans, and carcinogenic polyaromatic hydrocarbons ("cPAHs"). (*See id.* at 37-39.)

For the cleanup of the LDW, the EPA estimated a total cost of $342 million in the ROD. (Howard Decl., Ex. 1 at 91.) In 2014, the LDW Allocation Proceedings followed to resolve shares of liability for past and future costs to implement the ROD, ultimately involving 44 potentially responsible parties, including the City and Defendant Pharmacia. (*See* DeBord Decl. (dkt. # 327) at ¶ 82, Ex. 81 (dkt. # 331-6) at ¶ 3.)

Based on this background and the City's allegations, Dr. Kavanaugh, Mr. Karls, Mr. Recker, Dr. Velleux, and Mr. Apt have each been set forth by the parties to testify regarding sources of PCB contamination in the LDW and remediation costs:

**A.    Dr. Kavanaugh, Mr. Karls, and Mr. Recker**

Dr. Kavanaugh, Mr. Karls, and Mr. Recker are each environmental consultants retained by Defendants to opine on the LDW, the sources of its contamination, the effect of PCBs, and costs of remediation.[1] (*See* First Wishik Decl., Ex. A (dkt. # 600-1) at 3; *id.*, Ex. B (dkt. # 600-2)

---

[1] Mr. Karls and Mr. Recker co-authored an expert report. (*See* First Wishik Decl., Ex. B (dkt. # 600-2).)

at 3.) Based on their knowledge, experience, and site observations, Defendants' experts opined that the City's drainage infrastructure contributed a significant source of the pollutants in the LDW. (*See id.*, Ex. A at 3, 5-15, 21-22, 27-29; *id.*, Ex. B at 3, 11-17.)

Specifically, the opinions at issue identified by the City are:

[Dr. Kavanaugh] Opinion 1: The City is responsible for developing the LDW into a heavily industrialized waterway which would have required the same level of environmental investigation had PCBs never existed.

[Dr. Kavanaugh] Opinion 2: The City's waste management practices at the SCL [Seattle City Light] South Service Center and Georgetown Steam Plant resulted in discharges of Several Constituents, including PCBs, to the LDW that could have been prevented.

. . .

[Mr. Karls and Mr. Recker] Opinion 2: Sources of constituents found in the LDW include: (a) industrial waste disposal; (b) industrial releases; (c) combined sewer overflows; and (d) stormwater discharges.

[Mr. Karls and Mr. Recker] Opinion 4: The City of Seattle has substantially contributed to the presence of constituents in the LDW through its facilities and its combined, separated, and partially separated sewer systems.

[Mr. Karls and Mr. Recker] Opinion 5: Landfills are not sources of PCBs to the LDW.

(First Wishik Decl., Ex. A at 3, Ex. B at 3.)

Per Dr. Kavanaugh's first opinion, he opines the City has a near 80-year history of permitting discharges of raw and partially treated sewage and industrial waste into the LDW from the 1890s to the 1970s. (First Wishik Decl., Ex. A at 5-15.) Dr. Kavanaugh opines the City's channelization of the Duwamish River, and the historical industrialization of the LDW banks and use as an extension of the City's municipal and industrial waste management practices, led to the current condition of the LDW. (*Id.* at 8.) In Part 2.1 of his first opinion, Dr. Kavanaugh specifically points to the City's choice to use a combined sewer system in the 1890s to convey blended stormwater and sewage and the historic lack of adequate treatment plants

contributed to the LDW's contamination. (*Id.* at 9-13.) Dr. Kavanaugh further opines this, combined with the City's continued discharges from combined sewer overflow events, are the predominant causes of the environmental impacts to the LDW sediment. (*Id.* at 5, 13-15.)

Per Dr. Kavanaugh's second opinion, he opines the City's historical waste management practices at the SCL South Service Center and Georgetown Steam Plant, and current waste management practices at the SCL South Service Center, allowed for off-site discharge of constituents into the LDW. (First Wishik Decl., Ex. A at 21-22, 27-29.) As to the SCL South Service Center, Dr. Kavanaugh notes discharges of PCBs from PCB-containing transformer and capacitor oil, and discharges containing other constituents, at the Center were within the City's ability to control. (*Id.* at 21-22.) As to the Georgetown Steam Plant, Dr. Kavanaugh finds the City's operation of the plant, fuel storage practices, permit to allow fire training, and dumping practices also contributed PCBs and other constituents to the LDW. (*Id.* at 27-29.)

As to Mr. Karls and Mr. Recker, their second opinion opines that the LDW's contamination is due to certain industrial waste disposal practices along the LDW that generated unpermitted wastewater to discharge into the LDW (First Wishik Decl., Ex. B at 11-13), industrial releases from upland source properties (*id.* at 14-17), and combined sewer overflow events (*id.* at 17).[2]

**B.      Dr. Velleux**

Dr. Velleux was retained by the City to rebut Defendants' experts Dr. Kavanaugh, Mr. Recker, and Mr. Karls. (*See* Brunton Decl., Ex. C (dkt. # 630-3) at 1.) Dr. Velleux is a professional engineer and hydrologist with 32 years of experience, specializing in watershed and

---

[2] Absent identifying Mr. Karls and Mr. Recker's summaries of their fourth and fifth opinions, the City did not provide any excerpts from their opinions that it sought to be excluded. (*See* First Wishik Decl., Ex. B at 3, 11-13.)

river sediment and contaminant transport. (*Id.* at 1, 24-29.) Dr. Velleux's experience includes environmental consulting work on contaminated sediment cleanup efforts on Superfund Sites at several locations across the United States, as well as source attribution and cost allocation support for the Portland Harbor Superfund Site in Oregon and the LDW. (*Id.*)

Based on his experience, background, and review of documents prepared by others concerning the LDW and its surrounding watershed, including the EPA's ROD, Dr. Velleux's first, second, and third opinions in his rebuttal report provide:

> Opinion 1. The LDW ROD remedy, and its projected future costs, is fundamentally driven by human health risks caused by PCB concentrations in river sediments.

> Opinion 2. Benthic Contaminants of Concern ("COCs") are small contributors to LDW site risk.

