UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

                    Plaintiff,

      v.

MONSANTO COMPANY, *et al.*,

                    Defendants.

Case No. C16-107-RAJ-MLP

ORDER

## I.     INTRODUCTION

This matter is before the Court on Plaintiff City of Seattle's ("City") "Motion to Exclude Proposed Expert Testimony by William Desvousges." (Pl.'s Mot. (dkt. # 603).) Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC's ("Defendants" or "Monsanto") filed a response (Defs.' Resp. (dkt. # 688)), and the City filed a reply (Pl.'s Reply (dkt. # 697)). The Court heard oral argument from the parties on August 21, 2023. (Dkt. # 773.) Having considered the parties' submissions, oral argument, the balance of the record, and the governing law, the City's Motion (dkt. # 603) is GRANTED in part and DENIED in part, as further explained below.

## II.   BACKGROUND

This case arises out of Defendants' manufacture and sale of polychlorinated biphenyls ("PCBs"). Through this lawsuit, the City seeks to hold Defendants liable for PCBs that have escaped from their use in industrial and commercial applications into the Lower Duwamish Waterway ("LDW") and the City's stormwater and drainage systems. (*See* Second Am. Compl. (dkt. # 267) at ¶¶ 5-15.) The City's sole remaining cause of action alleges Defendants intentionally manufactured, distributed, marketed, and promoted PCBs in a manner that created a public nuisance harmful to the health and free use of the LDW and the City's stormwater and drainage systems. (*Id.* at ¶¶ 91-108.) Defendant Pharmacia LLC (a/k/a "Old Monsanto") was the sole producer of PCBs in the United States from the 1930s until they were banned by Congress in 1977. (*Id.* at ¶ 38.)

The City's complaint alleges Old Monsanto knew its PCBs would get into the environment and waterbodies, such as the LDW, through their ordinary use, and that Old Monsanto's knowledge was based in part on its sales of PCBs to businesses near the LDW and its own use of PCBs at its vanillin plant that operated adjacent to the LDW. (Second Am. Compl. at ¶¶ 61-79.) The City alleges it has incurred past costs, and will incur future costs, for investigation and remediation of the LDW, its source control efforts in the LDW, and for the design and construction of a stormwater treatment plant to reduce PCBs from one drainage basin adjacent to the LDW. (*Id.* at ¶¶ 8, 10, 15, 104-05.)

Relevant to the instant motion, the Washington State Department of Health ("DOH") in 2005 determined it was unsafe for people to eat LDW resident seafood (fish or shellfish that reside in the LDW) due to PCB contamination. (Woerner Decl., Ex. A (dkt. # 623-1) at 9.) In its 2014 Record of Decision on the LDW, the U.S. Environmental Protection Agency ("EPA") also

identified resident seafood in the LDW as a risk to human health (*See id.*, Exs. B (dkt. # 623-2) at 29, 53, C (dkt. # 623-3) at 2.) The EPA found the remedial actions described in its Record of Decision would be necessary to reduce human health risk from consumption of LDW resident seafood. (*See id.*, Ex. B at 134-35.)

Based on the City's allegations, Dr. Desvousges was retained by Defendants to evaluate the City's claim that PCBs in the LDW have impacted its use and enjoyment and to rebut the City's expert Dr. Mark Buckley. (Mensher Decl., Exs. B (dkt. # 604-2) at 1, D (dkt. # 604-4) at 2.) Dr. Desvousges is an environmental economist, with a Ph.D. in Economics from Florida State University, who has conducted economic valuation research on environmental matters for over 40 years. (*Id.*, Ex. B at 1.) Dr. Desvousges has conducted over 35 natural resources damages assessments since 1987 on hazardous substance release and potential human use losses at sites across the United States. (*Id.*) He has previously served as an expert on property diminution studies involving environmental concerns, including on studies with regard to PCBs. (*Id.*)

Dr. Desvousges offers three opinions opining that the City's claim for public nuisance damages for impacts to the LDW has no economic basis. (*See* Mensher Decl., Ex. B at 3-4, 34.) Specifically, Dr. Desvousges opines that:

Opinion 1: The City has designated the [LDW] as an industrial sanctuary that yields substantial economic value to the [City] and its residents.