> Opinion 3. At least 80% of projected future costs for the LDW remediation are attributable to the presence of PCBs in site sediment.

(Brunton Decl., Ex. C at 1.)

Per his first opinion, Dr. Velleux rebuts Dr. Kavanaugh's opinion that less than 4% of projected future costs for LDW remediation are attributable to PCBs alone, with most costs attributed to contaminants that pose potential risks to sediment-dwelling (benthic) organisms. (Brunton Decl., Ex. C at 7.) Conversely, Dr. Velleux opines most human health risks are attributable to PCBs and that individual benthic COCs contribute little to the risks addressed by the ROD. (*Id.* at 7-10.) Dr. Velleux provides: (1) Dr. Kavanaugh ignored the LDW sediment remedy was primarily designed by the EPA to manage human health risks; (2) PCBs were the primary driver for the risk management actions required by the ROD; (3) PCBs have a predominant influence on any risk-based assessment for remedial action levels; and (4) that PCBs and other human health COCs take priority over individual benthic COCs. (*Id.*)

1    In addressing that PCBs and other human health COCs take priority over individual

2    benthic COCs for the remedies provided for in the ROD, Dr. Velleux states that "[t]he LDW

3    ROD risk management paradigm *lends itself to a hierarchy for assessing COCs in descending*

4    *order of risk*: PCBs, then other human health COCs, and then individual benthic COCs."

5    (Brunton Decl., Ex. C at 9 (emphasis added).) Based on this hierarchy, Dr. Velleux mapped

6    PCB, other human health, and benthic COCs measured exceedance locations; active remediation

7    areas; and areas where PCB calculated sediment concentrations exceeded remedial action levels.

8    (*Id.* at 9-10.) Dr. Velleux provided figures displaying locations of remedial action level

9    exceedances for individual COCs. (*Id.* at 9-10, 30-73.) Based on his analysis, Dr. Velleux opines

10   that in contrast to PCBs, locations with exceedances for only individual benthic COCs "(*i.e.*,

11   locations where one or more COCs other than PCBs, arsenic, cPAHs, or dioxins/furans

12   exceedances occur), are few in number and tend to occur either immediately adjacent to

13   locations with human health COC exceedances or in isolated locations." (*Id.* at 9-10.)

14       Per his second opinion, Dr. Velleux rebuts Dr. Kavanaugh's opinion that the ROD

15   remedy and associated implementation costs would be essentially the same regardless of the

16   presence of PCBs because of the presence of other COCs. (Brunton Decl., Ex. C at 11-12.) Dr.

17   Velleux opines Dr. Kavanagh erred in his analysis because the ROD manages benthic COCs

18   exceedances differently than human health exceedances. (*Id.* at 11.) Dr. Velleux provides there is

19   no basis to assume that benthic COCs would become determinants of LDW remedial actions,

20   unlike PCBs, which represent a higher risk to human health. (*Id.* at 11-12.)

21       Per his third opinion, Dr. Velleux counters Dr. Kavanaugh's opinion that less than 4% of

22   projected future remediation costs for the LDW are attributable to PCBs, opining to the contrary

23   that the ROD substantially considers risks from PCBs and projected costs given PCB risks.

ORDER - 7

1    (Brunton Decl., Ex. C at 13.) Dr. Velleux notes the ROD identifies 128 active remediation areas

2    across an area of roughly 175 acres, with each area being associated with one of four remediation

3    technologies: (1) dredging: (2) partial dredging and capping; (3) capping; or (4) adding clean

4    material to dilute contaminants, *i.e.*, "Enhanced Natural Recovery." (*Id.* at 13-17.)

5         Dr. Velleux opines PCB exceedances were associated with approximately 83% of the

6    active remediation areas considered in the ROD, resulting in at least 82 percent of the costs of

7    remediation being attributable to PCBs for the ROD's selected remedies. (Brunton Decl., Ex. C

8    at 17-19.) In providing his third opinion, Dr. Velleux identifies that the "the ROD COC risk

9    hierarchy was used." (*Id.* at 13.)

10        **C.    Mr. Apt**

11        Mr. Apt was retained by the City to rebut Defendants' experts Dr. Kavanaugh, Mr.

12   Recker, Mr. Karls, and Paul D. Boehm, Ph.D.[3] (*See* McMahan Decl., Ex. A (dkt. # 645-1) at 2.)

13   Mr. Apt is a stormwater quality and water resources environmental consultant, with over 26

14   years of experience, and a former regulator for the Florida Department of Environmental

15   Protection and the California Coastal Commission Water Quality Unit. (*Id.* at 2-3.) Mr. Apt

16   specializes in municipal stormwater management, including program area development,

17   guidance, and training. (*Id.*) He has worked with both state and federal stormwater, water

18   resources, and environmental regulatory agencies, and has provided trainings, taught, and been

19   published regarding stormwater practices. (*Id.*)

20        Based on his experience, background, and training, Mr. Apt opines Defendants' experts

21   Dr. Boehm, Dr. Kavanaugh, Mr. Karls, and Mr. Recker employed 11 erroneous facts, distortions,

22   omissions, and/or provided a lack of context to support their opinions that the City's drainage

23

---

[3] Dr. Boehm's expert opinions were not challenged by the City.

infrastructure contributed a significant source of the pollutants in the LDW. (McMahan Decl., Ex. A at 2, 19.) Mr. Apt provides in sum:

Erroneous Fact No. 1: The Kavanaugh report Section 2.1 (page 9) claims that the Waring Report of 1889 called for separate pipes for sewage and stormwater. That is inaccurate. The Waring Report did not recommend separate pipes for sewage and stormwater, but rather recommended that the system should only be constructed for sewage . . . .

Erroneous Fact No. 2: The Boehm report in Section 8.3.1. (page 38) says that with the construction of the first municipal sewer system in 1892, an outfall was constructed that discharged to the Duwamish River, citing Klingle. Klingle, however, does not state this . . . .

Erroneous Fact No. 3: The Boehm report in Section 8.3.1. (page 38) says that sewage and industrial pollution were affecting salmon in the Duwamish River by 1917, citing Klingle again. However, Klingle actually says that the dredging that created the Duwamish Waterway prior to its opening in 1917, caused significant degradation of salmon habitat . . .