Opinion 2: The recreational use of the [LDW] has been and continues to be limited by its designation and development for industrial use, not the presence of PCBs.

Opinion 3: Compensation for the lost use of natural resources is being addressed through the natural resource damage assessment for the [LDW].

(*Id.*)

Dr. Desvousges' opinions note the EPA's Record of Decision recommended seafood consumption advisories be provided for the LDW to protect human health. (Mensher Decl. Ex. D

at 2.) As part of these recommendations, a fish consumption survey was conducted, and the Lower Duwamish Waterway Group published a study of the results (the "Fisher Study"). (*Id.*; *see also* Goutman Decl., Ex. K (dkt. # 689-11).) The Fisher Study "was conducted to gather information from people who either harvest or consume resident seafood . . . to inform the development and improve the effectiveness and appropriateness of [institutional controls] related to the consumption of LDW resident seafood . . . ." (Goutman Decl., Ex. K at 1-2.) The Fisher Study further provides it:

> [W]as not designed to quantify the overall number of fishers using the LDW nor the number of fishers targeting resident versus non-resident fish. The study was dependent on self-reported fishing patterns (i.e., the surveyor did not note or count fish and shellfish in fisher catch bucket) on specific days and at specific locations and times-of-day throughout a 1-year period.

(*Id.* at ES-2 n.1.)

Relevant to the City's challenges, the Fisher Study found 21%—69 out of 325 respondents—reported fishing for resident species. (*See* Goutman Decl., Ex. K at 51.) Twenty respondents reported fishing exclusively for resident fish, while another 49 reported catching both salmon and one or more resident species. (*Id.*) These percentages were "based on self-reported information (i.e., a survey rather than direct observation)", and as such, the Fisher Study notes "there is some uncertainty in quantifying fishing for salmon vs. non-salmon." (*Id.* at 51 n.21.)

Per his second opinion, Dr. Desvousges opines that though the industrial nature of the LDW limits access and the appeal of recreation, recreational opportunities exist for anglers and the public. (Mensher Decl., Ex. B at 3-4, 19-27.) Dr. Desvousges relies on the Fisher Study to opine LDW anglers primarily fish for salmon, that LDW anglers do not typically fish for other LDW resident seafood, and that LDW anglers primarily fish for recreation and social interaction.

1    (*Id.* at 19-20.) Dr. Desvousges notes the Fisher Study's "results . . . show that 90% of anglers

2    were targeting salmon and only 6% of anglers reported fishing for resident species." (*Id.* at 19.)

3    Dr. Desvousges also opines that though the industrial nature of the LDW inhibits its use for

4    fishing, PCBs do not fully prevent recreational fishing. (*Id.* at 19, 21.)

5          In addition, Dr. Desvousges' second opinion notes several preferred fishing sites, such as

6    Lake Washington, are located near the LDW and provide alternative fishing sites within a short

7    distance to the LDW. (Mensher Decl., Ex. B at 23.) Dr. Desvousges provides that PCBs do not

8    stop the public from recreationally boating in the LDW given the presence of four marinas, a

9    boat ramp, and a rowing club facility. (*Id.* at 23-25.) Dr. Desvousges also indicates there are

10   several small pocket parks and trails along the LDW allowing for recreational opportunities and

11   access to the LDW. (*Id.* at 26.) Given these points, Dr. Desvousges ultimately opines in his

12   second opinion that the industrial nature of the LDW and lack of public access are its primary

13   limiting factors to its use for recreation, and not the presence of PCBs. (*Id.* at 26-27.)