Erroneous Fact No. 4: The Kavanaugh report Section 2.1 (pages 9-10) says that in 1922 the State Department of Health ordered that that no more untreated sewage could be discharged into Lake Washington or into the Duwamish River. However, the 1922 letter from the State Department of Health actually refers only to Lake Washington and does not mention the Duwamish River . . . .

Erroneous Fact No. 5: The Kavanaugh report Section 2.1 (page 10) says the Diagonal Avenue Sewage Treatment Plant only served approximately one-sixth of the area connected to combined sewers and that sewage from the remainder of the combined sewer system was discharged directly to the LDW without treatment. This is a mischaracterization of the 1958 Brown and Caldwell report . . . .

Erroneous Fact No. 6: Boehm (page 39) says that at times the dissolved oxygen (DO) was so depleted in the LDW that fish could not survive, citing the Brown and Caldwell 1958 report. In fact, the Brown and Caldwell report says that at some of the monitoring locations, DO was at 5.0 PPM, the minimum prescribed by the Pollution Control Commission for fish life . . . .

Erroneous Fact No. 7: The Boehm report in Section 8.3.1. (page 39) says that biochemical oxygen demand (BOD) associated with organic matter and ammonia in sewage can lead to oxygen depletion and severe ecological harm. However, it takes a large amount of BOD in sewage to lead to oxygen depletion . . . .

Erroneous Fact No. 8: Kavanaugh (page 11) claims that 34 million gallons of untreated industrial wastewater were discharged to the LDW each day. The Brown

and Caldwell 1958 report says that 34 million gallons was a maximum discharge, not an average daily discharge, as claimed by Kavanaugh . . . .

Erroneous Fact No. 9: Boehm (page 39) says the Diagonal Avenue Sewage Treatment Plant discharged primary-treated sewage and industrial waste to the LDW from 1940 to 1970. Boehm fails to say that the Washington Pollution Control Commission required pre-treatment of certain types of hazardous wastes prior to discharge to the sanitary sewer . . . .

Erroneous Fact No. 10: Karls and Recker (pages 22-23) state in their report that "over 53 million gallons of untreated sewage and stormwater" was discharged from CSO [combined sewer overflow] #111 from 1978 to 2020. They fail to provide context for the volume of the CSO discharges . . . .

Erroneous Fact No. 11: Boehm (page 40) says that raw sewage releases into the Duwamish Waterway remain an episodic problem due to combined sewer overflows (CSOs). Karls and Recker (page 17) says that CSOs are a source of contaminants in the LDW. They all omit key information regarding CSO discharges . . . .

(*Id.* at 6-19.)

Relevant to aspects of Defendants' challenges, Mr. Apt's rebuttal opinion provides: "[H]istoric actions taken by the City with regard to its sanitary sewer and stormwater systems, including those discharging to the [LDW], were more comprehensive than comparable cities' actions and implemented in most cases prior to, and in some instances decades ahead, of comparable cities." (McMahan Decl., Ex. A at 6.) To support this conclusion, Mr. Apt supplies in his Erroneous Fact No. 1 that the "City [] was proactive in protecting the health of its growing population" based on the date of implementation of combined stormwater and sewer systems as compared to "comparable cities" in the United States. (*Id.* at 7.)

Mr. Apt further provides in Erroneous Fact No. 11 that the City's stormwater programs with respect to business inspections were performed at a higher rate than that of "comparable cities," such as Portland, and the City's implementation of source control best management practices ("BMPs") exceeded those of "comparable cities" such as Portland, Tacoma, San

Francisco, and Spokane. (McMahan Decl., Ex. A at 17-18.) Mr. Apt notes the City and Portland were the earliest implementers of green stormwater infrastructure ("GSI") retrofit projects and that both have set more ambitious goals to manage runoff using GSI than other "comparable cities." (*Id.* at 18.) Mr. Apt submits similar efforts in Tacoma, San Francisco, and Spokane were initiated later in time than by the City. (*Id.*)

Last, Mr. Apt provides in Erroneous Fact No. 10 that Mr. Karls and Mr. Recker failed to provide volume context for their opinion that "over 53 million gallons of untreated sewage and stormwater" was discharged from CSO #111 from 1978 to 2020 into the LDW. (McMahan Decl., Ex. A at 15.) Using the "long-term mean flow rate in the LDW of 1,340 cubic feet per second," Mr. Apt calculated approximately 13.277 trillion gallons of water flowed through the LDW during that time period. (*Id.* at 15, n.12.) Mr. Apt calculated that 53 million gallons over 22 years was therefore "0.00040393% of the total volume flowing through the LDW during the same time period." (*Id.* at 15, n.13.) Mr. Apt noted the subject CSO discharges "would be the equivalent of adding 0.019 drops into one 8 oz. cup." (*Id.*)

## III.   DISCUSSION

### A.   Legal Standards

Federal Rule of Evidence 702 provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. For expert testimony to be admissible under Rule 702, it must satisfy three requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3)

the testimony must be relevant. *See Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S. 579, 589-91 (1993). The proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Id.* at 592 n.10; *see also Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Before admitting expert testimony into evidence, the Court acts as a "gatekeeper" in determining its admissibility under Rule 702 by ensuring the testimony is both "relevant" and "reliable." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert I*, 509 U.S. at 597). Expert testimony is relevant where "the evidence logically advance[s] a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotations and citation omitted), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc). Testimony is reliable where it has "a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The Supreme Court has noted the reliability inquiry is a "flexible one," and while the Supreme Court has suggested several factors helpful in determining reliability, trial courts are generally given "broad latitude in determining the appropriate form of the inquiry."[4] *United States v. Wells*, 879 F.3d 900, 934 (9th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 150); *see also Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (finding Rule 702 should be applied with a "liberal thrust" favoring admission) (quoting *Daubert I*, 509 U.S. at

---

[4] In relevant part, *Daubert I* suggested several reliability factors a trial court may examine to determine the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; (4) the existence and maintenance of standards and controls; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert I*, 509 U.S. at 592-94; *see also Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).

1   588); *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) (Rule 702 is "construed liberally"

2   in considering admissibility of testimony based on specialized knowledge).