14         In his third opinion, Dr. Desvousges sets out a summary of the natural resource damage

15   assessment and restoration activities carried out in the LDW under the Comprehensive

16   Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*

17   ("CERCLA"). (Mensher Decl., Ex. B at 27.) Dr. Desvousges opines any loss in natural resource

18   services that have occurred on the LDW are being addressed through such assessment and

19   restoration activities. (*Id.* at 34.) Dr. Desvousges therefore concludes in his third opinion that

20   "[t]he City's claims for nuisance damages equates to double counting." (*Id.*)

21         Per his challenged rebuttal opinion, Dr. Desvousges rebuts Dr. Buckley's opinions

22   estimating the cost of expanding a community outreach program that provides culturally

23   appropriate information about safely eating fish from the LDW. (Mensher Decl. Ex. D at 2.) Dr.

1  Buckley opined the current public outreach program on fish consumption in the LDW is

2  insufficient and will need to be expanded by $19 million. (Brunton Decl., Ex. E (dkt. # 627-5) at

3  25.) Dr. Desvousges opines Dr. Buckley's opinion is flawed because Dr. Buckley

4  mischaracterized the results of the "Fisher Study" to arrive at his cost estimates. (Mensher Decl.,

5  Ex. D at 2.)

6      Dr. Desvousges notes the Fisher Study "was not intended to generate quantitative fish

7  consumption rates, quantify the total number of people consuming resident fish and shellfish

8  from the LDW, or to further risk communication/outreach measures beyond those already in

9  place" despite Dr. Buckley's use of it. (Mensher Decl., Ex. D at 2.) Dr. Desvousges additionally

10 opines there is no evidence that existing programs developed and being implemented as a result

11 of the Institutional Control Implementation and Assurance Plan ("ICIAP") are insufficient or

12 require expansion to meet the needs of the Record of Decision's recommended public health

13 outreach program. (*Id.* at 2, 6.)

14                      **III.    DISCUSSION**

15     **A.    Legal Standards**

16     Federal Rule of Evidence 702 provides in relevant part:

17     A witness who is qualified as an expert by knowledge, skill, experience, training,
       or education may testify in the form of an opinion or otherwise if: (a) the expert's
18     scientific, technical, or other specialized knowledge will help the trier of fact to
       understand the evidence or to determine a fact in issue; (b) the testimony is based
19     on sufficient facts or data; (c) the testimony is the product of reliable principles and
       methods; and (d) the expert has reliably applied the principles and methods to the
20     facts of the case.

21 Fed. R. Evid. 702. For expert testimony to be admissible under Rule 702, it must satisfy three

22 requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3)

23 the testimony must be relevant. *See Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509

U.S. 579, 589-91 (1993). The proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Id.* at 592 n.10; *see also Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Before admitting expert testimony into evidence, the Court acts as a "gatekeeper" in determining its admissibility under Rule 702 by ensuring the testimony is both "relevant" and "reliable." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert I*, 509 U.S. at 597). Expert testimony is relevant where "the evidence logically advance[s] a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotations and citation omitted), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc). Testimony is reliable where it has "a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The Supreme Court has noted the reliability inquiry is a "flexible one," and while the Supreme Court has suggested several factors helpful in determining reliability, trial courts are generally given "broad latitude in determining the appropriate form of the inquiry."[1] *United States v. Wells*, 879 F.3d 900, 934 (9th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 150); *see also Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (finding Rule 702 should be applied with a "liberal thrust" favoring admission) (quoting *Daubert I*, 509 U.S. at 588); *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) (Rule 702 is "construed liberally" in considering admissibility of testimony based on specialized knowledge).

---

[1] In relevant part, *Daubert I* suggested several reliability factors a trial court may examine to determine the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; (4) the existence and maintenance of standards and controls; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert I*, 509 U.S. at 592-94; *see also Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).

1    Furthermore, the reliability inquiry favors admission of testimony as "[s]haky but

2    admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

3    the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing

4    *Daubert I*, 509 U.S. at 596). The reliability inquiry test does not seek to measure "the correctness

5    of the expert's conclusions but the soundness of [his or her] methodology," and therefore, when

6    an expert meets the standards established by Rule 702, "the expert may testify[,] and the fact

7    finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas.*

8    *Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano*, 598 F.3d at 564-65).