3        Furthermore, the reliability inquiry favors admission of testimony as "[s]haky but

4   admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

5   the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing

6   *Daubert I*, 509 U.S. at 596). The reliability inquiry test does not seek to measure "the correctness

7   of the expert's conclusions but the soundness of [his or her] methodology," and therefore, when

8   an expert meets the standards established by Rule 702, "the expert may testify[,] and the fact

9   finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas.*

10  *Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano*, 598 F.3d at 564-65).

11       **B.       Dr. Kavanaugh, Mr. Karls, and Mr. Recker**

12       First, the City seeks exclusion of parts of Dr. Kavanaugh's first and second opinions, and

13  the entirety of Mr. Karls and Mr. Recker's second, fourth, and fifth opinions, as not relevant to

14  the City's public nuisance claim or to Defendants' defenses. (Pl.'s Mot. at 1, 4.) The City argues

15  that their opinions will also confuse the jury and may result in unfair prejudice against the City.

16  (*Id.*) In addition, the City claims Part 2.1 of Dr. Kavanaugh's opinion should be excluded as

17  unreliable because it is based on factual errors the City contends cannot effectively be addressed

18  on cross-examination. (*Id.* at 4.)

19       Defendants respond that the City's own conduct and historical discharges into the LDW,

20  as well as the presence of other chemicals in the LDW, are all relevant to the causation element

21  of the City's public nuisance claim, the City's alleged damages, and to several of Defendants'

22

23

affirmative defenses to the City's public nuisance claim.[5] (Defs.' Resp. at 1-2, 5-9.) Defendants

further contend the City's challenges to the admissibility of Dr. Kavanaugh's opinion, and its

lack of page citation and alleged factual errors, are cross-examination material. (*Id.* at 10-11.)

Last, Defendants claim Mr. Karls and Mr. Recker's fifth opinion ("Landfills are not a source of

PCBs to the LDW") is relevant because the City's operative complaint alleges PCB-related

contamination from landfills. (*Id.* at 12.)

Here, as an initial matter, this Court has already determined that opinions regarding

landfills, as a source of PCBs, are irrelevant in this case. As noted previously in considering the

motion to exclude Dr. Marc Rogoff (dkt. # 750 at 11), landfills as a source of PCBs is not an

issue at dispute at this case and otherwise runs the risk of confusing issues before the jury.[6]

Therefore, Mr. Karls and Mr. Recker's fifth opinion is excluded as irrelevant. *See Daubert I*, 509

U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and,

ergo, non-helpful.").

However, on the central relevancy issue addressed by the parties, the remaining identified

testimony of Dr. Kavanaugh, Mr. Karls, and Mr. Recker is clearly relevant to addressing the

City's public nuisance claim. As noted above, expert testimony is relevant if it "logically

advance[s] a material aspect of the party's case." *Estate of Barabin*, 740 F.3d at 463; *see also*

*Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995).

---

[5] In addition, Defendants claim the City's efforts to impose a narrow view of this case solely to PCBs and no other contaminants has twice been rejected by both the Honorable Robert S. Lasnik and the Discovery Master who served in this case. (Defs.' Resp. at 9-10 (citing *City of Seattle v. Monsanto Company*, 237 F. Supp. 3rd 1096, 1108 (W.D. Wash. 2017); Howard Decl., Ex. 2 (dkt. # 681-2)).)

[6] Defendants also conceded at oral argument Mr. Karls and Mr. Recker's fifth opinion was irrelevant. (*See* dkt. # 767 at 15:15-23 ("We concede that this is not relevant to a dispute that is live, and . . . should be excluded based on relevance.").)

ORDER - 14

Expert testimony is not excluded for relevancy where "it speaks clearly and directly to an issue in dispute in the case, and . . . it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.

For a public nuisance claim, the City must establish conduct constituting a nuisance. *See Miotke v. City of Spokane*, 101 Wn.2d 307, 309, 331 (Wash. 1984), *abrogated on other grounds by Blue Sky Advocs. v. State*, 107 Wn.2d 112 (Wash. 1986). As such, the City bears the burden of proving the unreasonableness of Monsanto's conduct. *See Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 923 (Wash. 2013) (citations omitted) (noting that the reasonableness of a defendant's conduct in a nuisance action is determined by "weighing the harm to the aggrieved party against the social utility of the activity"); *see also* Wash. Civil Pattern Jury Instruction 380.03.

Here, the identified testimony of Dr. Kavanaugh, Mr. Karls, and Mr. Recker addresses the City's and other industrial historical practices surrounding the LDW in explaining the contamination, conditions, and sources of constituents found in the LDW. (*See* First Wishik Decl., Ex. A at 3, 5-15, 21-22, 27-29; *id.*, Ex. B at 3, 11-17.) Each of the identified opinions opine on contributions to the LDW's contamination from the City or other parties, which touches on issues of causation and damages to be considered in this case. Consequently, these expert opinions are relevant to addressing whether Defendants' conduct constituted a public nuisance and how liability should be apportioned. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 709 F.3d 872, 883 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."). At a minimum, Dr. Kavanaugh, Mr. Karls, and Mr. Recker's testimony is relevant to several of Defendants' affirmative defenses, *i.e.*, causation, comparative fault, allocation of

1    liability, and/or apportionment of damages. (*See* Answer (dkt. # 270) at 28-49; *see also* Order

2    (dkt. # 581) at 5.)

3        As to Part 2.1 of Dr. Kavanaugh's opinion, any factual errors claimed by the City in his

4    analysis of the historical documents considered, and his lack of specific citation, are subjects

5    properly addressed on cross-examination. *See Primiano*, 598 F.3d at 564 (citing *Daubert I*, 509

6    U.S. at 596); *United States v. Sanft*, 2021 WL 5278766, at *2 (W.D. Wash. Nov. 13, 2021)

7    ("Defendants may disagree with [an expert's] opinions and challenge the accuracy of the

8    evidence supporting his conclusions, [but] their challenge goes to the weight of his testimony,

9    not its admissibility.").

10        Consequently, the City's Motion is granted in part and denied in part. Mr. Karls and Mr.

11    Recker's fifth opinion concerning landfills as a source of PCBs is excluded. Dr. Kavanaugh, Mr.

12    Karls, and Mr. Recker will otherwise be permitted to testify as to the remainder of the identified

13    opinions in their reports.