9    **B.    Dr. Desvouges**

10   The City seeks exclusion of all of Dr. Desvouges' opinions provided in his expert report

11   and his first opinion submitted in his rebuttal report. (Pl.'s Mot. at 1.) The Court will examine

12   each of the City's contentions in turn:

13   *i.    First Opinion*

14   1.    <u>Relevance</u>

15   The City argues Dr. Desvouges' first opinion is irrelevant because the City does not seek

16   damages for harm to its industrial sector from PCBs. (Pl.'s Mot. at 5.) Defendants respond Dr.

17   Desvouges' first opinion is relevant to whether there is a connection between Old Monsanto's

18   alleged actions and any alleged injury or damages the City sustained due to the LDW's

19   condition. (Defs.' Resp. at 2-3.)

20   As noted above, expert testimony is relevant if it "logically advance[s] a material aspect

21   of the party's case." *Estate of Barabin*, 740 F.3d at 463; *see also Daubert v. Merrell Dow*

22   *Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). Expert testimony is not

23   excluded for relevancy where "it speaks clearly and directly to an issue in dispute in the case,

and . . . it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17. For a public nuisance claim, the City must establish conduct constituting a nuisance. *See Miotke v. City of Spokane*, 101 Wn.2d 307, 309, 331 (Wash. 1984), *abrogated on other grounds by Blue Sky Advocs. v. State*, 107 Wn.2d 112 (Wash. 1986). As such, the City bears the burden of proving the unreasonableness of Monsanto's conduct. *See Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 923 (Wash. 2013) (citations omitted) (noting reasonableness of a defendant's conduct in a nuisance action is determined by "weighing the harm to the aggrieved party against the social utility of the activity"); *see also* Wash. Civil Pattern Jury Instruction 380.03.

Here, Dr. Desvousges' opinion is relevant to the City's public nuisance claim and its alleged damages. Dr. Desvousges' first opinion addresses the industrialization of the LDW to explain its economic significance to the City and whether this sector of the City's economy is impacted by PCBs in the LDW. (*See* Mensher Decl., Ex. B at 11-12, 19.) He opines the City's primary use of the LDW as an "industrial sanctuary" provides the City substantial economic value. (*Id.*) The alleged use of the LDW as an "industrial sanctuary" by the City is relevant to whether there is a connection between Old Monsanto's alleged conduct and the City's alleged economic damages given the City's own contributions to the development of manufacturing and industry near the LDW and its present condition. (*See e.g.*, Second Am. Compl. at ¶ 97 ("Monsanto's conduct and the presence of PCBs interferes with and obstructs the public's free use and comfortable enjoyment of the Duwamish River for *commerce*, navigation, fishing, recreation, and aesthetic enjoyment." (emphasis added)).) Dr. Desvousges' first opinion is at least relevant to Defendants' affirmative defenses regarding causation, comparative fault, and allocation of liability/apportionment of damages. (*See* Answer (dkt. # 270) at 28-49; *see also* Order (dkt. # 581) at 5.)

2.   <u>Foundation</u>

The City next argues Dr. Desvousges' first opinion lacks foundation because none of the factual sources underpinning his opinion demonstrate the City has designated the LDW an "industrial sanctuary." (Pl.'s Mot. at 6-7.) The City notes the documents Dr. Desvousges cites to merely refer to efforts by the City to protect the maritime and manufacturing businesses operating on the LDW from being displaced by commercial and residential development. (*Id.* at 6.) Defendants counter Dr. Desvousges' first opinion remains supported based on his cited materials, which support his opinion based on the City's development intent and land use strategies. (Defs.' Resp. at 3-5 (citing Goutman Decl., Exs. D (dkt. # 689-4) at 3-4, F (dkt. # 689-6) at 15, G (dkt. # 689-7) at 315, H (dkt. # 689-8) at 9).)