14    **C.    Dr. Velleux**

15        Next, Defendants move to strike Dr. Velleux's declarations and to exclude his first,

16    second, and third opinions.[7] The Court will address each of Defendants' contentions in turn:

17

18

19

20    [7] The City moves to strike Defendants' Velleux Motion to the extent it exceeds the 12-page limit
established by the Court's Local Civil Rules. (Pl.'s Velleux Resp. at 1; Local Civil Rule 7(e)(4).) The
City notes Defendants incorporate by reference material from another motion. (*Id.* (citing Defs.' Velleux
21    Mot. at 3).)

22    The incorporated material by Defendants was the legal standard provided in its previous *Daubert* motion
to exclude the expert testimony of Dr. Mark Buckley. (*See* Defs.' Velleux Mot. at 3.) The Court
23    admonishes Defendants for circumventing the Court's established page limits in this fashion, but declines
to strike Defendants' Velleux Motion due to its incorporation of a legal standard.

*i.     Dr. Velleux's Declaration*

As an initial matter, Defendants argue on reply that the City submitted belated declarations from Dr. Velleux that should be stricken pursuant to Fed. R. Civ. P. 26. (Defs.' Velleux Reply at 6 (citing First Velleux Decl. (dkt. # 352), Second Velleux Decl. (dkt. # 652)).) Defendants note Dr. Velleux offered recanted and modified testimony in his first declaration submitted in response to Defendants' previous motion to clarify the protective order and offered several paragraphs of altered and supplemental opinions in his second declaration. (*Id.*) The City did not file a response or surreply to Defendants' motion to strike.[8]

Rule 26(a)(2)(B)(i) provides that a written expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." An expert witness has a duty to supplement his or her report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). When a party fails to comply with Rule 26, the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation was either substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). Therefore, Rule 26(e) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005) (citation omitted); *see also Lo v. United States*, 2021 WL 5121745, at *2 (W.D. Wash. Nov. 3, 2021) ("The rule for supplementation does not give license to sandbag one's opponent with claims and issues which

---

[8] This Court's Local Rules require requests to strike material attached to submissions of opposing parties not be presented in a separate motion, but instead be included in the responsive brief to be considered with the underlying motion. *See* Local Civil Rule 7(g).

ORDER - 17

should have been included in the original witness report."(citation and internal quotations omitted)).

Given the City's Response relies only on Dr. Velleux's second declaration submission (*see* Pl.'s Velleux Resp. at 3-4, 7-9), the Court will consider only that challenge. Here, Dr. Velleux's second declaration submission improperly attempts to offer opinions not previously provided in his report. Dr. Velleux's declaration offers opinions explaining his use of the "descending order of risk" hierarchy, bolstering previous opinions offered as to the defectiveness of Dr. Kavanaugh's report, and/or otherwise responding to Defendants' criticisms expressed in their motion. (*See* Second Velleux Decl. at ¶¶ 3-14.) For example, as noted by Defendants, Dr. Velleux's declaration provides the EPA assumed PCB concentrations would decrease by 50% upon completion of early action areas addressing hotspots and that this assumption "was built into" the EPA's ROD and its corresponding cost estimate. (*Id.* at ¶ 12.) This opinion is not expressed in his report. (*See* Brunton Decl., Ex. C at 7, 9-10.) Furthermore, Dr. Velleux's declaration was not submitted because his filed report was incomplete or incorrect, but only upon filing of Defendants' motion. The expert discovery cutoff in this matter was June 1, 2022 (*see* dkt. # 229), but Dr. Velleux's declaration was submitted on August 17, 2022 (*see* Second Velleux Decl.).

In fact, the situation presented by the City's submission of Dr. Velleux's declaration mirrors that previously presented in this case in the Court's adjudication of Defendants' motion to exclude the City's expert Dr. Michael Trapp. (*See* Order (dkt. # 761) at 12-15.) As with Dr. Trapp's declaration, Dr. Velleux's declaration here "is in all practical effect a supplemental expert report aimed at remedying the deficiencies in [his] report" and therefore, "little more than a back-door effort around the Court's discovery deadlines." *See Bell v. Boeing Co.*, 2022 WL

1206728, at *3 (W.D. Wash. Apr. 22, 2022) (citing *Eno v. Forest River Inc.*, 2021 WL 6428636, at *2 (W.D. Wash. July 1, 2021) (finding expert declaration submitted after expert report deadline, and in response to motion to exclude, untimely and that it "d[id] not excuse Plaintiff's non-compliance with Rule 26(a)")). Moreover, the City has failed to argue or make any demonstration its submission of Dr. Velleux's declaration was substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). Dr. Velleux's second declaration (dkt. # 652) is therefore stricken.[9]

### ii.    Qualifications

Next, Defendants argue Dr. Velleux is not qualified to provide his opinions because he is not a toxicologist and because his "descending order of risk" hierarchy is premised on principles of toxicology and risk assessment outside of his area of expertise. (Defs.' Velleux Mot. at 4-6.) Defendants level that Dr. Velleux is a civil engineer by training and that the majority of his experience is in the fate and transport of chemicals. (*Id.*) The City responds that Dr. Velleux applied the EPA's risk assessment from the ROD and that he need not be qualified as a toxicologist to provide such opinions. (Pl.'s Velleux Resp. at 8.)

An expert is considered qualified to testify if the expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire*, 526 U.S. at 156. Because Rule 702 "contemplates a *broad conception* of expert qualifications," only a "*minimal foundation* of knowledge, skill, and experience" is required. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (internal quotations and citation omitted, emphasis in original).

---

[9] At oral argument, Defendants requested the Court deem any of the City's arguments relying on Dr. Velleux's declaration waived. (*See* dkt. # 767 at 26:7-11.) This request was raised for the first time at oral argument, and therefore, will not be considered. (*See* Defs.' Velleux Reply at 6.)