On this issue, Dr. Desvousges provides adequate factual support for his first opinion that the City has promoted the growth of industrial jobs and business on the LDW. *See United States v. W.R. Grace*, 455 F. Supp. 2d 1148, 1152 (D. Mont. 2006) (noting requirement expert testimony be based on "sufficient facts or data" only requires the Court to engage in "an analysis of the sufficiency of underlying facts or data that is quantitative rather than qualitative."). Specifically, Dr. Desvousges' cited materials include: (1) a 2013 Duwamish M/IC [Manufacturing/Industrial Center] Policy and Land Use Study draft recommendations (Goutman Decl., Ex. D at 3-4); (2) a 2012 Report to the Port of Seattle on a SODO Arena Proposal (*id.*, Ex. F at 15); (3) the City's 2020 Comprehensive Plan (*id.*, Ex. G at 315); and (4) the City's 2021 Industrial and Maritime Strategy Council's Recommendations (*id.*, Ex. H at 9). The term "industrial sanctuary" is pulled verbatim from the 2013 land use study, which was prepared by the City's Department of Planning and Development. (*See id.*, Ex. D at 3 (noting City's commitment to "protect maritime and industrial uses and reinforce the role of the M/IC as an

industrial sanctuary"), 4 ("This study evaluates policies, land uses, and zoning mechanisms . . .

to protect maritime and industrial uses and reinforce the role of the Duwamish

Manufacturing/Industrial Center as a manufacturing and industrial sanctuary."), 40-41.)

Moreover, Dr. Desvousges' use of "industrial sanctuary" in his first opinion appears to be merely

descriptive of the City's development and zoning plans for the LDW given his consideration of

the City's land use and development plans.

To the extent the City finds Dr. Desvousges' use of "industrial sanctuary" prejudicial, the

City is free to challenge such use through a motion in limine. *See Mooney v. Roller Bearing Co.*

*of Am., Inc.*, 601 F. Supp. 3d 881, 884 (W.D. Wash. 2022) ("Parties may file motions in limine

before or during trial 'to exclude anticipated prejudicial evidence before the evidence is actually

offered.'" (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984))).

In addition, the City contends Dr. Desvousges' first opinion lacks foundation because he

disregarded economic evidence of how PCBs impact commercial uses of the LDW. (Pl.'s Mot. at

7.) The City argues Dr. Desvousges fails to consider impacts related to environmental and safety

hazards on residents and workers. (*Id.* (citing Mensher Decl., Ex. C (dkt. # 604-3) at 6-7).)

Defendants argue Dr. Desvousges' first opinion is founded on substantial evidence of economic

growth in the Duwamish Manufacturing Industrial Center. (Defs.' Resp. at 5-6 (citing Goutman

Decl., Exs. D at 7, H at 5, I (dkt. # 689-9) at 18, J (dkt. # 689-10) at 29).)

Dr. Desvousges' alleged failure to consider how PCBs may have impacted commercial

uses of the LDW, due to environmental and safety hazards to residents and workers, is not a

basis to exclude his first opinion. Countervailing considerations concerning the materials relied

on for an opinion are not a basis for exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750

F.3d 1036, 1053 (9th Cir. 2014) ("Facts casting doubt on the credibility of an expert witness and

1    contested facts regarding the strength of a particular scientific method are questions reserved for

2    the fact finder."). Moreover, Dr. Desvousges' first opinion that there is a lack of evidence the

3    City has been economically impacted by PCBs in the LDW is sufficiently founded based on his

4    cited evidence of economic growth for the LDW's M/IC. (*See* Goutman Decl., Exs. D at 7, H at

5    5, I at 18, J at 29.) The City is free to address any contesting economic evidence with Dr.

6    Desvousges during his cross-examination.

7         Based on the above considerations, the Court declines to exclude Dr. Desvousges' first

8    opinion.