ORDER - 19

Here, the Court finds Dr. Velleux is sufficiently qualified to provide his opinions. As previously outlined above, Dr. Velleux has several decades of experience working and consulting on Superfund Sites, source attribution, and allocating remediation costs for such sites. (*See* Brunton Decl., Ex. C at 1, 24-29.) Dr. Velleux's opinions do not engage in assessing toxicological risks being greater from PCBs than other contaminants present in the LDW, but in allocating costs based on recognition of the EPA's toxicological risk determination. Dr. Velleux's cites to aspects of the ROD, based on his knowledge and experience, as evincing that PCBs present the highest human health risk of the contaminants present in the LDW based on the EPA's analysis in the ROD. (*See* Brunton Decl., Ex. C at 6-11.) Dr. Velleux need not conduct his own toxicological assessment or risk assessment to cite to the EPA's in his report. *See Daubert*, 509 U.S. at 592 ("An expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

Defendants fail to convince this Court why specialized toxicology knowledge is necessary to support Dr. Velleux's citations to the ROD as demonstrating PCBs are the primary cost driver of remediating the LDW due to their impact on human health. *See Cypress Ins. Co. v. SK Hynix Am., Inc.*, 2019 WL 634684, *3 (W.D. Wash. Feb. 14, 2019) ("[T]he fact that [his] opinions are based only on his knowledge or experience is not enough to disqualify him as an expert."). Dr. Velleux's opinions are therefore not inadmissible merely because he lacks specific expertise in toxicology or risk assessment. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31 (9th Cir. 1998) (citation omitted) ("Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of [his] testimony")); *Bluetooth SIG, Inc. v. FCA*

1   *US LLC*, 468 F. Supp. 3d 1342, 1349 (W.D. Wash. 2020) (finding expert had "no obligation to

2   conduct a survey of [their] own") (citations omitted).

3                     iii.     *Methodology and Reliability*

4         Next, Defendants argue that Dr. Velleux's methodology is not reliable. (Defs.' Velleux

5   Mot. at 6-11.) Specifically, Defendants identify Dr. Velleux's references to the EPA employing a

6   "descending order of risk" hierarchy in its evaluation of the LDW in the ROD as excludable

7   because his opinions have none of the indicia of reliability provided for under *Daubert*, his

8   opinions arrive at a conclusion expressly rejected by the EPA, he fails to consider the impact of

9   dioxins and furans, and because he relies on biased and outdated LDW sediment data. (*Id.*) The

10  City responds that Dr. Velleux reliably applied all of the EPA's ROD in engaging in his analysis

11  of costs due to the contaminants present in the LDW for his opinions, unlike Dr. Kavanaugh,

12  presenting the Court with a typical "battle of the experts" that should be left for the jury. (Pl.'s

13  Velleux Resp. at 1, 5-10.)

14        Based on the Court's review of Dr. Velleux's opinions, Dr. Velleux draws upon his

15  experience and expertise in examining EPA documents and consulting on Superfund Sites to

16  opine that a hierarchy exists as to the risks presented by the different COCs in the LDW

17  requiring remedial action as addressed in the ROD. (*See* Brunton Decl., Ex. C at 6 ("The premise

18  of COC equality is inconsistent with the risk management framework the EPA outlined in the

19  LDW ROD, wherein human health risks, particularly those posed by PCBs, played the

20  predominant role in defining the scope and extent of remediation."), 9 ("The LDW ROD risk

21  management paradigm lends itself to a hierarchy for assessing COCs in descending order of risk:

22  PCBs, then other human health COCs, and then individual benthic COCs.").) Based on

23  information contained in the ROD and its structure, Dr. Velleux therefore opines the EPA

1    positions PCBs as the primary human health risk. (*See id.* at 9 ("The remedy described in the

2    ROD emphasizes reduction of human health risks . . . PCBs have the highest priority in the

3    analysis of exceedances and remedy development because they are the largest contributor to

4    human health risk.").) Dr. Velleux's citations in his report to the ROD provide adequate support

5    for such opinions. (*See e.g.*, Brunton Decl., Ex. C at 7 ("The ROD and its subsequent

6    Explanation of Significant Differences [] state that the selected remedy in sequence with cleanup

7    of Early Action Areas [] and source control efforts, addresses risks to human health . . . . ), 8

8    ("PCBs comprise nearly 60% of the cumulative excess cancer risk and roughly 90% of the

9    non-cancer risk to human health at the site.").)

10          Defendants claim throughout their motion that the EPA has already rejected Dr.

11   Velleux's methodology and assumptions because the EPA's responsiveness summary included in

12   its 2014 ROD explicitly rejected a comment suggesting PCBs are the primary risk driver for

13   LDW remediation, clarifying that PCBs "are not the only contributor of risk." (*See* Defs.'

14   Velleux Mot. at 7-8, 11-12 (quoting Brunton Decl., Ex. D (dkt. # 630-4) at 111-12).) But as the

15   City notes, the EPA revised the ROD with an Explanation of Significant Differences in 2021 to

16   find "PCBs are the main source of risk to people's health from the [LDW] Superfund site" after

17   cPAHS were determined to be less carcinogenic than previously found. (*See* Second Wishik

18   Decl., Ex. A (dkt. # 651-1) at 2.) Defendants' criticisms for how Dr. Velleux arrived at his

19   understanding of the ROD to set forth his opinion that PCBs are the ultimate contributor to the

20   LDW's contamination ultimately goes to the weight, and not the admissibility, of his testimony.

21   *See Primiano*, 598 F.3d at 564 (citing *Daubert I*, 509 U.S. at 596); *Sanft*, 2021 WL 5278766 at

22   *2. Defendants may make such challenges in the course of Dr. Velleux's cross-examination.

23

1      Though testimony may be excluded where there is "too great an analytical gap between

2   the data and the opinion proffered," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), Dr.

3   Velleux's alleged lack of consideration of the impacts of other contaminants, such as

4   dioxins/furans, also does not render his opinions unsupported. Countervailing considerations

5   concerning the materials relied on for an opinion are not a basis for exclusion. *See City of

6   Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1053 (9th Cir. 2014) ("Facts casting doubt on the

7   credibility of an expert witness and contested facts regarding the strength of a particular

8   scientific method are questions reserved for the fact finder.").