9              *ii.    Second Opinion*

10                  1.    LDW Resident Seafood

11         The City next contends Dr. Desvousges' second opinion is unreliable, and not based on

12    sufficient facts or data, because he misinterpreted the Fisher Study by concluding it found only

13    6% of LDW anglers fished for LDW resident species. (Pl.'s Mot. at 7-8 (comparing Mensher

14    Decl., Ex. B at 19 *with* Goutman Decl., Ex, K at 51).) The City argues Dr. Desvousges also

15    failed to account for obvious alternative explanations why LDW anglers would target salmon

16    rather than LDW resident seafood given DOH's advisories to the public not to consume LDW

17    resident seafood. (*Id.* at 8.)

18         Defendants respond Dr. Desvousges' second opinion remains admissible because he

19    correctly interpreted the Fisher Study's results demonstrated 6% of LDW anglers were

20    "targeting" resident species exclusively. (Defs.' Resp. at 6-7.) Defendants respond there is no

21    evidence in the record LDW anglers would primarily target LDW resident seafood over salmon.

22    (*Id.* at 7-8.) To the contrary, Defendants note that LDW anglers are encouraged to eat salmon by

23    the Seattle and King County Public Health and that Fisher Survey respondents indicated they

1    fished primarily for recreational purposes, not for personal consumption. (*Id.* (citing Mensher

2    Decl., Ex. B at 21-22; Goutman Decl., Ex. K at 56).)

3           The Court agrees with the City; Dr. Desvousges misrepresented the Fisher Study for his

4    second opinion. The Fisher Study's results clearly indicate 21%—or 69 out of 325 respondents—

5    reported fishing for LDW resident species. (*See* Goutman Decl., Ex. K at 51.) Though 20

6    respondents reported fishing exclusively for LDW resident fish, Dr. Desvousges omitted an

7    additional 49 reported catching both salmon and one or more resident LDW species. (*See id.*)

8    Though Dr. Desvousges' report used the word "targeting" in his opinion (Mensher Decl., Ex. B

9    at 19), the Fisher Study did not make this distinction in its survey (*see* Goutman Decl., Ex. K at

10   51). Dr. Desvousges was also unable to testify as to the basis of his 6% calculation. (*See*

11   Mensher Decl., Ex. A (Desvousges Dep. (dkt. # 604-1) at 109:7-12).)

12          Moreover, Dr. Desvousges used the Fisher Study in a quantitative fashion to opine the

13   number of LDW anglers who targeted salmon over LDW resident species. (*See* Mensher Decl.,

14   Ex. B at 19.) The Fisher Study explicitly disclaimed that its findings be used in this manner. (*See*

15   Goutman Decl., Ex. K at 2 n.1 ("The fisher study was not designed to quantify the overall

16   number of fishers using the LDW nor the number of fishers targeting resident versus

17   non-resident fish.").) Dr. Desvousges also failed to account for or mention the potential impacts

18   of DOH's fishing advisories not to consume LDW resident seafood on the habits of LDW

19   anglers (*see* Mensher Decl., Ex. B at 19), who would otherwise appear to have heeded such

20   advisories. *See Whisnant v. United States*, 2006 WL 2861112, at *2 (W.D. Wash. Oct. 5, 2006)

21   ("[C]ourts have also found the following factors relevant in assessing the reliability of expert

22   testimony . . . whether the expert has adequately accounted for obvious alternative

23   explanations.").

1          2.      LDW Recreational Use

2          The City argues the remainder of Dr. Desvousges' second opinion suffers from faulty

3    methodology because he did not conduct his own study of LDW angler preferences, lacks

4    foundation for his assertion that PCBs do not interfere with the LDW's recreational use, and that

5    his opinion that Lake Washington serves as a preferred alternative fishing sites is irrelevant and

6    unreliable. (Pl.'s Mot. at 9-10.) Defendants counter Dr. Desvousges properly relied on existing

7    LDW survey results for his opinion, that it was not necessary for him to conduct his own data

8    collection, and that his second opinion is otherwise supported. (Defs.' Resp. at 8-9.) Defendants

9    argue Dr. Desvousges' opinions relating to the availability of alternative fishing sites remain

10   relevant to the City's alleged damages. (*Id.* at 9.)