9      Defendants' arguments that the data employed by Dr. Velleux for his opinions render his

10  opinions unreliable are similarly unavailing. Pursuant to Rule 702(b), the requirement that expert

11  testimony be based on "sufficient facts or data" only requires the Court to engage in "an analysis

12  of the sufficiency of underlying facts or data that is quantitative rather than qualitative." *United

13  States v. W.R. Grace*, 455 F. Supp. 2d 1148, 1152 (D. Mont. 2006); *see also* Fed. R. Evid. 702

14  Advisory Committee's Note to 2000 Amendments. Here, Dr. Velleux used the data available to

15  the EPA when it issued the ROD in 2014. (*See* Brunton Decl., Ex. C.) Though more recent and

16  additional data has been collected since the issuance of the ROD, any faults in Dr. Velleux's use

17  of the EPA's data employed for his opinion goes to the weight and not the admissibility of his

18  testimony. *See Kennedy*, 161 F.3d at 1230-31; *Sanft*, 2021 WL 5278766 at *2.

19     However, Defendants' issues with how Dr. Velleux articulated his approach are

20  well-taken. Nowhere in the ROD does the EPA explicitly identify a "descending order of risk"

21  hierarchy was employed in the EPA's analysis of the LDW. (*See* Howard Decl., Ex. 1.) It instead

22  appears Dr. Velleux identified such hierarchy as a "paradigm" the EPA engaged in to structure

23  its determinations based on the EPA's prioritization of PCBs in the ROD compared to its

consideration of other contaminants. (*See* Brunton Decl., Ex. C at 7-13.) Though "descending order of risk" hierarchy appears to be descriptive of the work the EPA did when constructing the ROD (*see* Pl.'s Velleux Resp. at 7-8), this Court remains uneasy about allowing Dr. Velleux to reference a "risk management paradigm" or "descending order of risk" hierarchy that the EPA does not itself reference in the ROD. Moreover, there is no support in the record for a "risk management paradigm" or "descending order of risk" hierarchy in the relevant scientific community and it appears to have been created solely for this case.

> iv.   *Legal Opinions*

Defendants argue Dr. Velleux also provides improper legal conclusions as to what the EPA's ROD demonstrates. (Defs.' Velleux Mot. at 11-12.) Defendants contend the ROD is a legal document governing the remediation of the LDW and that Dr. Velleux's opinions based on his interpretation of the ROD are not useful because they directly conflict with the ROD and the EPA's explanation of it. (*Id.*) The City responds the ROD is a lengthy, technical document that the jury will require expert assistance to understand. (Pl.'s Velleux Resp. at 5-7.) The City further responds Dr. Velleux's opinions merely applied the EPA's determinations from the ROD. (*Id.*)

The Court agrees with the City. It is clear from the record Dr. Velleux reviewed the EPA's ROD, the entirety of which totals nearly 400 pages (*see* Howard Decl., Ex. 1; Brunton Decl., Ex. D), and provided his understanding of the EPA's conclusions with regard to the LDW remediation and what costs should be attributable to PCBs to rebut Dr. Kavanaugh's opinion (*see* Brunton Decl., Ex. C). This is not dissimilar from the process engaged in by Defendants' own

experts, such as Dr. Kavanaugh.[10] Though the parties' experts disagree as to what remediation

costs are attributable to PCBs based on their understanding of the ROD, Dr. Velleux has not

provided an opinion on a question of law reserved for the Court. Defendants' cited authority on

this issue is inapposite as each addresses expert opinions provided on the interpretation of

contract terms or its enforceability.[11]

Defendants' Velleux Motion is therefore granted in part and denied in part. Dr. Velleux is

permitted to testify as to his first, second, and third opinions challenged by Defendants.

Specifically, Dr. Velleux is permitted to testify and provide his opinions that the ROD's remedy

for the LDW, and its projected future costs, are driven by human health risks caused by PCB

concentrations in river sediments, benthic COCs are small contributors to LDW site risk, and at

least 80% of projected future costs for the LDW remediation are attributable to PCBs in the

LDW site sediment. However, Dr. Velleux must testify to such opinions without reference to a

"risk management paradigm" or "descending order of risk" hierarchy having been employed by

the EPA in its ROD.

### D.    Mr. Apt

Finally, Defendants argue Mr. Apt's rebuttal testimony should be excluded because: (1)

he performed a "cite-checking function" targeting 11 factual statements without explaining how

---

[10] Dr. Kavanaugh consulted the ROD for the EPA's decision criteria presented regarding remedial action selection, and provided his opinion as to what costs should be attributable to the presence of PCBs based on his understanding. (*See* Second Wishik Decl., Ex. B (dkt. # 651-2) at iii ("Less than 4% of projected future costs for the LDW remediation are attributable to the presence of PCBs alone."), 50-51.)

[11] *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (rejecting expert testimony on interpretation of "lottery" in Tribal-State compact); *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (rejecting expert testimony on enforceability of a contract on a promissory estoppel theory); *Trident Seafoods Corp. v. Commonwealth Ins. Co.*, 850 F. Supp. 2d 1189, 1196 (W.D. Wash. 2012) (rejecting expert testimony providing interpretations of meaning of insurance policy language); *Cypress Ins. Co.*, 2019 WL 634684 at *1-2 (rejecting expert testimony finding party's conduct was unreasonable in light of the contract language).

1   the alleged errors rebutted the opinions or methodologies set forth by Dr. Boehm, Dr.

2   Kavanaugh, Mr. Recker, and Mr. Karls in their reports; and (2) to the extent Mr. Apt's rebuttal

3   could be construed to offer an opinion that the City's stormwater management was progressive

4   compared to "comparable cities," he failed to articulate a methodology to support the reliability

5   of such opinion. (Defs.' Apt Mot. at 1-2, 7-12.)

6       The City responds Mr. Apt's rebuttal testimony is improperly characterized as

7   "cite-checking" because he utilized the same approach Dr. Kavanaugh and Mr. Boehm used for

8   their opinions regarding the City's drainage system; identifying and reviewing historical

9   documents. (Pl.'s Apt Resp. at 1-4, 7.) The City further provides Mr. Apt's opinions are

10  necessary to rebut the omission of page citations by Defendants' experts in their reports. (*Id.* at

11  4-5, 8.) The City additionally argues Mr. Apt provides substantive opinions in finding the City's

12  drainage infrastructure was not a significant source of pollutants to the LDW and because he

13  conducted independent research to opine that the City was progressive in installing its sewer

14  systems to replace failing septic systems. (*Id.* at 6-8.)