11         On these issues, the Court finds the remainder of Dr. Desvousges' second opinion

12   sufficiently reliable regarding the LDW's recreational use. Though Dr. Desvousges' employment

13   of the Fisher Study was unreliable for his quantitative assessment that LDW anglers primarily

14   target salmon, Dr. Desvousges need not conduct his own primary data collection for the

15   remainder of his analysis citing the Fisher Study qualitatively for LDW angler behavior. (*See*

16   *e.g.*, Mensher Decl., Ex. B at 19 ("Respondents to the Fisher[] Study reported the primary

17   reasons for fishing are fun, recreation and social interaction.").) "An expert is permitted wide

18   latitude to offer opinions, including those that are not based on firsthand knowledge or

19   observation." *See Daubert I*, 509 U.S. at 592. Dr. Desvousges' reliance on existing site-specific

20   survey results therefore does not make his second opinion defective.

21         Dr. Desvousges' cited materials also provide adequate factual support for his second

22   opinion that the LDW's recreational use is limited by industrialization, and not PCBs. *See W.R.*

23   *Grace*, 455 F. Supp. 2d at 1152. This includes evidence that the City's Public Utilities Strategic

ORDER - 14

Advisor managing the LDW sediment program acknowledged PCBs do not prevent recreational fishing and that the City and Port of Seattle are initiating the development of more recreational access to the LDW despite the presence of PCBs. (*See* Mensher Decl., Exs. B at 21, 26-27 (citing Goutman Decl., Ex. L (dkt. # 689-12), E (Schuchardt Dep. (dkt. # 604-5) at 245:21-246:14)).)

Last, the availability of alternative fishing sites near the LDW remains relevant to assess the degree to which the presence of PCBs in the LDW have economically harmed the City. *See Daubert II*, 43 F.3d at 1321 n.17. As noted above, any contested facts or countervailing considerations as to whether Dr. Desvousges' selection of Lake Washington was appropriate as an alternate fishing site near the LDW in his second opinion, based on its location and/or the availability of different fish and shellfish species, is not a proper basis for exclusion of this testimony. *See City of Pomona*, 750 F.3d at 1053.

In sum, the portions of Dr. Desvousges' second opinion quantitatively relying on the Fisher Study to indicate LDW anglers primarily target salmon, and not LDW resident seafood species, are excluded. The remainder of the City's challenges to Dr. Desvousges' second opinion are denied.

    *iii.*   *Third Opinion*

The City argues Dr. Desvousges' third opinion is irrelevant and consists of improper legal conclusions. (Pl.'s Mot. at 10-11.) The City argues his third opinion serves as a misleading conclusion of law because it would allow jurors to believe the City's damages have been addressed through the CERCLA process and otherwise is irrelevant to the City's claim for damages in this case. (*Id.*)

Defendants respond Dr. Desvousges' third opinion is admissible because it is relevant to the City's alleged damages for PCB contamination in the LDW. (Defs.' Resp. at 9-10.)

Defendants argue Dr. Desvousges may also provide explanations of abatement activities undertaken in the LDW that concern the alleged nuisance in this case. (*Id.* at 10.)

On this opinion, Dr. Desvousges ultimately provides an improper legal conclusion. "It is well established that experts may not give opinions as to legal conclusions." *Cypress Ins. Co. v. SK Hynix Am., Inc.*, 2019 WL 634684, at *2 (W.D. Wash. Feb. 14, 2019) (citing *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.")). Here, Dr. Desvousges is not permitted to opine the CERCLA process has provided the City with compensation that would amount to "double counting" of the City's requested relief. (*See* Mensher Decl., Ex. B at 27, 34.) As argued by the City, CERCLA contains an express savings provision prohibiting such conclusion. *See* 42 U.S.C. § 9652 ("Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants."); *see also Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000) ("CERCLA does not provide compensation to a private party for damages resulting from contamination."). The allocation process under CERCLA instead allows responsible parties to apportion costs of resolving their liability to the United States. *See* 42 U.S.C. § 9607(a). The "double recovery" issue under CERCLA is also pending before the Honorable Richard A. Jones as an issue of law in Defendants' pending motion for summary judgment.[2] (*See* dkt. # 326 at 39-40, 104-13; dkt. # 442 at 101-111.)