15      Here, Mr. Apt's work is accurately characterized as fact checking.[12] (*See* McMahan

16  Decl., Ex. A at 6-19.) Though Mr. Apt has significant experience and expertise in stormwater

17  management practices (*see id.* at 2-3), he does not clearly rely upon such experience or expertise

18  in identifying several of the alleged errors in Defendants' expert reports. Mr. Apt identifies

19  documents supporting his alleged errors, but fails to explain how any of the alleged errors or

20  countervailing facts make Defendants' experts' opinions unreliable or not credible. (*See*

21  McMahan Decl., Ex. A at 6-19.) Identifying alleged errors without providing any explanation

22

23  ---
[12] At his deposition, Mr. Apt also described his work as a "cite check" of Defendants' experts' reports to "check those reports for validity based on information provided by the City." (*See* McMahan Decl., Ex. B (Apt. Dep. (dkt. 645-2) at 225:24-226:9).)

about why such errors matter fails to assist the trier of fact in determining issues in this case. *See Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009) ("[E]xpert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading."). The Court agrees with Defendants that the information provided by Mr. Apt is analogous to that which would be provided by a research assistant preparing counsel for a deposition or trial (*see* Defs.' Apt Mot. at 9), and not that which would be helpful to the jury in this case. *See Alaska Rent-A-Car, Inc.*, 709 F.3d at 883 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.")

To the extent the City argues that some of Mr. Apt's alleged errors do provide an opinion, Mr. Apt fails to support such opinions with identifiable data, methodology, or fails to actually rebut Defendants' experts. First, though the City contends Mr. Apt's report opines the City was progressive in developing its municipal storm and wastewater management infrastructure with regard to "comparable cities," (*see* McMahan Decl., Ex. A at 7, 17-19), his report fails to identify what data served as the foundation for his selected cities to serve as comparable municipalities. *See* Fed. R. Evid. 702(b).

Nor did Mr. Apt supply an identifiable methodology for why the selected cities cited are indeed comparable for addressing the City's drainage infrastructure, such as whether the comparisons were made based on similar time periods, populations, topography, or wastewater management procedures. *See City of Pomona*, 750 F.3d at 1049 ("It is where expert opinion is 'connected to the existing data only by the *ipse dixit* of the expert' that there may be 'too great an analytical gap between the data and the opinion proffered' to support inclusion of the testimony.") (internal citation and quotations omitted). The City has also not set forth any

specific methodology for Mr. Apt.'s "comparable cities" and conceded at oral argument that Mr. Apt failed provide a basis for choosing them as comparable.[13] (*See* dkt. # 767 at 61:1-3; Pl.'s Apt. Resp. at 6, 8.)

Moreover, Mr. Apt's calculation in Erroneous Fact No. 10 to show the amount of sewage and wastewater discharge from one of City's outfalls in the LDW fails to provide a rebuttal opinion. At his deposition, Mr. Apt testified he performed the calculation to "provide context" to Defendants' expert's discharge figures. (McMahan Decl., Ex. B (Apt. Dep. at 198:22-199:2); *see* McMahan Decl., Ex. A at 15 ("The CSO discharges would be the equivalent of adding 0.019 drops into one 8 oz cup.").) The City reads Mr. Apt's report to have opined that "the volume of combined sewage that [Mr. Karls and Mr. Recker] attributed to a City outfall was negligible compared to the flow in the [LDW]." (Pl.'s Apt Resp. at 1; *see also id.* at 6.) Mr. Apt's report itself does not make this conclusion. (*See* McMahan Decl., Ex. A at 15.) Mr. Apt testified at his deposition this calculation was done only to provide context as he was uncertain of the impact such discharge had on the LDW, admitting it was beyond his expertise. (*See* Second McMahan Decl., Ex. 2 (Apt Dep. (dkt. # 720-2) at 199:22-201:20).) In any case, Mr. Apt's calculation is subject to exclusion because his report itself fails to identify the source for the variables he used to render the calculation. (*See* McMahan Decl. at 15 at n.12; *see also* Second McMahan Decl., Ex. 2 (Apt. Dep. at 195:24-196:7, 198:6-21).)

The alleged factual errors in the expert reports of Dr. Boehm, Dr. Kavanaugh, Mr. Recker and Mr. Karls provided by Mr. Apt's rebuttal report—and the alleged omission of page citations in those opinions—are best addressed on cross-examination of Defendants' expert witnesses at trial. *See Primiano*, 598 F.3d at 564 (citing *Daubert I*, 509 U.S. at 596); *Sanft*, 2021 WL

---

[13] Likewise, Mr. Apt failed to identify during his deposition what specific methodology he employed for his "comparable cities" opinion. (*See* McMahan Decl., Ex. B (Apt. Dep. at 110:21-113:4).)

5278766 at *2. Addressing these alleged errors on cross-examination of Defendants' experts will also save the additional time and resources at trial of having Mr. Apt testify. Defendants' Apt Motion is therefore granted.

## IV.    CONCLUSION

For the foregoing reasons: (1) the City's Motion (dkt. # 599) is GRANTED in part and DENIED in part; (2) Defendants' Velleux Motion (dkt. # 629) is GRANTED in part and DENIED in part; and (3) Defendants' Apt Motion (dkt. # 644) is GRANTED.

The City's Motion is granted in part as to Mr. Karls and Mr. Recker's fifth opinion that landfills are not a source of PCBs to the LDW, but otherwise denied. Defendants' Velleux Motion is granted as to excluding Dr. Velleux's specific reference to a "risk management paradigm" or a "descending order of risk" hierarchy, but otherwise denied. Dr. Velleux's declaration (dkt. # 652) is STRICKEN pursuant to Fed. R. Civ. P. 37(c)(1).

The Clerk is directed to send copies of this Order to the parties and to the Honorable Richard A. Jones.

Dated this 18th day of August, 2023.

MICHELLE L. PETERSON
United States Magistrate Judge