Consequently, Dr. Desvousges' third opinion centered on the City's alleged "double" recovery of natural resource damages under CERCLA consists of improper legal conclusions, and therefore, is excluded.

---

[2] A jury instruction may otherwise also be appropriate here in its consideration of damages based on Judge Jones' eventual ruling on this issue.

1            *iv.*    *Rebuttal Opinion*

2            Finally, the City argues Dr. Desvousges' rebuttal report with respect to the Fisher Study

3    is unreliable because it is based on a misstatement of its results. (Pl.'s Mot. at 11-12.) The City

4    notes Dr. Desvousges incorrectly concluded the Fisher Study found only 6% of anglers fished for

5    LDW resident seafood, that his rebuttal opinion runs counter to his first opinion, and that he

6    improperly relied on the Fisher Study quantitatively. (*Id.*) The City additionally argues Dr.

7    Desvousges' rebuttal opinions improperly rely on Dr. David Sunding's fish consumption

8    estimates, which the City has filed a motion challenging as flawed based on Dr. Sunding's

9    unreliable methods and erroneous calculations. (*Id.* at 12 (citing dkt. ## 615, 617).)

10           Defendants failed to rebut the City's raised issues with respect to the Fisher Study, but

11   instead argue the City merely disagrees with Dr. Desvousges' reliance on Dr. Sunding's fish

12   estimate consumptions for his rebuttal opinions. (*See* Defs.' Resp. at 10-11.) Defendants refer

13   this Court to its responses to the City's motion concerning Dr. Sunding and contend Dr.

14   Sunding's fish consumption estimates were calculated with a reliable methodology. (*Id.* at 11.)

15           Again, the Court agrees that Dr. Desvousges misrepresented the Fisher Study's results.

16   As considered above, Dr. Desvousges' reliance on the Fisher Study in his rebuttal opinion

17   similarly lacks a reliable basis to support his opinion that Dr. Buckley mischaracterized the

18   results of the Fisher Study by relying on it quantitatively, and not qualitatively. (*See* Mensher

19   Decl., Ex. D at 2.) Curiously, Dr. Desvousges also relied on the Fisher Study quantitively for his

20   opinion that LDW anglers primarily target salmon—and as noted above—misrepresented the

21   survey's results. (*Compare id.*, Ex. B at 19 ("The results of the survey show that 90% of anglers

22   were targeting salmon and only 6% of anglers reported fishing for resident species.") *with*

23   Goutman Decl., Ex. K at 51 ("78%, or 255 out of 325 first-time survey respondents[] surveyed

1   were fishing for only salmon.").) Dr. Desvousges' first rebuttal opinion that Dr. Buckley

2   mischaracterized the results of the Fisher Study is therefore excluded.[3]

### IV.   CONCLUSION

4        For the foregoing reasons, the City's Motion (dkt. # 603) is GRANTED in part and

5   DENIED in part. Dr. Desvousges' second opinion's quantitative references to the Fisher Study,

6   and first rebuttal opinion relying on the Fisher Study, are excluded. Dr. Desvousges' third

7   opinion that compensation for the City's lost use of natural resources is being addressed through

8   CERCLA is also excluded. The remainder of the City's challenges to Dr. Desvousges' expert

9   testimony are denied.

10       The Clerk is directed to send copies of this Order to the parties and to Judge Jones.

11       Dated this 28th day of August, 2023.

MICHELLE L. PETERSON
United States Magistrate Judge

---

[3] The Court declines to consider at this time whether the remainder of Dr. Desvousges' rebuttal opinions improperly relied on Dr. Sunding's fish consumption estimates to rebut Dr. Buckley. Any deficiencies related to Dr. Sunding's fish consumption estimates will be addressed in a future Order on the City's pending motions concerning Dr. Sunding. (*See* dkt. ## 615, 617.)

ORDER - 18